**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| THE BOARD OF LUCAS COUNTY, COMMISSIONERS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:24-cv-00779 |
| U.S. ENVIRONMENTAL, PROTECTION AGENCY, et al., | ) ) ) | |
| Defendants. | ) ) | |

## ANSWER

Pursuant to Federal Rule of Civil Procedure 8, Defendants United States Environmental Protection Agency, Michael Regan in his official capacity as Administrator of the United States Environmental Protection Agency, and Debra Shore in her official capacity as Regional Administrator of the United States Environmental Protection Agency, Region 5 (collectively, "Defendant") answer the Complaint of Plaintiff Board of Lucas County Commissioners, City of Toledo, and Environmental Law and Policy Center (collectively, "Plaintiffs") as follows:

### Introduction

1.     Plaintiffs The Board of Lucas County Commissioners, City of Toledo, and Environmental Law & Policy Center ("ELPC") bring this case to remedy Defendant United States Environmental Protection Agency's ("EPA") failure to comply with its obligations under Clean Water Act, 33 U.S.C. § 1251 *et seq.* to prevent harmful algal blooms ("HABs") in western Lake Erie.

ANSWER:  The allegations in Paragraph 1 characterize the Complaint, which speaks for itself and is the best evidence of its contents.

2.       Every year, HABs cover large portions of western Lake Erie in thick, foul-smelling scum. HABs are accumulations of cyanobacteria that can release dangerous neurotoxins and liver toxins.

ANSWER: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 1, which are vague and ambiguous. Defendant admits the allegations in the second sentence of Paragraph 2.

3.       HABs cause serious ecological, economic, and public health problems. They impair outdoor recreation, degrade fisheries, devalue property, and threaten access to safe clean drinking water. That threat materialized during the Toledo water crisis of 2014, when algal toxins got into a drinking water intake, cutting off water access to nearly 500,000 people.

ANSWER: As to the allegations in the first and second sentences of Paragraph 3, Defendant admits that harmful algal blooms ("HABs") can cause serious ecological, economic, and public health problems and that they can impair outdoor recreation, degrade fisheries, devalue property, and threaten access to safe clean drinking water. As to the allegations in the third sentence of Paragraph 3, Defendant admits that algal toxins infiltrated a drinking water intake in Toledo in 2014 and that approximately 500,000 people lost access to drinking water. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3.

4.       Lake Erie's HABs are caused by excess phosphorus. One form of phosphorus, known as dissolved reactive phosphorus (DRP), is the main driver of Lake Erie's HABs.

ANSWER: As to the allegations in the first sentence of Paragraph 4, Defendant admits that excess phosphorus is a cause of HABs in the Western Lake Erie Basin. As to the allegations in the second sentence of Paragraph 4, Defendant admits that dissolved reactive phosphorus ("DRP") is a form of phosphorus and that DRP, among other things,

2

contributes to the formation of HABs in the Western Lake Erie Basin. Defendant denies the remaining allegations in Paragraph 4.

5.     The source of the phosphorus pollution causing Lake Erie's HABs is undisputed: manure and other livestock waste and synthetic fertilizer from upstream agriculture that either runs off field edges or is discharged through subsurface drainage systems. According to the Ohio Environmental Protection Agency (Ohio EPA), 92% of the phosphorus load into the Maumee River comes from agriculture.

ANSWER:  As to the first sentence of Paragraph 5, Defendant admits that manure and other livestock waste and synthetic fertilizer from upstream agriculture that either runs off field edges or is discharged through subsurface drainage systems is one source of the phosphorus pollution causing HABs in the Western Lake Erie Basin. Defendant denies the remaining allegations in the first sentence of Paragraph 5. Defendant denies the allegations in the second sentence of Paragraph 5.

6.     In 2015, the State of Ohio committed to reduce phosphorus loads, including DRP, into Lake Erie by 40% from 2008 levels pursuant to Annex 4 of the Great Lakes Water Quality Agreement. U.S. EPA, the State of Michigan, and the Province of Ontario all made the same commitment. The target date for these reductions is 2025.

ANSWER:     The allegations in the first sentence of Paragraph 6 characterize Annex 4 of the Protocol Amending the Agreement Between Canada and the United States of America on Great Lakes Water Quality, 1978, as Amended on October 16, 1983, and on November 18, 1987 ("Annex 4") and the *Western Basin of Lake Erie Collaborative Agreement* (June 2015) ("WLEB Collaborative Agreement"), which speak for themselves and are the best evidence of their contents. The allegations in the second and third sentences characterize the WLEB Collaborative Agreement and the *United States Action Plan for Lake Erie* (Feb. 2018) ("U.S.

3

Action Plan"), which speak for themselves and are the best evidence of their contents.

7.      It is now 2024 and water sampling data shows no evidence of any consistent reductions in Ohio's phosphorus loads from 2008 levels.

ANSWER:  Defendant denies the allegations in Paragraph 7.

8.      HABs render western Lake Erie "impaired" under the federal Clean Water Act. The Act obligates Defendant U.S. EPA to take a series of steps to remediate the impairment.

ANSWER:  As to the allegations in the first sentence of Paragraph 8, Defendant admits that it has approved the following impairment listings in the Western Lake Erie Basin for Ohio under the Clean Water Act, 33 U.S.C. § 1251 *et. al*.: (1) the Lake Erie Western Basin Shoreline assessment unit has impaired recreational uses due to excessive algae, impaired public drinking water uses due to excessive algae, and impaired aquatic life uses due to excessive nutrients; (2) The Lake Erie Western Basin Open Water assessment unit has impaired recreational uses due to excessive algae and impaired public drinking water uses due to excessive algae; and (3) The Lake Erie Islands Shoreline assessment unit has impaired recreational uses due to excessive algae, impaired public drinking water uses due to excessive algae, and impaired aquatic life uses due to excessive nutrients. The remaining allegations in the first sentence of Paragraph 8 contain legal conclusions to which no response is required. The allegations in the second sentence of Paragraph 8 characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

9.      The agency has repeatedly failed to take those steps. As a result, Plaintiffs filed three cases in this Court against U.S. EPA between 2017 and 2019. Each case succeeded in requiring the agency to take the applicable step in the statutory process. But when the cases were over, U.S. EPA—and Ohio EPA—failed to complete the required next step.

4

ANSWER: The allegations in the first, third, and fourth sentences of Paragraph 9 are legal conclusions to which no response is required. To the extent that the first, third, and fourth sentences of Paragraph 9 are deemed to contain any factual allegations, Defendant denies them. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 9.

10. This case challenges U.S. EPA's violation of the central statutory requirement for remediating impaired waters like Lake Erie: establishing a Total Maximum Daily Load (TMDL) that complies with section 303(d) of the Clean Water Act (33 U.S.C. § 1313(d)) and applicable regulations.

ANSWER: The allegations in Paragraph 10 characterize the Complaint, which speaks for itself and is the best evidence of its contents.

11. A TMDL is often known as a pollution "cap" or "diet."

ANSWER: To the extent the allegations in Paragraph 11 purport to define a TMDL, the Code of Federal Regulations speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 11 suggests that TMDLs have been referred to as pollution diet or cap colloquially, Defendant admits having knowledge of such references but denies the allegations to the extent they allege an alternative definition of a TMDL from the legal one.

12. The objective of a TMDL is to ensure that impairments are remediated and "water quality standards [are] achieved." See *Overview of Total Maximum Daily Loads,* U.S. EPA (last visited Apr. 29, 2024).

ANSWER: The allegations in Paragraph 12 characterize *Overview of Total Maximum Daily Loads,* U.S. EPA, which speaks for itself and is the best evidence of its contents.

13. Technically, a TMDL is the total maximum pollutant load that a water body can tolerate without being impaired under the Clean Water Act. A TMDL also apportions this total

5

load among pollution sources in the watershed, which must reduce their current loads to comply with the new limits.

ANSWER: The allegations in Paragraph 13 contain legal conclusions to which no response is required and characterize the Clean Water Act and the Code of Federal Regulations, which speak for themselves and are the best evidence of their contents.

14. The Clean Water Act charges states with preparing TMDLs, which U.S. EPA must approve or disapprove. If it disapproves a TMDL, U.S. EPA must prepare the TMDL. *See* 33 U.S.C. § 1313.

ANSWER: The allegations in Paragraph 14 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

15. In response to Plaintiffs' prior lawsuits, Ohio EPA prepared a TMDL for western Lake Erie, known as the Maumee Watershed Nutrient TMDL ("Maumee TMDL"). U.S. EPA approved the Maumee TMDL on September 28, 2023.

ANSWER: As to the allegations in first sentence of Paragraph 15, Defendant admits that Ohio prepared and submitted to EPA for approval the Maumee Watershed Nutrient TMDL ("Maumee TMDL"). As to the allegations in second sentence of Paragraph 15, Defendant admits that EPA Region 5 approved the Maumee TMDL on September 28, 2023. Defendant denies the remaining allegations in Paragraph 15.

16. As explained in detail below, the Maumee TMDL fails to comply with numerous legal requirements under the Clean Water Act and applicable regulations and will not be sufficient to remediate the HABs in western Lake Erie. Among other things, the Maumee TMDL:

(a) fails to limit DRP, which is the pollutant driving the HAB crisis, as required by 33 U.S.C. § 1313(d)(1)(C) and 40 C.F.R. § 130.7(c)(1)(ii);

(b) fails to include "a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality" as required by 33 U.S.C. § 1313(d)(1)(C);

(c) fails to apportion pollution reductions (known as "wasteload allocations") to large, industrialized livestock facilities designated as "concentrated animal feeding operations" (CAFOs) under the Clean Water Act, as required by 40 C.F.R. § 130.2(h);

(d) fails to apportion the "load allocation" among "nonpoint" sources of pollution as required by 40 C.F.R. § 130.2(g), Ohio Rev. Code 61111.562(B), and Ohio Admin. Code 3745-2-12(c); and

(e) fails to include an implementation plan that provides "reasonable assurances" that target pollution loads will be reached as required by Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f) and 3745-2-12(E)(3) and U.S. EPA Guidance. Office of Water, U.S. EPA, Guidance for the Implementation of Water Quality-Based Decisions: The TMDL Process 15 (Apr. 1991) ("U.S. EPA Guidance").

ANSWER:  The allegations in Paragraph 16 are legal conclusions to which no response is required, and characterize the Clean Water Act, the Code of Federal Regulations, the Ohio Revised Code, the Ohio Administrative Code, and U.S. EPA Guidance. Office of Water, U.S. EPA, Guidance for the Implementation of Water Quality-Based Decisions: The TMDL Process (Apr. 1991) ("U.S. EPA Guidance"), which speak for themselves and are the best evidence of their contents.

17.    Because the Maumee TMDL violates these legal requirements and will not remediate Lake Erie's HABs, U.S. EPA's approval of the TMDL was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A).

ANSWER: The allegations in Paragraph 17 are legal conclusions to which no response is required and characterize the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 et. al., which speaks for itself and is the best evidence of its contents.

18.     Plaintiffs accordingly ask the Court to set aside U.S. EPA's approval of the Maumee TMDL and order Defendants to prepare a TMDL that both complies with the Clean Water Act and will actually be sufficient to clean up Lake Erie.

ANSWER: The allegations in Paragraph 18 characterize the Complaint, which speaks for itself and is the best evidence of its contents.

**Jurisdiction and Venue**

19.     This Court has jurisdiction because Plaintiffs are aggrieved by a final agency action subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701, *et. seq.*

ANSWER: The allegations in Paragraph 19 are legal conclusions to which no response is required.

20.     U.S. EPA's approval of the TMDL was a "final agency action" subject to judicial review under 5 U.S.C. § 704 because it: (1) was the consummation of U.S. EPA's decision-making process on the TMDL under 40 C.F.R. § 130.7; and (2) determined rights and obligations of the parties or caused legal consequences.

ANSWER: The allegations in Paragraph 20 are legal conclusions to which no response is required.

21.     Plaintiffs claim that U.S. EPA's approval of the TMDL was unlawful and should be set aside under 5 U.S.C. § 706(2)(A) because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Specifically, Plaintiffs claim that approval of the TMDL was contrary to law because the TMDL violated requirements in 33 U.S.C. § 1313(d)(1)(C), 40 C.F.R. § 130.2(h), 40 C.F.R. § 130.2(g), Ohio Rev. Code 61111.562(B), Ohio

8

Admin. Code 3745-2-12(C), Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f) and 3745-2-12(E)(3), and U.S. EPA Guidance.

ANSWER:  The allegations in Paragraph 21 are legal conclusions to which no response is required.

22.     This court also has jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under laws of the United States.

ANSWER:  The allegations in Paragraph 22 are legal conclusions to which no response is required.

23.     A substantial part of the events or omissions giving rise to this case occurred on or near western Lake Erie, which is located in the Northern District of Ohio, making venue proper under 28 U.S.C. § 1391(e). Alternatively, venue is proper in this Northern District of Ohio because Plaintiffs Lucas County Board of Commissioners (Lucas County Board) and City of Toledo are local units of government in this district and Plaintiff ELPC has members who reside in this district.

ANSWER:  The allegations in Paragraph 23 contain legal conclusions to which no response is required. To the extent Paragraph 23 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23, which are vague and ambiguous.

## Parties

24.     Plaintiff Lucas County Board is a body politic that, under Ohio Revised Code Section 305.12, can sue in its own name.

ANSWER:  The allegations in Paragraph 24 contain legal conclusions to which no response is required. To the extent Paragraph 24 contains factual allegations, they describe Plaintiff Lucas County Board, and Defendant lacks knowledge or information sufficient to form a

belief as to the truth of such allegations.

25.     Plaintiff City of Toledo is a chartered municipal corporation located in Lucas County, Ohio, which operates under home-rule authority pursuant to Section 3, Article XVIII of the Ohio Constitution. The Charter of the City of Toledo, Chapter II, Section 8(b), provides the authority for the City to sue and be sued.

> ANSWER:  The allegations in Paragraph 25 contain legal conclusions to which no response is required. To the extent Paragraph 25 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

26.     Plaintiff ELPC is a Midwest-based not-for-profit public interest environmental advocacy organization dedicated to improving environmental quality and public health, including protecting the Great Lakes and other Midwest natural resources. ELPC's headquarters is in Chicago, Illinois and ELPC has additional offices in Ohio, Iowa, Wisconsin, and Washington, D.C. ELPC members live, work, and play in and near Lake Erie and the other Great Lakes. They depend on clean water from Lake Erie as a source of drinking water, and they use and enjoy Lake Erie for its aesthetic and recreational value.

> ANSWER:  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26.

27.     Defendant U.S. EPA is an agency of the United States government. Among other responsibilities, U.S. EPA is responsible for overseeing and administering the development of TMDLs under 33 U.S.C. § 1313.

> ANSWER:  Defendant admits that U.S. EPA is a federal agency of the United States of America and that U.S. EPA administers provisions of the Clean Water Act. The remaining allegations in Paragraph 27 are legal conclusions to which no response is required.

28.     Defendant Michael Regan is the Administrator of U.S. EPA and is being sued in his official capacity. The U.S. EPA Administrator is responsible for overseeing the agency, including its implementation of the Clean Water Act and its decisions to approve or disapprove state TMDLs submitted under 33 U.S.C. § 1313. Plaintiffs name Administrator Regan as a Defendant pursuant to 5 U.S.C. § 702 because they seek injunctive relief.

ANSWER:  As to the first sentence of Paragraph 28, Defendant admits that Michael Regan is the Administrator of U.S. EPA. The remaining allegations in the first sentence of Paragraph 28 characterize the Complaint, which speaks for itself and is the best evidence of its contents. The allegations in the second sentence of Paragraph 28 are legal conclusions to which no response is required. The allegations in the third sentence of Paragraph 28 characterize the Complaint, which speaks for itself and is the best evidence of its contents.

29.     Defendant Debra Shore is the Regional Administrator of U.S. EPA Region 5 (which includes Ohio, Michigan, Indiana, Illinois, Wisconsin, and Minnesota) and is being sued in her official capacity. The U.S. EPA Regional Administrator is responsible for overseeing Region 5 of the agency, including its implementation of the Clean Water Act and its decisions to approve or disapprove state TMDLs submitted under 33 U.S.C. § 1313. Plaintiffs name Regional Administrator Shore as a Defendant pursuant to 5 U.S.C. § 702 because they seek injunctive relief.

ANSWER:  As to the first sentence of Paragraph 29, Defendant admits that Debra Shore is the Regional Administrator of U.S. EPA, Region 5, and that U.S. EPA Region 5 includes Ohio, Michigan, Indiana, Illinois, Wisconsin, and Minnesota. The remaining allegations in the first sentence of Paragraph 29 characterize the Complaint, which speaks for itself and is the best evidence of its contents. The allegations in the second sentence of Paragraph 29 are legal conclusions to which no response is required. The allegations in the third sentence of Paragraph 29 characterize the Complaint, which speaks for itself and is the best evidence of

its contents.

**<u>Standing</u>**

30.    Plaintiffs have standing because: (i) they have been distinctly and palpably injured by HABs in western Lake Erie; (ii) their injuries are fairly traceable to Defendants' acts and omissions as alleged in this Complaint; and (iii) those injuries can be redressed by the relief sought in this Complaint.

ANSWER:  The allegations in Paragraph 30 are legal conclusions to which no response is required.

**Lucas County Board's Standing**

31.    Under Ohio law, the Lucas County Board is generally responsible for the health, welfare, and safety of the county's residents.

ANSWER:  The allegations in Paragraph 31 contain legal conclusions to which no response is required. To the extent Paragraph 31 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

32.    As part of that role, the Board is authorized to, and obligated to, establish policies and rules regarding water quality management within the county, either directly or through agencies in which Lucas County is a participant.

ANSWER:  The allegations in Paragraph 32 contain legal conclusions to which no response is required. To the extent Paragraph 32 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

33.    The discharge of these responsibilities requires the Board to commit significant financial, personnel, and other resources to the maintenance and monitoring of water quality.

ANSWER:  The allegations in Paragraph 33 contain legal conclusions to which no response is required. To the extent Paragraph 33 contains factual allegations, Defendant lacks

knowledge or information sufficient to form a belief as to the truth of such allegations.

34.    The presence and continuation of annual HABs in western Lake Erie causes pecuniary injury to the Lucas County Board by requiring expenditure of County resources that would have been unnecessary or at least substantially reduced if water quality standards were met in western Lake Erie and its waters were no longer impaired by HABs.

ANSWER: The allegations in Paragraph 34 contain legal conclusions to which no response is required. To the extent Paragraph 34 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

35.    This ongoing pecuniary injury is fairly traceable to U.S. EPA's unlawful approval of Ohio EPA's legally defective TMDL. As alleged below, the Maumee TMDL fails to comply with statutory requirements and will not sufficiently reduce phosphorus pollution to remediate the impairment of western Lake Erie by HABs that are injuring the Lucas County Board and its constituents.

ANSWER: The allegations in Paragraph 35 are legal conclusions to which no response is required.

36.    The Lucas County Board's injuries can be redressed by the relief sought in this case. Plaintiffs ask the Court to set aside U.S. EPA's approval of Ohio EPA's defective TMDL and order preparation of a TMDL that complies with the Clean Water Act. Because a lawful TMDL would lead to reduction of the HABs that are injuring the Lucas County Board, the requested relief would redress its injuries.

ANSWER: The allegations in the first and third sentences of Paragraph 36 are legal conclusions to which no response is required. The allegations in the second sentence of Paragraph 36 characterize the Complaint, which speaks for itself and is the best evidence of its contents.

**City of Toledo's Standing**

37.     The City of Toledo is a home-rule municipality. The City has an interest in protecting the health, welfare, and safety of its residents.

> ANSWER:  The allegations in Paragraph 37 contain legal conclusions to which no response is required. To the extent Paragraph 37 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

38.     As part of that role, the City of Toledo supplies potable drinking water to roughly 500,000 people living in the City and surrounding areas. The City of Toledo is responsible for the effective production, filtration, treatment, and quality control of the water it supplies.

> ANSWER:  The allegations in Paragraph 38 contain legal conclusions to which no response is required. To the extent Paragraph 38 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

39.     The discharge of these responsibilities requires the City of Toledo to commit significant financial, personnel, and other resources to the maintenance and monitoring of water quality.

> ANSWER:  The allegations in Paragraph 39 contain legal conclusions to which no response is required. To the extent Paragraph 39 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

40.     The City of Toledo's water is sourced in western Lake Erie and pumped to a treatment plant owned and operated by the City, known as the Collins Park Treatment Plant. The Collins Park Treatment Plant filters an average of 75 million gallons of water per day.

> ANSWER:   Defendant admits the allegations in the first sentence of Paragraph 40. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence Paragraph 40.

41.     The presence and continuation of recurring HABs in western Lake Erie causes the City of Toledo pecuniary injury by requiring expenditure of City resources that would otherwise be unnecessary or at least significantly reduced if water quality standards were met in western Lake Erie and its waters were no longer impaired by HABs.

ANSWER:  The allegations in Paragraph 41 contain legal conclusions to which no response is required. To the extent Paragraph 41 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

42.     Since 2014, the City of Toledo has incurred costs of $490.4 million to upgrade the Collins Park Treatment Plant, in part to improve its treatment of HAB toxins in water sourced from western Lake Erie. The City has also incurred substantial additional costs to upgrade other systems to address the HAB crisis.

ANSWER:  As to the allegations in the first sentence of Paragraph 42, Defendant admits that following the occurrence of a large bloom in Lake Erie in 2014 the City of Toledo, Ohio, invested over $400 million to upgrade its water utilities. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 42 and the allegations in the second sentence of Paragraph 42.

43.     The City of Toledo expects to be forced to continue to direct resources toward treating and mitigating HAB toxins in water sourced from Lake Erie.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.

44.     This ongoing pecuniary injury is fairly traceable to U.S. EPA's unlawful approval of Ohio EPA's legally defective TMDL. As alleged below, the Maumee TMDL fails to fulfill basic statutory requirements and will not remediate the impairment of western Lake Erie by HABs that are injuring the City of Toledo and its residents.

ANSWER: The allegations in Paragraph 44 are legal conclusions to which no response is required.

45. The City of Toledo's injuries can be redressed by the relief sought in this case. Plaintiffs ask the Court to set aside U.S. EPA's approval of Ohio EPA's defective TMDL and order preparation of a TMDL that complies with the Clean Water Act. Because a lawful TMDL would lead to reduction of the HABs that are injuring the City of Toledo, the requested relief would redress its injuries.

ANSWER: The allegations in the first and third sentences of Paragraph 45 are legal conclusions to which no response is required. The allegations in the second sentence of Paragraph 45 characterize the Complaint, which speaks for itself and is the best evidence of its contents.

**ELPC's Standing**

46. ELPC files this action on behalf of itself and its members. ELPC members rely on the portion of western Lake Erie under Ohio's jurisdiction for drinking water, recreation, and aesthetic enjoyment. These uses are directly impaired by HABs and other phosphorus-related pollution. Such pollution harms water quality, threatens access to safe, clean drinking water, impedes swimming, boating and other outdoor recreation, and harms fish and other aquatic life.

ANSWER: The allegations in the first sentence of Paragraph 46 characterize the Complaint, which speaks for itself and is the best evidence of its contents. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 46. As to the allegations in the third sentence of Paragraph 46, Defendant admits that portions of the Western Lake Erie Basin are listed as impaired by nutrients and algae for the uses of aquatic life, drinking water, and recreation pursuant to Section 303(d) of the Clean Water Act. Defendant lacks knowledge or information sufficient

to form a belief as to the remaining allegations in the third sentence of Paragraph 46. As to

the allegations in the fourth sentence, Defendant admits that HABs can harm water quality,

threaten access to safe, clean drinking water, impede swimming, boating and other outdoor

recreation, and harm fish and other aquatic life. Defendant lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in the fourth sentence

of Paragraph 46, which are vague and ambiguous.

47.     ELPC's injuries are directly traceable to U.S. EPA's unlawful approval of Ohio

EPA's defective TMDL. As alleged below, the Maumee TMDL fails to comply with statutory

requirements and, as a consequence, will not sufficiently reduce phosphorus pollution to remediate

the impairment of western Lake Erie by HABs that are injuring ELPC and its members.

ANSWER:  The allegations in Paragraph 47 are legal conclusions to which no response is

required.

48.     ELPC's injuries can be redressed by the relief sought in this case. Plaintiffs ask the

Court to set aside U.S. EPA's approval of Ohio EPA's defective TMDL and order preparation of a

TMDL that complies with the Clean Water Act. Because a lawful TMDL would lead to reduction of

the HABs that are injuring ELPC and its members, the requested relief would redress their

injuries.

ANSWER:   The allegations in the first and third sentences of Paragraph 48 are legal

conclusions to which no response is required. The allegations in the second sentence of Paragraph

48 characterize the Complaint, which speaks for itself and is the best evidence of its contents.

## The Clean Water Act

49.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The

statute aimed to make Americans' waters drinkable, fishable, and swimmable by 1983. 33 U.S.C.

17

§ 1251(a)(2). The Clean Water Act and its implementing regulations create a complex process under which U.S. EPA and the states share responsibility for achieving statutory objectives.

ANSWER:  The allegations in Paragraph 49 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

**NPDES Permits**

50.     The Clean Water Act prohibits anyone from "discharging pollutants" into "waters of the United States" without a National Pollution Discharge Elimination System (NPDES) permit. 33 U.S.C. § 1311(a).

ANSWER:  The allegations in Paragraph 50 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

51.     The definition of "pollutant" includes "solid waste, . . . sewage, . . . biological materials, . . . and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

ANSWER:  The allegations in Paragraph 51 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

52.     "Discharge of a pollutant" means "any addition of any pollutant to" waters of the United States "from any point source." 33 U.S.C. § 1362(12).

ANSWER:  The allegations in Paragraph 52 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

53.     "Point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure,

container, rolling stock, *concentrated animal feeding operation*, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added).

>ANSWER:  The allegations in Paragraph 53 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

54.     While the Clean Water Act gives U.S. EPA lead responsibility for the NPDES program, it allows most administrative functions to be delegated to states, subject to supervision by U.S. EPA. 33 U.S.C. § 1342. Ohio is one of 47 states that administers its NPDES program pursuant to delegation from U.S. EPA. Ohio EPA is the Ohio agency charged with that administration.

>ANSWER:  The allegations in Paragraph 54 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

**Impaired Waters**

55.     The Clean Water Act requires states to establish "water quality standards" for all waters in its jurisdiction. 33 U.S.C. § 1313(c)(2). Water quality standards consist of the designated uses of the water body (e.g., public water supply, recreation, habitat) and criteria to evaluate if the uses are supported. 33 U.S.C. § 1313(c)(2)(A). These criteria can be expressed as numerical limits on concentration of a pollutant or as narrative statements.

>ANSWER:  The allegations in Paragraph 55 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

56.     Every two years, states must develop a list of water bodies within their jurisdiction that do not meet designated uses or attain water quality standards despite implementation of the

NPDES program. These are known as "impaired" waters. States must also prepare a "priority

ranking" for impaired waters to receive TMDLs, "taking into account the severity of the pollution

and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A); *see also* 40 C.F.R. §

130.7(b)(4).

> ANSWER:  The allegations in Paragraph 56 contain legal conclusions to which no response
>
> is required and characterize the Clean Water Act and the Code of Federal Regulations which
>
> speak for themselves and are the best evidence of their contents.

57.     Every two years, states must submit their impaired waters lists, priority rankings

for waters to receive TMDLs, and supporting documentation for approval to U.S. EPA. 40 C.F.R.

§ 130.7(b)(6). These materials are combined into an "Integrated Report." U.S. EPA may approve

the Integrated Report "only if it meets the requirements of § 130.7(b)," including the requirement

for the state to "assemble and evaluate all existing and readily available water quality-related data"

to develop its impaired waters list. 40 C.F.R. § 130.7(b)(5).

> ANSWER:  The allegations in Paragraph 57 contain legal conclusions to which no response
>
> is required and characterize the Code of Federal Regulations, which speaks for itself and is
>
> the best evidence of its contents.

**TMDLs**

58.     TMDLs are the Clean Water Act's tool for reducing pollution into impaired water

bodies so that they are no longer impaired. Technically, TMDL is a number representing the

maximum amount of a pollutant that a water body can tolerate and still comply with water quality

standards and not be impaired.

> ANSWER:  The allegations in Paragraph 58 contain legal conclusions to which no response
>
> is required and characterize the Clean Water Act, which speaks for itself and is the best
>
> evidence of its contents. To the extent the allegations in Paragraph 58 purport to define a

TMDL, the Code of Federal Regulations speaks for itself and is the best evidence of its contents.

59.     As explained below, regulations require TMDLs to be accompanied by an implementation plan to reduce current pollutant loads to comply with TMDL limits. TMDLs are commonly described as a "diet" or "cap" on the pollutant being targeted.

ANSWER:  The allegations in the first sentence of Paragraph 59 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents. To the extent the allegations in the second sentence of Paragraph 59 purport to define a TMDL, the Code of Federal Regulations speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 59 suggests that TMDLs have been colloquially referred to as pollution "diet" or "cap," colloquially, Defendant admits having knowledge of such references but denies the allegations to the extent they assert or imply an alternative definition of a TMDL from the legal one.

60.     The Clean Water Act requires each TMDL to "be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(e).

ANSWER:  The allegations in Paragraph 60 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

61.     TMDLs must be established "for all pollutants preventing or expected to prevent attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii).

ANSWER:  The allegations in Paragraph 61 contain legal conclusions to which no response

is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents.

62.     TMDLs allocate the target pollution load between point sources and nonpoint sources. *See* 40 C.F.R. § 130.2.

ANSWER:  The allegations in Paragraph 62 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents.

63.     As noted earlier, a "point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, [or] concentrated animal feeding operation." 33 U.S.C. § 1362(14) "Nonpoint source" means any source of pollution that does not meet the definition of "point source" in 33 U.S.C. § 1362(14), such as overland agricultural runoff or urban stormwater runoff.

ANSWER:  The allegations in Paragraph 63 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents.

64.     A TMDL assigns pollution limits (known as wasteload allocations) to each point source in the TMDL zone. 40 C.F.R. § 130.2(h). Wasteload allocations become enforceable by incorporation into the point source's NPDES permit. 40 C.F.R. § 122.44(d)(1)(vii)(B).

ANSWER:  The allegations in Paragraph 64 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents.

65.     A TMDL's nonpoint source pollution targets are called "load allocations," defined as "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g).

ANSWER: The allegations in Paragraph 65 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents.

66. U.S. EPA Guidance requires each TMDL to include an implementation plan that provides "reasonable assurances that nonpoint source reduction will in fact be achieved." Otherwise, "the entire load reduction must be assigned to point sources." U.S. EPA Guidance at 15.

ANSWER: The allegations in Paragraph 66 characterize U.S. EPA Guidance, which speaks for itself and is the best evidence of its contents.

67. Ohio regulations require TMDLs to include an "implementation plan establishing specific actions, schedules and monitoring proposed to effectuate a TMDL." Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f). Ohio likewise requires the final implementation to include "reasonable assurances that water quality standards will be attained in a reasonable period of time." Ohio Admin. Code 3745-2-12(E)(3).

ANSWER: The allegations in Paragraph 67 contain legal conclusions to which no response is required and characterize the Ohio Administrative Code, which speaks for itself and is the best evidence of its contents.

68. States must submit all TMDLs to U.S. EPA for review. 33 U.S.C. § 1313(d)(2). U.S. EPA "shall either approve or disapprove" a TMDL "not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

ANSWER: The allegations in Paragraph 68 contain legal conclusions to which no response is required and characterize the Clean Water Act and Code of Federal Regulations, which speaks for themselves and are the best evidence of their contents.

69. If U.S. EPA approves a TMDL, the state must incorporate wasteload allocations

23

into point sources' NPDES permits. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2); 40 C.F.R. § 122.44(d)(1)(vii)(B).

ANSWER: The allegations in Paragraph 69 contain legal conclusions to which no response is required and characterize the Clean Water Act and Code of Federal Regulations, which speaks for themselves and are the best evidence of their contents.

70. If U.S. EPA disapproves a TMDL, the administrator "shall not later than thirty days after the date of such disapproval . . . establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters." 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

ANSWER: The allegations in Paragraph 70 contain legal conclusions to which no response is required and characterize the Clean Water Act and Code of Federal Regulations, which speaks for themselves and are the best evidence of their contents.

### Factual Background

**Lake Erie Impairment**

71. Western Lake Erie has suffered from recurring annual HABs for years. The current spate of large Lake Erie HABs began in the mid-1990s.

ANSWER: Defendant admits the allegations in the first sentence of Paragraph 71. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 71, which are vague and ambiguous.

72. HABs coat surface waters in thick, odiferous scum and can produce powerful liver toxins and neurotoxins. These algal toxins, including microcystin, are more toxic by orders of magnitude than many other toxic compounds, including cyanide and DDT.

ANSWER: As to the allegations in the first sentence of Paragraph 72, Defendant admits that HABs can coat surface waters and can produce liver toxins and neurotoxins. As to the

allegations in the second sentence of Paragraph 72, Defendant admits that microcystin is an algal toxin. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72, which are vague and ambiguous.

73.      If consumed, algal toxins can cause kidney and liver damage, gastrointestinal distress and infections, as well as dementia, amnesia, other neurological damage, and death. Even skin contact with algal toxins is dangerous, potentially causing numbness, dizziness, and skin irritation or rashes.

ANSWER:  As to the allegations in Paragraph 73, Defendant admits algal toxins can have serious health effects. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73, which are vague and ambiguous.

74.      HABs have sickened or killed pets that drink or swim in water containing algal toxins.

ANSWER:  As to the allegations in Paragraph 74, Defendant admits that exposure to algal toxins can have negative health impacts for animals. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 74 which are vague and ambiguous.

75.      HABs also deplete dissolved oxygen levels and fuel the growth of toxic organisms, which can kill and damage fish and reduce the diversity of fish species.

ANSWER:  Defendant admits the allegations in Paragraph 75.

76.      HABs occur when waters become overloaded with nutrients, particularly nitrogen and phosphorus. The "limiting nutrient" for cyanobacteria growth in freshwater is phosphorus. That means phosphorus loads determine the size and severity of HABs.

ANSWER:  As to the allegations in the first sentence of Paragraph 76, Defendant admits that phosphorus and nitrogen are nutrients that in elevated amounts can cause HABs to form.

Defendant denies the remaining allegations in the first sentence of Paragraph 76. Defendant denies the allegations in the second and third sentences of Paragraph 76.

77.     Phosphorus is fully "bioavailable" to cyanobacteria in its dissolved form, known as dissolved reactive phosphorus (DRP). Consequently, DRP loads drive HAB formation.

ANSWER:  Defendant admits that DRP is a form of phosphorus that is highly bioavailable and that DRP, among other things, contributes to the formation of HABs in the Western Lake Erie Basin. Defendant denies the remaining allegations in first sentence of Paragraph 77. Defendant denies the allegations in second sentence of Paragraph 77.

78.     The current HAB crisis is not Lake Erie's first. Beginning around 1850, western Lake Erie was contaminated by extensive phosphorus pollution from industry and municipal sewage, and later, from phosphates in laundry detergent. These phosphorus loads peaked in 1968, causing annual HABs and depleted fish populations.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 78. As to the allegations in the third sentence of Paragraph 78, Defendant admits that the phosphorus loads in the Western Lake Erie Basin reached their highest in 1968. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the third sentence of Paragraph 78.

79.     In 1972, Congress passed the Clean Water Act, and the United States and Canada also entered into the Great Lakes Water Quality Agreement (GLWQA). Through the GLWQA, scientists from the United States and Canada established a total phosphorus loading target (11,000 metric tons annually) to clean up Lake Erie. This target represented a 60% reduction in total phosphorus loads.

ANSWER:  The allegations in the first sentence of Paragraph 79 characterize the Clean

Water Act and the Great Lakes Water Quality Agreement ("GLWQA"), which speak for themselves and are the best evidence of their contents. The allegations in the second sentence of Paragraph 79 characterize the GLWQA, which speaks for itself and is the best evidence of its contents. Defendant admits the allegations in the third sentence of Paragraph 79.

80.     The United States and Canada reached this target for the first time in 1981, largely through reducing pollution from wastewater treatment plants (which, in the United States, had to comply with NPDES permits) and phasing out phosphates in laundry detergent. HABs declined, Lake Erie's ecosystems began to recover, and the lake became known as the "walleye capital of the world."

ANSWER:  As to the allegations in the first sentence of Paragraph 80, Defendant admits that in 1981, the GLWQA target load of 11,000 metric tons per year was achieved as a result of a substantial drop in the point source total phosphorus load resulting largely from sewage treatment plants being improved and a reduction of phosphates in laundry soaps and detergents. As to the allegations in the second sentence of Paragraph 80, Defendant admits that algal blooms in Lake Erie decreased significantly throughout the 1980s. Defendant lacks knowledge or information sufficient to form a belief as to the remaining allegations in the first and second sentences of Paragraph 80, which are vague and ambiguous.

81.     In the mid-late 1990s, however, large HABs began reappearing in western Lake Erie. A particularly large HAB formed in 2003 and large HABs have occurred every year since then, typically forming in late spring/early summer and, increasingly, continuing well into the fall. As discussed below, this HAB resurgence coincided with a major shift in livestock production to the CAFO model.

ANSWER:  As to the allegations in the first sentence of Paragraph 81, Defendant admits that in the late 1990s, there was a resurgence of algal blooms. Defendant lacks knowledge

or information sufficient to form a belief as to the remaining allegations in the first sentence of Paragraph 81, and the allegations in the second and third sentences of Paragraph 81, which are vague and ambiguous.

82.     The 2014 HAB was particularly costly and dangerous. The algal toxin microcystin got into one of Toledo's drinking water intakes, causing the City to issue a drinking water advisory. Nearly 500,000 people lost access to safe drinking water for more than two days. The governor declared a state of emergency and deployed the National Guard to truck in bottled water for residents to drink and cook with.

ANSWER:     Defendant lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 82, which are vague and ambiguous. As to the allegations in the second and third sentences of Paragraph 82, Defendant admits that the algal toxin microcystin infiltrated a drinking water intake in Toledo in 2014 and that approximately 500,000 people lost drinking water access. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second and third sentences of Paragraph 82. As to the allegations in the fourth sentence of Paragraph 82, Defendant admits that Ohio National Guardsmen were activated to help distribute clean water and the Governor declared a state of emergency. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the fourth sentence of Paragraph 82.

83.     Western Lake Erie's HABs are enormous and persistent. In 2023, for example, Lake Erie suffered a "moderately severe" HAB, which covered 312 square miles and lasted from July 4th until mid-October.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83, which are vague and ambiguous.

84.     HABs in the Western Basin of Lake Erie can also flow east to the Central Basin, die off, and then sink to the bottom where they are decomposed by bacteria. This process depletes dissolved oxygen levels, creating an annual "dead zone" in the Central Basin that typically equals the combined size of Delaware and Rhode Island.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 84, which are vague and ambiguous. As to the allegations in the second sentence of Paragraph 84, Defendant admits that there is a hypoxic (low-oxygen) area in the Central Lake Erie Basin known as the "dead zone." Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence of Paragraph 84, which are vague and ambiguous.

85.     Of all tributaries flowing into western Lake Erie, the Maumee River contributes the most phosphorus by far. Although it contributes only 3 to 4% of the water flowing into Lake Erie, the Maumee River delivers nearly 50% of the total phosphorus load. Nearly 75% of the Maumee watershed is in Ohio. The river forms near Fort Wayne, Indiana and flows through agricultural land in northwest Ohio before entering metropolitan Toledo and discharging to Lake Erie through Maumee Bay.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 85, which are vague and ambiguous. As to the allegations in the second sentence of Paragraph 85, Defendant admits that the Maumee River contributes nearly 50 percent of the total phosphorus load into the Western Lake Erie Basin. Defendant denies the remaining allegations in the second sentence of Paragraph 85. Defendant denies the allegations in the third sentence of Paragraph 85. Defendant admits the allegations in the fourth sentence of Paragraph 85.

86.     According to Ohio EPA, 92% of the phosphorus loads into the Maumee River come from agriculture. This pollution happens when manure and other livestock waste, or synthetic fertilizer, enters surface waters through subsurface drainage systems or runs off the surface of crop fields following rain or snow melt.

ANSWER:  Defendant denies the allegations in the first sentence of Paragraph 86. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 86, which are vague and ambiguous.

**Great Lakes Water Quality Agreement, Annex 4**

87.     In 2012, the United States and Canada tried to address the HAB resurgence by amending the Great Lakes Water Quality Agreement to include Annex 4, which addresses nutrient pollution.

ANSWER:  Defendant admits that on September 7, 2012, the United States and Canada signed an amendment to the GLWQA to include Annex 4. The remaining allegations in Paragraph 87 characterize Annex 4, which speaks for itself and is the best evidence of its contents.

88.     Annex 4 created an "Objectives and Targets Task Team" (Task Team) to set new phosphorus loading targets for Lake Erie to control HABs. The Task Team co-chair was Dr. Jeffrey Reutter, then Director of Ohio Sea Grant (a research program within Ohio State University (OSU) focused on the health of Lake Erie) and OSU's Stone Lab.

ANSWER:  The allegations in the first sentence of Paragraph 88 characterize Annex 4, which speaks for itself and is the best evidence of its contents. As to the second sentence of Paragraph 88, Defendant admits that Dr. Jeffrey Reutter was co-chair of the Annex 4 Objectives and Targets Task Team ("Task Team") but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of the second sentence

30

of Paragraph 88.

89.     The Task Team released a report titled Recommended Phosphorus Loading Targets for Lake Erie on May 11, 2015 ("Task Team Report"). The Task Team Report set loading targets equivalent to a 40% reduction from 2008 load levels in metric tons for two types of phosphorus: DRP and total phosphorus.

ANSWER:  Defendant admits the allegations in the first sentence of Paragraph 89. The allegations in the second sentence of Paragraph 89 characterize the Recommended Phosphorus Loading Targets for Lake Erie (May 11, 2015) ("Task Team Report"), which speaks for itself and is the best evidence of its contents.

90.     DRP refers to dissolved reactive phosphorus. Total phosphorus refers to DRP plus phosphorus attached to sediment or soil particles, known as particulate phosphorus (PP). Presently, DRP comprises approximately 21% of total phosphorus flowing into Lake Erie but, as explained below, it is the primary driver of HABs.

ANSWER:  Defendant admits the allegations in the first and second sentences of Paragraph 90. Defendant denies the allegations in the third sentence of Paragraph 90.

91.     Because phosphorus load levels can vary widely based on the volume of water entering Lake Erie (which is heavily driven by precipitation), the Task Team also identified target concentrations for DRP and total phosphorus that adjust for flow (flow-weighted mean concentration or FWMC) and correspond with the metric ton reduction targets. The Task Team recommended that FWMC be used to track progress toward achieving its targets.

ANSWER:  The allegations in Paragraph 91 characterize the Task Team Report, which speaks for itself and is the best evidence of its contents.

92.     The Task Team Report repeatedly emphasized the need for separate loading targets for total phosphorus and DRP. It explained that DRP is "the most important target for reduction"

because it is 100% bioavailable to cyanobacteria, while PP is only 25-50% bioavailable. The more bioavailable phosphorus is, the more easily it will be consumed by and feed a HAB. Consequently, the Task Team Report explained, it made no sense to use a single total phosphorus target because "various combinations of DRP and PP [loads] can reach the 40% reduction in TP but have vastly different effects on the total bioavailable phosphorus."

    ANSWER:  The allegations in Paragraph 92 characterize the Task Team Report, which speaks for itself and is the best evidence of its contents.

93.    The Task Team Report recognized that total phosphorus loads declined before HABs re-emerged in the mid-1990s and had since shown "no clear trends in concentrations or loads"; by contrast, DRP concentrations and loads rose sharply beginning in the mid-1990s through 2015 (they have since plateaued at that elevated level).

    ANSWER:  The allegations in Paragraph 93 characterize the Task Team Report, which speaks for itself and is the best evidence of its contents.

94.    Total phosphorus reductions can be driven entirely by reductions in PP, but those will not, on their own, reduce HABs; DRP loads must also come down.

    ANSWER:  Defendant denies the allegations in Paragraph 94.

95.    The divergent trends in total phosphorus and DRP loading reflect the fact that measures for reducing PP often do not work, or are even counterproductive, in reducing DRP. For instance, reducing or eliminating agricultural tillage can minimize erosion and PP loss, but the same practice can accelerate DRP loss.

    ANSWER:  Defendant denies the allegations in Paragraph 95.

96.    Shortly after release of the Task Team Report in June 2015, the Governors of Michigan and Ohio and the Premier of Ontario signed a Collaborative Agreement committing to achieve the Task Team's 40% reduction targets for total phosphorus and DRP by 2025, with an interim goal of a 20% reduction by 2020. The United States and Canada adopted the Task Team

targets in February 2016. And in June 2019, Ohio Governor Mike DeWine re-committed the State of Ohio to reducing its phosphorus loads into Lake Erie by 40% by 2025.

ANSWER:  The allegations in the first sentence of Paragraph 96 characterize the WLEB Collaborative Agreement, which speaks for itself and is the best evidence of its contents. The. allegations in the second sentence of Paragraph 96 characterize the U.S. Action Plan, which speaks for itself and is the best evidence of its contents.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 96.

**Failure to Meet Annex 4 Targets**

97.     The State of Ohio has made virtually no progress toward meeting its Annex 4 commitments.

ANSWER:  Defendant denies the allegations in Paragraph 97.

98.      The U.S. Geological Survey has a gauging station in the Maumee River at Waterville, Ohio, just upstream of metropolitan Toledo. Pollutant levels at Waterville identify phosphorus loads coming from the Maumee River. Waterville monitoring station data demonstrate yearly fluctuations but no trending decrease in the flow-weighted mean concentration of DRP. Ohio still has not met its interim goal of a 20% phosphorus reduction (which it was supposed to do in 2020) and is far from meeting its commitment to reduce phosphorus loads by 40% by 2025.

ANSWER:  Defendant admits the allegations in the first and second sentences of Paragraph 98. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third and fourth sentences of Paragraph 98.

99.     Ohio's failure to reduce phosphorus loads has not resulted from a failure to spend money. Ohio's established the H2Ohio program in 2019. Since 2020, H2Ohio has been allotted over $400 million, much of which has been spent on voluntary conservation efforts in the western Lake

33

Erie watershed to reduce agricultural phosphorus pollution. As of April 2024, H2Ohio's agricultural incentive program expanded beyond the Lake Erie watershed and is now available across the state.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 99, which are vague and ambiguous. Defendant admits the allegations in the second sentence of Paragraph 99. As to the allegations in the third sentence of Paragraph 99, Defendant admits that the H2Ohio program funds, among other things, efforts to reduce agricultural phosphorus pollution. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the third sentence of Paragraph 99. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 99, which are vague and ambiguous.

100.    These voluntary conservation efforts largely rely on paying farmers to adopt so-called "best management practices" or BMPs. These BMPs, however, are often ineffective; indeed, as described above regarding reduced tillage, some BMPs can increase DRP loading. The effectiveness of BMPs depends on a slew of site-specific factors including field location, soil type, slope, tillage, and soil test phosphorus levels.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 100. Defendant denies the allegations in the second sentence of Paragraph 100. As to the allegations in the third sentence of Paragraph 100, Defendant admits that the effectiveness of BMPs depends on site-specific factors including field location, soil type, slope, tillage, and soil test phosphorus levels, and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the third sentence of Paragraph 100, which are vague and ambiguous.

101. Ohio fails to target BMPs to where they are most needed and likely to succeed; instead, Ohio prioritizes "enrolling acres" in BMPs regardless of location or other conditions. Ohio also fails to measure BMP effectiveness by testing the water; instead, the state relies on unsupported formulas that presume phosphorus loss reduction without measuring if any reductions are achieved. The data show that reductions are not being achieved.

ANSWER: Defendant denies the allegations in Paragraph 101.

102. With pollution from upstream agriculture continuing unabated, downstream communities—especially the City of Toledo—have been forced to both live with annual HABs and spend enormous sums of public funds trying to address their consequences.

ANSWER: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102, which are vague and ambiguous.

103. Since 2014, the City of Toledo has spent $490.4 million to upgrade its drinking water treatment plant in part to improve its treatment of HAB toxins. The City has also incurred substantial additional costs to upgrade other systems to address the HAB crisis. Statewide between 2011 and 2017, Ohio spent more than $3 billion to address HABs in Lake Erie, with $2.3 billion of that money going to fund wastewater or drinking water improvement projects.

ANSWER: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103.

104. Climate change is making the HAB problem worse, as more intense storms drive more runoff from agricultural fields and warmer temperatures in Lake Erie promote more cyanobacteria growth. As rain becomes less predictable, agricultural operators are less able to time how and when they apply manure or commercial fertilizer to reduce risk of runoff.

ANSWER: As to the allegations in the first sentence of Paragraph 104, Defendant admits that the effects of climate change, including increased precipitation and warmer temperatures,

35

are impacting nutrient concentrations in Lake Erie. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 104, and the allegations in the second sentence of Paragraph 104, which are vague and ambiguous.

**Animal Feeding Operations**

105.    The resurgence of HABs in Lake Erie coincided with a major change in livestock agriculture.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105, which are vague and ambiguous.

106.    For generations, livestock were raised on traditional, diversified farms with relatively small numbers of animals. These farms kept animals at pasture and balanced nutrient intake (grazing) with output (manure).

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, which are vague and ambiguous

107.    In the 1990s, these diversified farms began to be replaced by a smaller number of much larger, industrial-scale confined feeding operations (with up to 100,000+ animals). These operations generate far more nutrients in manure and other waste than surrounding land can absorb.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107, which are vague and ambiguous.

108.    As the United States Department of Agriculture (USDA) recognizes, these are not farms in the traditional sense—they are "large industrialized livestock operations." *See* James M. Macdonald & William D. McBride, The Transformation of U.S. Livestock Agriculture: Scale, Efficiency, and Risks, U.S. Dep't of Agric., iii (Jan 2009).

ANSWER:  The allegations in Paragraph 108 characterize The Transformation of U.S.

Livestock Agriculture: Scale, Efficiency, and Risks, USDA (Jan 2009), which speaks for itself and is the best evidence of its contents.

109.    Under the Clean Water Act, industrial livestock operations are known as Animal Feeding Operations or "AFOs." U.S. EPA regulations define AFOs as facilities where animals are confined for more than 45 days per year and where crops are not grown on site. 40 C.F.R. § 122.23(b)(1).

ANSWER:  The allegations in Paragraph 109 contain legal conclusions to which no response is required, and characterize the Clean Water Act and Code of Federal Regulations, which speak for themselves and are the best evidence of their contents.

110.    The largest AFOs are defined as Concentrated Animal Feeding Operations or "CAFOs." "Large CAFOs" are AFOs with the equivalent of at least 700 mature dairy cows, 2,500 swine, or 125,000 chickens. 40 C.F.R. § 122.23(b)(2), (4). Smaller AFOs can be deemed "CAFOs" in certain circumstances. 40 C.F.R. § 122.23(b)(6), (9). The Clean Water Act's definition of "point source" expressly includes "concentrated animal feeding operations." 33 U.S.C. § 1362(14).

ANSWER:  The allegations in Paragraph 110 contain legal conclusions to which no response is required, and characterize the Code of Federal Regulations and the Clean Water Act, which speak for themselves and are the best evidence of their contents.

111.    Because AFOs concentrate so many animals in a relatively small space, they also concentrate enormous amounts of manure and other waste, including urine and wastewater from cleaning animal confinement areas. As of 2012, large CAFOs in the United States produced more than 20 times the volume of fecal wet mass produced by all of the country's humans. Livestock concentration—with fewer farms raising more animals—has increased since 2012, both in Ohio and nationwide.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 111, which are vague and ambiguous.

112.     Unlike diversified family-scale farms, which manage manure in its natural form, all dairy and most swine AFOs in the western Lake Erie watershed water down manure and other waste products and store it in liquid form in open cesspits (called "lagoons"). AFOs or third-party transferees dispose of this waste by applying it to crop fields, ostensibly as fertilizer.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, which are vague and ambiguous.

113.     While manure nutrients can help fertilize crops, they become pollutants if they leave the field and get into surface waters. Other components of AFO waste, such as cleaning chemicals, antibiotics, and *E. coli*, likewise contaminate surface waters.

ANSWER:  As to the allegations in the first sentence of Paragraph 113, Defendant admits that manure nutrients can help fertilize crops. The remaining allegations in the first sentence of Paragraph 113 are legal conclusions to which no response is required. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 113, which are vague and ambiguous.

114.     When AFOs apply liquid waste in the western Lake Erie watershed, at least some portion of it (including dissolved contaminants), inevitably leaves crop fields and pollutes surface waters. This happens for two reasons.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as the truth of the allegations in Paragraph 114, which are vague and ambiguous.

115.     First, liquid AFO waste routinely gets overapplied. Transporting liquid waste is costly, with hauling costs generally exceeding fertilizer value after one mile. As a result, agricultural fields near AFOs typically receive far more nutrients than crops need. This is particularly true for phosphorus, which accumulates in soil. Such excess phosphorus is more likely to run off field edges

or escape through subsurface drains following rain or snow melt.

ANSWER: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and third sentences of Paragraph 115, which are vague and ambiguous. As to the allegations in the fourth sentence of Paragraph 115, Defendant admits that phosphorus can accumulate in soil, and lacks knowledge or information sufficient to form a belief as to truth of the remaining allegations in the fourth sentence of Paragraph 115, which are vague and ambiguous. As to the allegations in the fifth sentence of Paragraph 115, Defendant admits that, to the extent excess phosphorus is applied to an agricultural field, it is susceptible to run off field edges or escape through subsurface drains following rain or snow melt. Defendant lacks knowledge or information sufficient to form a belief as to truth of the remaining allegations in the fifth sentence of Paragraph 115, which are vague and ambiguous.

116. Second, at least some portion of land-applied liquid AFO waste gets directly discharged to surface waters through the subsurface or "tile" drainage systems that pervade the western Lake Erie watershed.

ANSWER: The allegations in Paragraph 116 are legal conclusions to which no response is required.

117. Much of the western Lake Erie watershed was originally a swamp. To make the land dry enough for agriculture, people began installing subsurface drainage systems in the 19th century. These systems originally consisted of clay "tiles;" but flexible, perforated plastic pipes are now commonly used. The western Lake Erie watershed is among the most heavily tiled in the country, with nearly all cropland containing pervasive subsurface piping.

ANSWER: Defendant lacks knowledge or information sufficient to form a belief as the truth of the allegations in Paragraph 117, which are vague and ambiguous.

118.    Tile drainage systems draw moisture from the surface, either through soil infiltration or through inlets installed at the low point of fields. When enough liquid accumulates in the tile pipes, gravity causes it to flow to edge-of-field outfalls, which discharge directly into streams or into human-made ditches that empty into streams.

ANSWER:  Defendant admits the allegations in the first sentence of Paragraph 118. As to the allegations in the second sentence of Paragraph 118, Defendant admits that liquid accumulates in tile pipes and gravity causes the liquid to flow to edge-of-field outfalls. The remaining allegations in the second sentence of Paragraph 118 are legal conclusions to which no response is required.

119.    Tile drainage is particularly effective in the western Lake Erie watershed because the soils are pervasively cracked and fractured. These cracks and fractures, as well as earthworm burrows, create "preferential flow paths" for liquid to quickly flow down into tile systems.

ANSWER:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 119, which are vague and ambiguous. As to the allegations in the second sentence of Paragraph 119, Defendant admits that a process affecting nutrient movement from fertilizer applications is preferential flow, where soil cracks, earthworm burrows, and other soil fissures can lead to rapid transport to tile drains and that this pathway exists for all applied nutrients. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence of Paragraph 119, which are vague and ambiguous.

120.    When applied to tiled fields, liquid AFO waste behaves exactly like water: some portion of it, including DRP and other dissolved contaminants, travels quickly through preferential flow paths down into tile systems, which discharge into surface waters.

ANSWER:  Defendant denies the allegations in Paragraph 120.

121.    Standard BMPs—which are designed to address overland flow—do not prevent discharges of dissolved contaminants through tile systems in the western Lake Erie watershed. For example, buffer strips—vegetated areas at the edge of crop fields—can slow overland runoff but do not stop dissolved contaminants from infiltrating the soil and getting into tile systems.

ANSWER:  The allegations in the first sentence of Paragraph 121 are legal conclusions to which no response is required. As to the allegations in the second sentence of Paragraph 121, Defendant admits that buffer strips are a form of Best Management Practices (BMP) that utilizes vegetated areas at the edge of farm fields to stop or slow runoff from farm fields into streams. Defendant denies the remaining allegations in the second sentence of Paragraph 121.

122.    These tile drainage systems help to explain why DRP loads into western Lake Erie began spiking in the 1990s. This is the same time that AFOs began proliferating in the watershed and applying liquid waste to tiled fields. Extensive additional evidence links AFOs to DRP pollution in the watershed, including water testing data and upstream-downstream studies.

ANSWER:  As to the allegations in the second sentence of Paragraph 122, Defendant admits that there was an increase in the number of AFOs in the Western Lake Erie Basin watershed in the 1990s. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence, which are vague and ambiguous. Defendant denies the allegations in the first and third sentences of Paragraph 122.

**Failure to Comply with Clean Water Act Requirements to Reduce Lake Erie HABs**

123.    This is the fourth lawsuit ELPC has had to file, and the second that the Lucas County Board has filed, to require U.S. EPA and the State of Ohio to comply with their Clean Water Act obligations to clean up HABs in western Lake Erie. *See ELPC v. U.S. EPA*, No. 3:17-cv-01032 (N.D. Ohio) (Carr, J.); *ELPC v. U.S. EPA*, No. 3:17-cv-01514 (N.D. Ohio) (Carr, J.); *ELPC v. U.S. EPA*, No. 3:19-cv-00295 (N.D. Ohio) (Carr, J.) (consolidated with *Bd. of Lucas*

*County Comm'rs v. U.S. EPA*, No. 3:19-cv-00873 (N.D. Ohio)). At every turn, the State of Ohio failed to fulfill its statutory obligations and U.S. EPA excused Ohio's noncompliance, violating its own Clean Water Act obligations by approving Ohio's improper actions.

> ANSWER: As to the allegations in the first sentence of Paragraph 123, Defendant admits that ELPC and others filed the following lawsuits: *ELPC v. U.S. EPA*, No. 3:17-cv-01032 (N.D. Ohio) (Carr, J.); *ELPC v. U.S. EPA*, No. 3:17-cv-01514 (N.D. Ohio) (Carr, J.); *ELPC v. U.S. EPA*, No. 3:19-cv-00295 (N.D. Ohio) (Carr, J.) (consolidated with *Bd. of Lucas County Comm'rs v. U.S. EPA*, No. 3:19-cv-00873 (N.D. Ohio)); and that Lucas County Board filed *Bd. of Lucas County Comm'rs v. U.S. EPA*, No. 3:19-cv-00873 (N.D. Ohio). Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 123. The allegations in the second sentence of Paragraph 123 are legal conclusions to which no response is required.

**Failure to Assess Lake Erie for Impairment**

124. The Clean Water Act requires states to submit Integrated Reports to U.S. EPA every two years. These documents assess water bodies for impairment and rank impaired waters for receipt of TMDLs based on "the severity of the pollution and the uses to be made of the waters." 40 C.F.R. § 130.7(b)(4)-(5).

> ANSWER: The allegations in first sentence of Paragraph 124 characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents. The allegations in second sentence of Paragraph 124 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents.

125. Judge Carr issued an Opinion and Order in ELPC's second case that carefully describes "Ohio's Noncompliance [w]ith the CWA" between 2012 and 2016. *See ELPC v. U.S.*

*EPA*, No. 3:17CV01514, ECF No. 29 (N.D. Ohio Apr. 11, 2018) ("2018 Opinion"). In essence, Ohio refused to assess the open waters of Lake Erie for impairment in its 2012, 2014, or 2016 Integrated Reports, despite U.S. EPA directing it to do so. U.S. EPA nonetheless approved Ohio's 2012 and 2014 Integrated Reports and then failed to approve or disapprove Ohio's 2016 Report within the statutory period. That failure prompted ELPC to file its first lawsuit (3:17-cv-01032) on May 17, 2017 to require U.S. EPA to act. Two days later, U.S. EPA formally approved Ohio's 2016 Integrated Report.

ANSWER:  As to the allegations in Paragraph 125, Defendant admits Judge Carr issued an Order in *ELPC v. U.S. EPA*, No. 3:17CV01514, ECF No. 29 (N.D. Ohio Apr. 11, 2018) ("2018 Order"). The remaining allegations in Paragraph 125 characterize the 2018 Order, which speaks for itself and is the best evidence of its contents.

126.    On July 18, 2017, ELPC filed its second case (No. 3:17-cv-01514). ELPC claimed that U.S. EPA's approval of Ohio's 2016 Integrated Report was arbitrary and capricious a contrary to law in violation of the APA because Ohio had refused to assess Lake Erie for impairment as required by 40 C.F.R. § 130.7(b)(5).

ANSWER:  As to the allegations in the first sentence of Paragraph 126, Defendant admits that on July 18, 2017, ELPC and others filed *ELPC v. U.S. EPA*, No. 3:17-cv-01514 (N.D. Ohio) (Carr, J.). Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 126. The allegations in the second sentence of Paragraph 126 characterize the complaint in No. 3:17-cv-01514, which speaks for itself and is the best evidence of its contents.

127.    Both Ohio EPA and U.S. EPA responded to the case with what Judge Carr described as "legal maneuvering," including conduct by U.S. EPA that Judge Carr said created a "whiff of bad faith." 2018 Opinion at 22, 16 n.8. After Judge Carr called out the agencies'

43

misconduct, Ohio finally assessed western Lake Erie as impaired in an "amended" 2016 Integrated Report, which U.S. EPA approved.

> ANSWER: The allegations in first sentence of Paragraph 127, characterize the 2018 Order, which speaks for itself and is the best evidence of its contents. As to the allegations in the second sentence of Paragraph 127, Defendant admits that on May 4, 2018, Ohio submitted an amendment to its 2016 Integrated Report that included assessments and listings for the open waters of Lake Erie based on algae, and that on May 10, 2018, Defendant approved Ohio's amendment to its 2016 Integrated Report. The remaining allegations in the second sentence of Paragraph 127 characterize the 2018 Order, which speaks for itself and is the best evidence of its contents.

**Failure to Establish TMDLs**

128. Having been effectively forced to list Lake Erie as impaired, the agencies began resisting the next steps required by the Clean Water Act to remediate the impairment: properly ranking Lake Erie for receipt of a TMDL and then establishing the TMDL.

> ANSWER: Defendant denies the allegations in Paragraph 128.

129. Ohio's 2018 Integrated Report designated Lake Erie as impaired and gave it the highest priority score of any Ohio waterbody. At the same time, the 2018 Integrated Report gave Lake Erie a "low" priority ranking for developing a TMDL. Ohio EPA said that instead of a TMDL, it would pursue vaguely defined alternative approaches to restoring Lake Erie and refused to commit to establishing a TMDL even if the alternatives failed. U.S. EPA nonetheless approved Ohio EPA's 2018 Integrated Report.

> ANSWER: The allegations in the first and second sentences of Paragraph 129 characterize the Ohio 2018 Integrated Water Quality Monitoring and Assessment Report, which speaks for itself and is the best evidence of its contents. Defendant lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph

129. As to the allegations in the fourth sentence of Paragraph 129, Defendant admits that on

July 9, 2018, it approved the Category 5 list of impaired waters in Ohio EPA's 2018 Integrated

Report. Defendant denies the remaining allegations in the fourth sentence of Paragraph 129.

130.    ELPC filed its third case on February 7, 2019, *ELPC v. U.S. EPA*, (N.D. Ohio) (No.

19-cv-00295). The Lucas County Board then filed a parallel case with identical claims (No. 19- cv-

00873) and Judge Carr consolidated the two cases.

> ANSWER:  As to the allegations in the first sentence of Paragraph 130, Defendant admits
>
> that on February 7, 2019, ELPC and others filed *ELPC v. U.S. EPA*, (N.D. Ohio) (No. 19-cv-
>
> 00295). Defendant lacks knowledge or information sufficient to form a belief as to the truth
>
> of the remaining allegations in the first sentence. As to the allegations in the second sentence
>
> of Paragraph 130, Defendant admits Lucas County Board filed *Board of Lucas County*
>
> *Commissioners v. EPA*, (N.D. Ohio) (No. 19-cv-00873), and that Judge Carr consolidated
>
> the two cases. The remaining allegations in the second sentence of Paragraph 130
>
> characterize Lucas County Board's complaint, which speaks for itself and is the best
>
> evidence of its contents.

131.    U.S. EPA moved to dismiss Plaintiffs' claims. In an Opinion and Order dated

November 13, 2019, Judge Carr denied the motion, holding that "Ohio EPA is essentially delaying,

and intends to continue to delay indefinitely, a TMDL for western Lake Erie in favor of alleged half

measures [and] does not have a plan to change course should those measures fail to remediate Lake

Erie." *ELPC v. U.S. EPA*, 415 F. Supp. 3d 775, 793, ECF No. 34 (N.D. Ohio 2019).

> ANSWER:  The allegations in Paragraph 131 characterize U.S. EPA's motion to dismiss
>
> (Doc. 26) and Judge Carr's Order (Doc. 34) ("2019 Order") in *ELPC v. EPA*, 415 F. Supp.

3d 775 (N.D. Ohio 2019), which speak for themselves and are the best evidence of their contents.

132.    At Judge Carr's encouragement, the parties mediated their dispute before Judge Dan Polster of the Eastern Division of this Court. The parties ultimately agreed to a consent decree setting a schedule for completion of a western Lake Erie TMDL: Ohio was to release a draft TMDL for public comment by December 30, 2022, and submit a final TMDL to U.S. EPA by June 30, 2023. U.S. EPA would then have 90 days to approve or disapprove Ohio's submission, and a total of six months from submission to establish its own TMDL in the event of disapproval.

ANSWER:  As to the allegations in the first sentence of Paragraph 132, Defendant admits that it participated in settlement negotiations with ELPC and Lucas County Board regarding *ELPC v. EPA*, 415 F. Supp. 3d 775 (N.D. Ohio 2019), and those negotiations included two in-person mediation sessions with U.S. District Judge Dan Aaron Polster. Defendant denies the remaining allegations in the first sentence. As to the allegations in the second sentence of Paragraph 132, Defendant admits that on April 25, 2023, the parties lodged a Consent Decree and filed a Joint Motion to Enter Consent Decree, which the Court entered on May 4, 2023 (Doc. 74). The remaining allegations in the second and the allegations in the third sentence of Paragraph 132 characterize the Consent Decree (Doc. 74), which speaks for itself and is the best evidence of its contents.

133.    Judge Carr entered the consent decree on April 5, 2023.

ANSWER:  Defendant denies the allegation in Paragraph 133.

**Maumee Watershed Nutrient TMDL**

134.    As the Consent Decree was being finalized, Ohio EPA worked to complete the Maumee TMDL. Ohio EPA released several preliminary documents for public comment— including a "Loading Analysis Plan"—leading up to release of the full Draft TMDL for public

comment on December 30, 2022. Ohio EPA submitted its final Maumee TMDL to U.S. EPA on June 30, 2023.

> ANSWER: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 134, which are vague and ambiguous. As to the allegations in the second sentence of Paragraph 134, Defendant admits that public comment on the Draft Maumee TMDL began on December 30, 2022. The remaining allegations in the second sentence of Paragraph 134 characterize Ohio EPA documents, which speak for themselves and are the best evidence of their contents. Defendant admits the allegations in the third sentence of Paragraph 134.

135. The Maumee TMDL contains five legal defects that both violate the Clean Water Act and ensure that the TMDL will not sufficiently reduce phosphorus to remediate Lake Erie's impairment. The Maumee TMDL: (1) fails to set limits for DRP as required by 33 U.S.C. § 1313(d)(1)(C) and 40 C.F.R. § 130.7(c)(1)(ii); (2) fails to set an adequate margin of safety as required by 33 U.S.C. § 1313(d)(1)(C); (3) fails to assign wasteload allocations to discharging CAFOs as point sources as required by 40 C.F.R. § 130.2(h); (4) fails to apportion the load allocation to nonpoint sources as required by 40 C.F.R. § 130.2(g), Ohio Rev. Code 61111.562(B), and Ohio Admin. Code 3745-2-12(C); and (5) fails to provide "reasonable assurances" that necessary pollution reductions will be achieved as required by U.S. EPA Guidance and Ohio Admin. Code 3745-2-12(E)(3).

> ANSWER: The allegations in Paragraph 135 are legal conclusions to which no response is required.

136. Plaintiffs and others explained these defects to Ohio EPA at every opportunity, but the agency refused to change course and follow the law.

ANSWER:  The allegations in Paragraph 136 contain legal conclusions to which no response is required. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 136, which are vague and ambiguous.

**Legal Defect #1: Failure to Set DRP Limits**

137.    The Maumee TMDL acknowledges that DRP is "the main driver of Western Basin of Lake Erie HABs" and that reducing DRP loads by at least 40% is necessary to remediate Lake Erie.

ANSWER:  The allegations in Paragraph 137 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

138.    The Maumee TMDL does not, however, set limits for DRP. Instead, it sets a limit only for total phosphorus, equivalent to a 40% reduction from 2008 levels.

ANSWER:  The allegations in Paragraph 138 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

139.    That failure to set DRP limits violates the Clean Water Act. TMDLs must "be established at a level necessary to implement the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C). As the TMDL document recognizes, "implementing applicable water quality standards" in Lake Erie requires a 40% reduction in DRP loads. That means the TMDL must be "established at a level necessary" to achieve a 40% DRP reduction.

ANSWER:  The allegations in the first sentence of Paragraph 139 contain legal conclusions to which no response is required. To the extent the allegations in the first sentence of Paragraph 139 are deemed to contain any factual allegations, the allegations in the first sentence of Paragraph 139 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents. The allegations in the second sentence of Paragraph 139 contain legal conclusions to which no response is required. To the extent the allegations in

the second sentence of Paragraph 139 are deemed to contain any factual allegations, the allegations in the second sentence of Paragraph 139 characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents. The allegations in the third sentence of Paragraph 139 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents. The allegations in the fourth sentence of Paragraph 139 contain legal conclusions to which no response is required. To the extent the allegations in the fourth sentence of Paragraph 139 are deemed to contain any factual allegations, the allegations in the fourth sentence of Paragraph 139 characterize the Maumee TMDL and the Clean Water Act, which speak for themselves and are the best evidence of their contents.

140. The Maumee TMDL violates that requirement because it sets no limit at all for DRP, which is the pollutant driving HAB formation. Instead, it requires only a 40% reduction in total phosphorus.

ANSWER: The allegations in Paragraph 140 contain legal conclusions to which no response is required and characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

141. Reducing total phosphorus by 40%, however, will not reduce DRP loads by that amount. Because DRP comprises only around 21% of total phosphorus with PP (particulate phosphorus) making up the rest, Ohio could reduce total phosphorus loads by 40% solely by reducing PP. Such a total phosphorus reduction would leave DRP loads (and therefore the extent of HABs) unchanged.

ANSWER: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 141, which are vague and ambiguous. Defendant denies the allegations in the second and third sentences of Paragraph 141.

142.     Because the Maumee TMDL sets no DRP limits, it is not "established at a level necessary" to clean up the HABs and comply with the Clean Water Act, 33 U.S.C. § 1313(d)(1)(C).

ANSWER:  The allegations in Paragraph 142 contain legal conclusions to which no response is required and characterize the CWA, which speaks for itself and is the best evidence of its contents.

143.     Because total phosphorus and DRP are different pollutants, the TMDL's failure to set DRP limits also violates U.S. EPA regulations, which state that "TMDLs shall be established for *all* pollutants preventing or expected to prevent attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii) (emphasis added).

ANSWER:  The allegations in Paragraph 143 contain legal conclusions to which no response is require and characterize the Code of Federal Regulations which speaks for itself and is the best evidence of its contents.

144.     Dr. Jeffrey Reutter, who co-led the Task Team that set the 40% reduction targets, filed extensive comments during the Maumee TMDL development process explaining why it was necessary for Ohio EPA to set DRP limits.

ANSWER:  The allegations in Paragraph 144 characterize comments on the draft Maumee TMDL submitted by Dr. Jeffrey Reutter, which speak for themselves and are the best evidence of their contents.

145.     In his comments on the Loading Analysis Plan (submitted on October 21, 2021), Dr. Reutter said that setting a limit only for total phosphorus would be a "huge mistake." He emphasized that there was "complete agreement [among the Task Team] that DRP was by far the most important component and increases in DRP loading were driving HABs" and that "achieving only the [total phosphorus] goal will not" remediate Lake Erie.

ANSWER:  The allegations in Paragraph 145 characterize comments on the draft Maumee

TMDL submitted by Dr. Jeffrey Reutter, which speak for themselves and are the best

evidence of their contents.

146.    Dr. Reutter's later comments on the Draft TMDL, dated March 6, 2023, were even

more pointed. He said that if Ohio EPA insisted on setting targets only for total phosphorus, "the

TMDL is doomed to failure, and we should not even waste the money to do it." Dr. Reutter

explained that "[o]ur efforts to only monitor and control TP loading had allowed DRP to surge and

cause the crisis."

ANSWER:  The allegations in Paragraph 146 characterize comments on the draft Maumee

TMDL submitted by Dr. Jeffrey Reutter, which speak for themselves and are the best

evidence of their contents.

**Legal Defect #2: Failure to Set Adequate Margin of Safety**

147.    The Clean Water Act requires a TMDL to incorporate a "margin of safety" to "take

into account any lack of knowledge concerning the relationship between effluent limitations" (the

wasteload and load allocations) "and water quality." 33 U.S.C. § 1313(d)(1)(C). *See also* 40 C.F.R. §

130.7(c)(1) (same). The margin of safety accounts for any uncertainty as to whether achieving the

wasteload and load allocations will, in fact, remediate the impairment.

ANSWER:  The allegations in Paragraph 147 contain legal conclusions to which no response

is required and characterizes the Clean Water Act and Code of Federal Regulations, which

speaks for themselves and are the best evidence of their contents.

148.    The Maumee TMDL claims to include a significant "implicit" margin of safety

because it uses supposedly "conservative" assumptions and methods. The Maumee TMDL also adds

an "explicit" margin of safety equal to 3% of the total loading capacity.

ANSWER:  The allegations in Paragraph 148 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

149.    This margin of safety is not sufficient to comply with the Clean Water Act.

ANSWER:  The allegations in Paragraph 149 are legal conclusions to which no response is required.

150.    As explained above, the Maumee TMDL's load and wasteload allocations are set only for total phosphorus but water quality is driven by DRP. Indeed, as Dr. Reutter's Draft TMDL comments pointed out, total phosphorus loads could be reduced by 40% without DRP declining at all and reducing DRP by 40% could require total phosphorus reductions of well over 80%.

ANSWER:  The allegations in the first sentence of Paragraph 150 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents. The allegations in the second sentence of Paragraph 150 characterize comments on the draft Maumee TMDL submitted by Dr. Jeffrey Reutter, which speak for themselves and are the best evidence of their contents.

151.    For this reason alone, the margin of safety in a total phosphorus-only TMDL should have been at least 40% (40% TP reduction in TMDL + 40% margin of safety = 80% total reduction). According to Dr. Reutter, "anything less than [40%] is certainly no 'margin of safety.'"

ANSWER:  The allegations in the first sentence of Paragraph 151 are legal conclusions to which no response is required. The allegations in the second sentence of Paragraph 151 characterize comments on the draft Maumee TMDL submitted by Dr. Jeffrey Reutter, which speak for themselves and are the best evidence of their contents.

152.    Even apart from the DRP issue, the 3% explicit margin of safety is inadequate because of uncertainties raised by climate change (discussed above).

ANSWER:  The allegations in Paragraph 152 are legal conclusions to which no response is required.

153.    A 3% margin of safety is also well below the general norm for TMDLs. For instance, Minnesota typically uses a 10% explicit margin of safety in TMDLs and Michigan recently used a 15% explicit margin of safety for the Ford/Belleville Lakes phosphorus TMDL. Ohio itself used a 5% margin of safety—describing it as "relatively low"—in the Black River TMDL, which included nutrients. *See* Black River Watershed TMDL, Ohio EPA (May 30, 2008).

ANSWER:  The allegations in the first sentence of Paragraph 153 are legal conclusions to which no response is required. To the extent the allegations in the first sentence of Paragraph 153 are deemed to contain any factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 153, which are vague and ambiguous. As to the allegations in the second sentence of Paragraph 153, Defendant admits that the Minnesota Pollution Control Agency has traditionally dedicated 10% of the TMDL as an explicit margin of safety. The remaining allegations in the second sentence of Paragraph 153 characterize the Ford/Belleville Lakes Phosphorus TMDL, which speaks for itself and is the best evidence of its contents. The allegations in the third sentence of Paragraph 153 characterize the Black River Watershed TMDL, which speaks for itself and is the best evidence of its contents.

**Legal Defect #3: Failure to Assign Wasteload Allocations to Discharging CAFOs**

154.    A TMDL must assign wasteload allocations to all discharging point sources. 40 C.F.R. § 130.2(h). CAFOs are included in the Clean Water Act's definition of "point source." 33 U.S.C. § 1362(14). Consequently, if CAFOs discharge pollutants, they must receive wasteload allocations in a TMDL.

ANSWER: The allegations in the first sentence of Paragraph 154 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents. The allegations in the second sentence of Paragraph 154 contain legal conclusions to which no response is required and characterize the Clean Water Act, which speaks for itself and is the best evidence of its contents. The allegations in the third sentence of Paragraph 154 are legal conclusions to which no response is required.

155. The Maumee TMDL recognizes that there are at least 73 Large CAFOs in the Maumee River watershed in Ohio. The Maumee TMDL does not, however, assign wasteload allocations to any of them. Instead, it treats all Large CAFOs (and all smaller AFOs) as nonpoint sources subject to the single "landscape" load allocation discussed below. The Maumee TMDL defends this approach by insisting that no CAFOs in the watershed are discharging point sources under the Clean Water Act.

ANSWER: The allegations in Paragraph 155 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

156. In fact, all dairy and most swine CAFOs in the watershed are discharging point sources because, among other reasons, they use liquid waste systems and nearly all fields in the Ohio portion of the Maumee watershed have pervasive subsurface tile drainage. When liquid manure and other CAFO waste is applied on tile-drained fields, at least some portion of it quickly flows down through the fractures and other preferential flow paths into tile systems. Those systems then discharge the liquid, including dissolved contaminants like DRP, to surface waters.

ANSWER: The allegations in the first sentence of Paragraph 156 are legal conclusions to which no response is required. To the extent the first sentence of Paragraph 156 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 156, which are vague and ambiguous. Defendant denies the allegations in the second and third sentences of Paragraph 156.

157. The Maumee TMDL insists that these CAFO discharges do not require wasteload allocations because they are subject to what is known as the agricultural stormwater exemption. This is the same rationale Ohio uses in failing to require CAFOs to get NPDES permits; instead, it requires CAFOs to obtain "no discharge" permits from the Ohio Department of Agriculture.

ANSWER: The allegations in the first sentence of Paragraph 157 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 157.

158. U.S. EPA's and Ohio's reliance on the agricultural stormwater exemption is not supported by law.

ANSWER: The allegations in Paragraph 158 are legal conclusions to which no response is required.

159. Clean Water Act regulations state that a discharge "as a result of" land application of CAFO waste "is a discharge subject to NPDES permit requirements" unless it amounts to "agricultural stormwater." 40 C.F.R. § 122.23(e). *See also* Ohio Admin. Code 901:10-2-14.

ANSWER: The allegations in Paragraph 159 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations and the Ohio Administrative Code, which speak for themselves and are the best evidence of their contents.

160. "Agricultural stormwater discharge" is defined as:

> ***runoff generated by precipitation that drains over terrain*** used for agriculture as defined in section 1.61 of the Revised Code that conveys manure to waters of the state, provided that the manure has been applied in accordance with site specific nutrient management practices

that *ensure appropriate agricultural utilization of nutrients in manure* in compliance with the best management practices set forth in Chapter 901:10-2 of the Administrative Code.

Ohio Admin. Code 901:10-1-01 (emphasis added). *See also* 40 C.F.R. § 122.23(e).

ANSWER:  The allegations in Paragraph 160 are legal conclusions to which no response is required and characterize the Code of Federal Regulations and the Ohio Administrative Code, which speak for themselves and are the best evidence of their contents.

161.    Discharges resulting from application of liquid CAFO waste to tile-drained fields do not meet the definition of "agricultural stormwater discharge" for three independent reasons.

ANSWER:  The allegations in Paragraph 161 are legal conclusions to which no response is required. To the extent Paragraph 161 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 161, which are vague and ambiguous.

162.    First, such discharges are not "*runoff generated by precipitation that drains over*" agricultural terrain; instead, they result from liquid waste flowing straight into the tile lines, even during dry weather, which then inevitably discharge it to Ohio's waters. Discharge of liquid waste through tile systems is not "runoff" as commonly understood—accidental precipitation-caused discharge that can occur despite a farmer's best efforts to prevent it—but rather the outcome of a human-engineered system operating as designed.

ANSWER:  The allegations in Paragraph 162 are legal conclusions to which no response is required. To the extent Paragraph 162 is deemed to contain any factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162, which are vague and ambiguous.

163.    Second, nutrients in CAFO waste that flow directly into tile drain systems cannot support crop growth and, therefore, are not subject to any, let alone "appropriate," "agricultural

utilization." If a field is significantly tiled, following "site specific nutrient management practices that ***ensure*** appropriate agricultural utilization of the nutrients" would necessarily mean that liquid waste could not be applied to it.

> ANSWER:  The allegations in Paragraph 163 are legal conclusions to which no response is required. To the extent Paragraph 163 is deemed to contain any factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163, which are vague and ambiguous.

164.    Third, many, if not most, CAFOs cannot satisfy the "agricultural utilization" requirement because they spread waste on fields that are already overloaded with phosphorus.

> ANSWER:  The allegations in Paragraph 164 are legal conclusions to which no response is required. To the extent Paragraph 164 is deemed to contain any factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164, which are vague and ambiguous.

165.    According to the Tri-State Fertilizer Recommendations applicable in Ohio, there is "***no agronomic reason*** to apply fertilizer" when soil test phosphorus levels exceed crop "maintenance limits," which for corn and soybeans is equivalent to 30 ppm on the Bray-P1 scale (emphasis added). Steve Culman et al., Tri-State Fertilizer Recommendations for Corn, Soy, Wheat & Alfalfa 25, 27-28 (2020).

> ANSWER:  The allegations in Paragraph 165 characterize Steve Culman et al., Tri-State Fertilizer Recommendations for Corn, Soy, Wheat & Alfalfa (2020) ("Tri-State Fertilizer Recommendations"), which speaks for itself and is the best evidence of its contents.

166.    CAFOs routinely apply waste when soil test phosphorus levels exceed these "maintenance limits." Ohio regulations allow manure application until soil test phosphorus levels reach ***150 ppm*** Bray-P1 (five times the Tri-State recommended levels), even while barring

application of synthetic fertilizer when levels exceed 40 ppm Bray-P1. *See* Appendix E Table 2 to Ohio Admin. Code 901:10-2-14.

> ANSWER: The allegations in the first sentence of Paragraph 166 are legal conclusions to which no response is required. To the extent the first sentence of Paragraph 166 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 166, which are vague and ambiguous. The allegations in second sentence of Paragraph 166 contain legal conclusions to which no response is required and characterize the Ohio Administrative Code, which speaks for itself and is the best evidence of its contents.

167. Because the agricultural stormwater runoff exemption does not apply to discharges of liquid CAFO waste through tile drainage systems, CAFOs applying liquid waste to tile-drained fields are discharging point sources that require wasteload allocations. The Maumee TMDL's failure to assign such wasteload allocations violates 40 C.F.R. § 130.2(h).

> ANSWER: The allegations in Paragraph 167 are legal conclusions to which no response is required.

168. The Maumee TMDL also should have assigned wasteload allocations to all medium AFOs (equivalent to 200-699 mature dairy cows or 750-2,499 swine weighing more than 55 lbs) that meet the definition of "Medium CAFO." *See* 40 C.F.R. § 122.23(a) & (d)(1); Ohio Admin. Code 3745-33-02(A).

> ANSWER: The allegations in Paragraph 168 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations and Ohio Administrative Code, which speaks for themselves and are the best evidence of their contents.

169. A medium AFO meets the definition of a "Medium CAFO" if it "[d]ischarges pollutants into waters of the United States through a ditch, . . . flushing system . . . or another similar

device constructed by humans." Ohio Admin. Code 903.01(Q). *See also* 40 C.F.R. § 122.23(6)(i)(A).

ANSWER:  The allegations in Paragraph 169 contain legal conclusions to which no response is required and characterize the Ohio Administrative Code and Code of Federal Regulations, which speak for themselves and are the best evidence of their contents.

170.    All dairy and most swine medium AFOs in the Maumee River watershed (of which there are more than 1,500 in Ohio) meet the "Medium CAFO" definition. Just as with Large CAFOs, these medium AFOs apply liquid waste to tile-drained fields. At least some of that waste flows directly into the tile lines and are not "agricultural stormwater" for the reasons explained above. The tile lines discharge into ditches (which flow into streams) or streams themselves, many of which would qualify as "waters of the United States." Both the tile drainage systems and ditches are "constructed by humans." Ohio Admin. Code 903.01(Q). Therefore, the Maumee TMDL's failure to assign wasteload allocations to discharging Medium CAFOs violates 40 C.F.R. § 130.2(h).

ANSWER:  The allegations in the first sentence of Paragraph 170 contain legal conclusions to which no response is required. To the extent the first sentence of Paragraph 170 contains factual allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 170, which are vague and ambiguous. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 170. The allegations in the third, fourth, fifth, and sixth sentences of Paragraph 170 are legal conclusions to which no response is required.

**Legal Defect #4: Failure to Apportion Load Allocation**

171.    TMDL must assign "load allocations" to all nonpoint sources. 40 C.F.R. § 130.2(g). "Load allocations are best estimates of the loading, which may range from reasonably accurate

estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading." *Id.*

> ANSWER:  The allegations in Paragraph 171 contain legal conclusions to which no response is required and characterize the Code of Federal Regulations, which speaks for itself and is the best evidence of its contents.

172.    Load allocations must be based on existing and "reasonably anticipated" increases or reductions in pollutant loadings. Ohio Admin. Code 3745-2-12(C)(1). To the extent load allocations are based on anticipated reductions, the TMDL must collect and analyze "monitoring data . . . in order to validate the TMDL's assumptions [and] verify anticipated load reductions." Ohio Admin. Code 3745-2-12(C)(2).

> ANSWER:  The allegations in Paragraph 172 are legal conclusions to which no response is required and characterize the Ohio Administrative Code, which speaks for itself and is the best evidence of its contents.

173.    In determining load allocations, the agency must "consider and evaluate, at a minimum, all of" seven listed factors. Ohio Rev. Code 61111.562(B)(1)-(7). These statutory factors include "flow dynamics, including but not limited to, periodic or seasonal flow variations" as well as "the degree to which nonpoint source reductions would influence attainment of the applicable water quality standard." *Id.* at 61111.562(B)(2)(4). Another factor is "[r]easonable assurances that reductions can be implemented." *Id.* at 61111.562(B)(5).

> ANSWER:  The allegations in Paragraph 173 contain legal conclusions to which no response is required and characterize the Ohio Revised Code, which speaks for itself and is the best evidence of its contents.

174.    The Maumee TMDL violates these statutory and regulatory requirements by using a single "landscape" nonpoint source load allocation across the entire watershed. This "landscape"

load allocation assumes that nonpoint source phosphorus loads—and potentials for reduction—are equivalent across the watershed.

ANSWER: The allegations in the first sentence of Paragraph 174 are legal conclusions to which no response is required. To the extent the first sentence of Paragraph 174 contains factual allegations, the allegations in the first sentence of Paragraph 174 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents. The allegations in the second sentence of Paragraph 174 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

175.    In fact, nonpoint source pollution loads vary widely around the Maumee River watershed. The southern sub-watersheds, particularly the Auglaize and the St. Mary's, are the most agricultural and AFO-intensive. Agriculture is the largest nonpoint source category. Consequently, there are significantly more nonpoint sources, and significantly more nonpoint source pollution, in the St. Mary's and other southern sub-watersheds than in the northern sub-watersheds.

ANSWER: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, and fourth sentences of Paragraph 175, which are vague and ambiguous. As to the allegations in the third sentence of Paragraph 175, Defendant admits that agriculture is the largest subcategory of nonpoint sources in the Maumee River watershed. Defendant denies the remaining allegations in the third sentence of Paragraph 175.

176.    The Maumee TMDL explicitly acknowledges that extensive water monitoring data shows that phosphorus loads and concentrations in the southern sub-watersheds are generally much higher than in the northern sub-watersheds.

ANSWER: The allegations in Paragraph 176 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

177.    By nevertheless allocating the entire nonpoint source load equally across the watershed, the Maumee TMDL fails to establish load allocations based on "best estimates" and "available data" as required by 40 C.F.R. § 130.2(g) or fulfill the other legal requirements explained above. Load allocations must reflect basic realities about the location of nonpoint sources across the watershed, which, in this case, requires apportioning a larger share of the total nonpoint source load to nonpoint sources in the southern as opposed to northern watersheds.

ANSWER: The allegations in Paragraph 177 contain legal conclusions to which no response is required and characterize the Maumee TMDL and the Code of Federal Regulations, which speak for themselves and are the best evidence of their contents.

178.    Properly apportioning the load allocation is also essential to providing "reasonable assurances" of nonpoint source reductions, as discussed below.

ANSWER: The allegations in Paragraph 178 are legal conclusions to which no response is required.

**Legal Defect #5: Inadequate Implementation Plan and Failure to Provide Reasonable Assurances**

179.    TMDLs must include a "[p]reliminary TMDL implementation plan establishing specific actions, schedules and monitoring proposed to effectuate a TMDL." Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f). In cases where "a TMDL implementation plan will not immediately attain water quality standards, the TMDL implementation plan shall reflect reasonable assurances that water quality standards will be attained in a reasonable period of time." Ohio Admin. Code 3745-2-12(E)(3). *See also* Ohio Rev. Code 6111.562(B)(5).

ANSWER: The allegations in Paragraph 179 contain legal conclusions to which no response is required and characterize the Ohio Administrative Code and Ohio Revised Code, which speak for themselves and are the best evidence of their contents.

180.  The Consent Decree also required the TMDL to include "an implementation plan as required by Ohio Administrative Code 3745-2-12(E)."

ANSWER: The allegations in Paragraph 180 characterize the Consent Decree, which speaks for itself and is the best evidence of its contents.

181.  U.S. EPA Guidance requires TMDLs to provide "reasonable assurances that nonpoint source reduction will in fact be achieved." U.S. EPA Guidance at 15.

ANSWER: The allegations in Paragraph 181 characterize U.S. EPA Guidance, which speaks for itself and is the best evidence of its contents.

182.  The Maumee TMDL's implementation plan does not comply with these "reasonable assurances" requirements.

ANSWER: The allegations in Paragraph 182 contain legal conclusions to which no response is required and characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

183.  First, the Maumee TMDL does not provide "reasonable assurances that water quality standards will be attained in a reasonable period of time" (Ohio Admin. Code 3745-2-12(E)(3)) because it does not require reductions in DRP, which is the pollutant causing Lake Erie's impairment.

ANSWER: The allegations in Paragraph 183 contain legal conclusions to which no response is required and characterize the Maumee TMDL and Ohio Administrative Code, which speak for themselves and are the best evidence of their contents.

184.  Second, even with respect to total phosphorus, the Maumee TMDL does not provide "specific actions, schedules and monitoring" (Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f)) needed to provide "reasonable assurances" that "water quality standards will be attained in a reasonable amount of time." Ohio Admin. Code 3745-2-12(E)(3).

ANSWER:  The allegations in Paragraph 184 contain legal conclusions to which no response is required and characterize the Maumee TMDL and Ohio Administrative Code, which speak for themselves and are the best evidence of their contents.

185.    The Maumee TMDL does not set any schedule for reducing total phosphorus loads. It contains no interim target loads for total phosphorus, even though loads and concentrations of that pollutant, as well as DRP, are already routinely measured across the watershed. The Maumee TMDL does not even set a date for achieving its final goal of a 40% total phosphorus reduction.

ANSWER:  The allegations in Paragraph 185 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

186.    The Maumee TMDL Implementation Plan is no more than a laundry list of past and ongoing BMP programs, most of which have been failing for years. The Implementation Plan does not identify anything that Ohio will do differently to make these programs effective or explain why Ohio EPA believes they will suddenly start working, let alone how they will achieve a 40% reduction in phosphorus loads. The Maumee TMDL does not propose any schedule for imposing backstop measures if, as there is every reason to expect, the current programs continue to fail.

ANSWER:  The allegations in Paragraph 186 characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

187.    The Implementation Plan also fails to propose taking numerous steps to reduce phosphorus pollution that Ohio EPA and the Ohio Department of Agriculture can, and in some cases must, take under current law, including:

(a)    requiring CAFOs that discharge by applying liquid waste on tiled fields to obtain NPDES permits;

(b)    targeting BMPs to areas where they can be more effective and measuring their impact, focusing on pollution reduction instead of "money spent" and "acres enrolled";

(c)      improving enforcement of existing CAFO permits;

(d)      improving data collection and analysis; and

(e)      implementing Ohio's "Watershed in Distress" program under Ohio Rev. Code 901:13-1-20.

ANSWER:  The allegations in Paragraph 187 contain legal conclusions to which no response is required and characterize the Maumee TMDL and Ohio Revised Code, which speak for themselves and are the best evidence of their contents.

188.    The Maumee TMDL does not include an implementation plan that provides "reasonable assurances" of pollution reductions as required by law.

ANSWER:  The allegations in Paragraph 188 are legal conclusions to which no response is required and characterize the Maumee TMDL, which speaks for itself and is the best evidence of its contents.

**Final Maumee TMDL and U.S. EPA Approval**

189.    Ohio EPA submitted its final Maumee TMDL to U.S. EPA on June 30, 2023. The final TMDL did not correct any of the defects in the Draft that Plaintiffs and others identified. The draft and final TMDLs were nearly identical, except for a perfunctory "response to comments" section that purported, but failed, to address Plaintiffs' and other commenters' concerns.

ANSWER:  Defendant admits the allegations in the first sentence of Paragraph 189. The allegations in the second and third sentences of Paragraph 189 contain legal conclusions to which no response is required and characterize the draft and final Maumee TMDL, which speak for themselves and are the best evidence of their contents.

190.    Plaintiffs met with U.S. EPA officials and staff to urge them to disapprove the defective Maumee TMDL. These meetings included: (a) an in-person meeting at U.S. EPA Region 5 headquarters where counsel for the Lucas County Board and ELPC gave a detailed presentation

about the legal defects in Ohio's draft TMDL; and (b) a Zoom meeting between the Region 5 Administrator (Defendant Debra Shore) and her staff, all three Lucas County Board members, Toledo Mayor Wade Kapszukiewicz, and ELPC. The Lucas County Commissioners and Mayor Kapszukiewicz asked Regional Administrator Shore to disapprove the TMDL and prepare a lawful and effective TMDL. They emphasized the massive economic and public health burden that Lucas County and the City of Toledo suffer as a result of HABs and the unfairness of allowing upstream agriculture to externalize its waste disposal and environmental costs onto their constituents.

ANSWER:  As to the allegations in the first sentence of Paragraph 190, Defendant admits that it met with Plaintiffs as described in this Answer. The remaining allegations in the first sentence of Paragraph 190 contain legal conclusions to which no response is required. As to the allegations in the second sentence of Paragraph 190, Defendant admits that meetings with Plaintiffs included (a) an in-person meeting at the U.S. EPA Region 5 office where counsel for the Lucas County Board and ELPC gave a presentation; and (b) a virtual meeting that included the Region 5 Administrator (Defendant Debra Shore) and some of her staff, all three Lucas County Board members, City of Toledo Mayor Wade Kapszukiewicz, and ELPC representatives. The remaining allegations in the second sentence of Paragraph 190 contain legal conclusions to which no response is required. The allegations in the third and fourth sentences of Paragraph 190 characterize allegations, statements, and claims made by Plaintiffs during those meetings, which Defendant denies the truth of said allegations, statements, and claims but admits that they were made by Plaintiffs during the identified meetings.

191.  On September 28, 2023, U.S. EPA nonetheless approved the Maumee TMDL, finding that it "satisf[ied] all elements for approvable TMDLs." U.S. EPA, Decision Document

for the Maumee Watershed Nutrient TMDL, In All or Parts of 18 Counties In Northwestern Ohio 69 (Sept. 28, 2023).

ANSWER:  Defendant admits that on September 28, 2023, it approved the Maumee TMDL. The remaining allegations in Paragraph 191 characterize U.S. EPA, Decision Document for the Maumee Watershed Nutrient TMDL, In All or Parts of 18 Counties In Northwestern Ohio (Sept. 28, 2023) ("U.S. EPA Decision Document"), which speaks for itself and is the best evidence of its contents.

192.    U.S. EPA issued several documents related to the approval, including a primary "Decision Document" and attachments addressing "EPA Review of" two key issues: DRP and CAFOs. These documents completely deferred to Ohio EPA and found that Plaintiffs' objections did not preclude approval of the TMDL. In the process, these documents ignored or mischaracterized scientific evidence and misapplied the law. U.S. EPA allowed Ohio to violate its Clean Water Act obligations, and in doing so, violated its own.

ANSWER:   The allegations in the first, second, and third sentences of Paragraph 192 characterize the U.S. EPA Decision Document, which speaks for itself and is the best evidence of its contents. The allegations in the fourth sentence of Paragraph 192 are legal conclusions to which no response is required.

**COUNT I**

**Violation of 5 U.S.C. § 706**

193.    Plaintiffs reallege paragraphs 1-192 above and incorporate them by reference in this Count I.

ANSWER:  Defendant incorporates by reference its responses to each and every statement and allegation contained in Paragraphs 1 through 192 herein.

194.    The APA requires courts to "hold unlawful and set aside" any "final agency action"

found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

ANSWER:  The allegations in Paragraph 194 characterize the APA, which speaks for itself and is the best evidence of its contents.

195.    U.S. EPA's Approval of Ohio EPA's TMDL was a "final agency action" because it: (1) was the consummation of U.S. EPA's decision-making process on the TMDL under 40 C.F.R. § 130.7; and (2) determined rights and obligations of the parties or caused legal consequences.

ANSWER:  The allegations in Paragraph 195 are legal conclusions to which no response is required.

196.    U.S. EPA's approval of Ohio EPA's TMDL was "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law" because the TMDL failed to comply with the Clean Water Act and applicable regulations and will not lead to the remediation of Lake Erie's impairment. These legal defects include:

- failure to set limits on DRP as required by 33 U.S.C. § 1313(d)(1)(C) and 40 C.F.R.§ 130.7(c)(1)(ii);

- failure to set an adequate margin of safety as required by 33 U.S.C. § 1313(d)(1)(C);

- failure to assign wasteload allocations to discharging CAFOs as point sources as required by 40 C.F.R. § 130.2(h);

- failure to apportion the load allocation among nonpoint sources as required by 40 C.F.R. § 130.2(g); Ohio Rev. Code 6111.562(B)(1-7); and Ohio Admin. Code 3745-2-12(C); and

- failure to include an implementation plan that provides "reasonable assurances" that target pollution loads will be reached as required by Ohio Admin. Code 3745-

2-12(A)(2)(a)(iv)(f) and 3745-2-12(E)(3) and U.S. EPA Guidance at 15.

While each of these failures alone would be sufficient to make U.S. EPA's approval of the TMDL arbitrary and capricious and contrary to law in violation of the APA, the violations are even more compelling when these failings are considered together.

> ANSWER:  The allegations in Paragraph 196 are legal conclusions to which no response is required, and characterize the Clean Water Act, the Code of Federal Regulations, the Ohio Revised Code, the Ohio Administrative Code, and U.S. EPA Guidance, which speak for themselves and are the best evidence of their contents.

The allegations in the Complaint following Paragraph 196 constitute a Prayer for Relief to which no response is required.

## GENERAL DENIAL

To the extent that any factual allegation in the Complaint has not been admitted or specifically responded to, Defendant denies such allegation.

## DEFENSES

1.      Plaintiffs fail to state a claim upon which relief can be granted.

2.      Because the Complaint seeks judicial review under the APA, judicial review of final agency action is limited to the administrative record, which does not include either the Complaint and its allegations of fact, or this Answer and Defendant's responses.

Defendant reserves the right to raise any defense - including, but not limited to, those expressly found in Federal Rules of Civil Procedure 8(c) and 12 - that may be supported by the record in the instant action.

Respectfully submitted this 29th day of July, 2024.

*/s/ Miranda M. Jensen*

MIRANDA M. JENSEN
DANIEL R. DERTKE
United States Department of Justice
Environment & Natural Resources Division

69

Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 598-3071 (Jensen)
(202) 514-0994 (Dertke)
miranda.jensen@usdoj.gov
daniel.dertke@usdoj.gov

REBECCA C. LUTZKO
United States Attorney

GUILLERMO J. ROJAS
Assistant United States Attorney
Northern District of Ohio, Toledo Branch
4 Seagate #308
Toledo, Ohio 43604

*Attorneys for Defendants*