**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

THE BOARD OF LUCAS COUNTY COMMISSIONERS, et al.

Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.

Defendants.

Case No. 3:24-cv-00779

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF STATE AND NATIONAL AGRICULTURAL ASSOCIATIONS' MOTION TO INTERVENE AS DEFENDANTS**

Ohio Pork Council, Ohio Dairy Producers Association, Ohio Cattlemen's Association, Ohio Poultry Association, Ohio Farm Bureau Federation, Ohio Soybean Association, Ohio Corn & Wheat Growers Association, American Farm Bureau Federation, National Pork Producers Council, National Corn Growers Association, and United Egg Producers (together, "Agricultural Associations") respectfully seek leave to intervene as of right under Federal Rule of Civil Procedure ("Rule") 24(a)(2), or alternatively, for permissive intervention under Rule 24(b).

Plaintiffs challenge the U.S. Environmental Protection Agency's ("U.S. EPA") September 28, 2023, decision approving the Ohio Environmental Protection Agency's ("Ohio EPA") Maumee Watershed Nutrient TMDL ("Maumee TMDL"). The Maumee TMDL establishes the maximum amount of total phosphorus that the Maumee Watershed—and ultimately, the Western Lake Erie Basin—can receive from all sources within the watershed and still meet applicable water quality standards that Ohio EPA established under the Clean Water Act ("CWA"). *See* Compl. ¶¶ 11-13,

15. Plaintiffs claim the Maumee TMDL is deficient in several respects and that U.S. EPA's approval of that TMDL is unlawful. *See id.* ¶¶ 196-97. Throughout their Complaint, Plaintiffs assert that the Maumee TMDL: (i) fails to assign pollutant loading limits to point and nonpoint sources of agricultural phosphorus; and (ii) lacks detailed implementation requirements to provide reasonable assurance that such limits assigned to agricultural sources will be achieved.

Agricultural Associations' members grow various agricultural commodities in the State of Ohio. Agricultural Associations have long sought to protect their members' interests in rational CWA regulation that is protective of water quality, while adhering to the federalism-preserving provisions of the CWA. Through this action, Plaintiffs ask this Court to compel U.S. EPA to reject Ohio EPA's TMDL and to promulgate a *federal* TMDL that remedies each of the alleged defects outlined in the Complaint. Such an outcome may result in new, more stringent regulatory burdens on the Agricultural Associations' members. Because Agricultural Associations' members have a significant stake in this proceeding, the Court should grant this Motion.

## BACKGROUND

### I. Regulatory Framework for Water Quality Standards and TMDLs.

The CWA places primary authority with each State to adopt water quality standards for its navigable waters, which consist of the designated uses for such waters (*e.g.*, recreation, drinking water supply) and the numeric or narrative water quality criteria that protect such uses. *See* 33 U.S.C. § 1313(c)(2)(A); *see also* 40 C.F.R. §§ 131.10 & 131.11. After establishing water quality standards, States must periodically identify waters within their borders for which effluent limitations on point source discharges are not stringent enough to meet applicable standards, along with a priority ranking for those waters, and States must submit those lists and rankings to U.S. EPA for approval. *See* 33 U.S.C. § 1313(d)(1), (2). In accordance with their priority rankings, States must then establish total maximum daily loads ("TMDLs") and submit them to U.S. EPA

for approval. *See id.* The Act does not define "total maximum daily load," but it directs that a TMDL be established "at a level necessary to implement the applicable water quality standards." *Id.* § 1313(d)(1)(C). EPA's regulations define a TMDL as the *sum* of loadings from existing or future point sources ("wasteload allocations") and loadings from existing or future nonpoint sources of pollution or natural background sources ("load allocations").[1] *See* 40 C.F.R. § 130.2.

In keeping with congressional policy to preserve and protect the primary responsibilities and rights of each state over its planning for the development and use of its land and water resources, the CWA "puts the responsibility for implementation of TMDLs on the states." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1031 (11th Cir. 2002). Implementation of TMDLs may be achieved through various mechanisms under the Act. For example, most States have authority to administer the National Pollutant Discharge Elimination System ("NPDES") permitting program regulating point source discharges. *See* 33 U.S.C. § 1342. NPDES permits must contain effluent limitations that are consistent with applicable wasteload allocations in a TMDL. *See* 40 C.F.R. § 122.44(d)(1)(vii)(B). The Act also supports planning and funding programs to aid States in reducing nonpoint source pollution. *See* 33 U.S.C. § 1329. The Act assigns responsibility to the States to prepare waste treatment management plans (*id.* § 1288) and nonpoint source management plans (*id.* § 1329), and to undertake a continuing planning process (*id.* § 1313(e)), "which is essentially a plan for how the state is going to clean up pollution." *Meiburg*, 296 F.3d at 1026.

---

[1] A "point source" is "any discernible, confined and discrete conveyance," such as a pipe or ditch. 33 U.S.C. § 1362(14). Point source discharges include wastewater discharges from industrial plants and municipal sewage treatment plants, but Congress expressly excluded "agricultural stormwater discharges" from the definition of "point source." *Id.* Nonpoint sources are any source other than a point source, and include various agricultural and forestry activities. *See, e.g.*, *id.* §§ 1288(b)(2)(F) & 1314(f)(2)(A).

State TMDL implementation plans are not part of a TMDL itself and are not subject to EPA review and approval. *See Meiburg*, 296 F.3d at 1030 n.10 (finding that 33 U.S.C. § 1313(d) and 40 C.F.R. § 130.2(i) unambiguously do not "indicate[] or even impl[y] that TMDLs include implementation plans"); *see also Bravos v. Green*, 306 F. Supp. 2d 48, 57 (D.D.C. 2004) ("[T]here is no statutory language requiring submission to or approval of a State's implementation plan by the EPA[.]"). Since 1992, U.S. EPA's express policy has been that "EPA is not required to and does not approve TMDL implementation plans." U.S. EPA, "Guidelines for Reviewing TMDLs under Existing Regulations issued in 1992," at 5 (May, 20, 2002).[2]

**II. Identity of Agricultural Associations.**

The Ohio Pork Council is a grassroots organization representing the interests of more than 2,500 members raising pigs across Ohio. The organization works to promote a viable, sustainable, and socially responsible pork industry.

The Ohio Dairy Producers Association is a grassroots legislative, research, producer education, and advocacy organization, representing dairy farmers from across the state, regardless of farm size, breed or production strategy, marketing preference, or political affiliation.

The Ohio Cattlemen's Association ("OCA") is a statewide non-profit membership organization that represents the business interests important to farm families that raise cattle. It serves as the voice and issues manager for all of Ohio's beef cattle business. OCA works sustainably to maintain profitability and growth opportunities for Ohio's beef industry, while providing consumers with safe and wholesome beef.

The Ohio Poultry Association ("OPA") is a non-profit trade organization that represents over 1,000 egg, chicken and turkey farmers. OPA members are committed to providing safe, high-

[2] *Available at* https://www.epa.gov/sites/default/files/2015-10/documents/2002_06_04_tmdl_guidance_final52002.pdf.

quality, and affordable food products for families across the state and nation and are integral members of their local communities. In addition, they are dedicated to providing excellent care to their flocks and being responsible stewards of the land, air and water surrounding their farms.

The Ohio Farm Bureau Federation is Ohio's largest general farm organization, representing members in all of Ohio's 88 counties. Ohio Farm Bureau members run the gamut from large to small businesses, from crop production to energy development, from livestock production to food processing, and everything in between. Ohio Farm Bureau and its members advocate for a robust farm community and the future of agriculture.

The Ohio Soybean Association ("OSA") was founded in 1966, and its mission is to advocate through member engagement to influence policy, regulation, and legislation that benefit Ohio soybean farmers and industry. OSA represents its members and all Ohio soybean farmers at both the state and federal levels, to shape policy and legislation to ensure a growing and profitable soybean industry for future generations of soybean farmers.

The Ohio Corn & Wheat Growers Association is a membership organization of farmers who grow corn and wheat in Ohio which advocates to protect its members freedom to farm and supports public policy on members' behalf.

American Farm Bureau Federation ("AFBF") is the largest non-profit general farm organization in the United States, representing about 6 million families in all fifty States and Puerto Rico. AFBF's members grow and raise every type of agricultural crop and commodity produced in the United States. AFBF protects, promotes, and represents the business, economic, social, and education interests of American farmers and ranchers.

National Pork Producers Council ("NPPC") is an association of 43 state pork producer organizations and is the global voice for the Nation's nearly 60,000 pork producers. NPPC

conducts public policy outreach at both the state and federal level with a goal of meeting a growing worldwide demand for pork. NPPC and its members throughout the United States work to promote the social, environmental, and economic sustainability of U.S. pork producers and their partners.

The National Corn Growers Association ("NCGA") was founded in 1957. NCGA represents nearly 40,000 dues-paying corn farmers nationwide and the interests of more than 300,000 growers. NCGA and its 50 affiliated state organizations work together to create and increase opportunities for corn growers to help them sustainably feed a growing world.

The United Egg Producers ("UEP") was founded in 1968. Since then, UEP has served as a farmer cooperative working collaboratively to address legislative, regulatory and advocacy issues impacting egg production through active farmer-member leadership and a unified voice. UEP membership represents 11 out of every 12 eggs produced in the United States.

As detailed below, each of these associations has members who would be directly impacted by new requirements that Plaintiffs seek to compel U.S. EPA to establish through this lawsuit.

## ARGUMENT

### I. AGRICULTURAL ASSOCIATIONS MEET THE STANDARD FOR INTERVENTION AS OF RIGHT.

The Sixth Circuit has interpreted Rule 24(a) as establishing four elements for intervention as of right: (1) the motion is timely; (2) the movant has a substantial legal interest in the case; (3) the movant's ability to protect its interest will be impaired absent intervention; and (4) the parties before the court may not adequately represent the movant's interest. *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997). Rule 24 should be "broadly construed in favor of potential intervenors." *Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007). This Court has noted that the Sixth Circuit's "standard for intervention as a matter of

right is lenient." *Zeeb Holdings, LLC v. Johnson*, 338 F.R.D. 373, 376 (N.D. Ohio 2021).[3] As explained below, Agricultural Associations satisfy the requirements for intervention as of right.

A. <u>This Motion is Timely.</u>

Courts consider the following factors in determining the timeliness of a motion to intervene: (1) the stage of the proceedings; (2) the purpose for which intervention is sought; (3) the length of time preceding the movant's application; (4) the prejudice to the original parties due to the movant's failure to promptly intervene; and (5) the existence of unusual circumstances in favor of or against intervention. *See Zeeb Holdings, LLC*, 338 F.R.D. at 376-77 (N.D. Ohio 2021) (citing *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 490 (6th Cir. 2014)).

This case is in its very early stages. There have been no arguments or rulings on substantive matters, and this Court has not yet issued a scheduling order for dispositive motions. U.S. EPA has only recently responded to Plaintiffs' Complaint on July 29, 2024, and it filed the certified index to the administrative record on August, 15, 2024. *See* Dkt. Nos. 16 & 17. Moreover, Plaintiffs have until September 23, 2024, to file any motion challenging the scope of the administrative record. *See* Dkt. No. 18. For these reasons, Agricultural Associations' intervention would not prejudice the existing parties or delay the resolution of the litigation.

B. <u>Agricultural Associations' Members Have Substantial Interests in This Case.</u>

A substantial interest need not be "'a specific legal or equitable interest' in the litigation for the interest to qualify as substantial." *Wineries of the Old Mission Peninsula Ass'n v. Twp. Of Peninsula*, 41 F.4th 767, 772 (6th Cir. 2022) (citation omitted). Instead, the Sixth Circuit adopts a

---

[3] "[A] party seeking to intervene need not possess the standing necessary to initiate a lawsuit." *Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 536-39 (1972)); *see also Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433,440 (2017) (requiring Art. III standing only where intervenor sought relief different from plaintiff).

"rather expansive notion of the interest sufficient to invoke intervention of right." *Michigan State AFL-CIO*, 103 F.3d at 1245. "'[T]he interest must be significantly protectable' to rise to the level of substantial." *Wineries of the Old Mission*, 41 F.4th at 772 (citation omitted).

Here, Agricultural Associations satisfy the interests requirement. Plaintiffs ask this Court to: vacate U.S. EPA's approval of the Ohio EPA's Maumee TMDL; order U.S. EPA to disapprove of that TMDL; and order U.S. EPA to promulgate a more stringent, federal TMDL that remedies various alleged legal defects in the TMDL. *See* Compl., Relief Requested ¶¶ B, C, D. The overall thrust of Plaintiffs' Complaint is that the Maumee TMDL does not do enough to reduce agricultural phosphorus pollution and thus, this Court must order EPA to impose more requirements on agricultural operations. *See* Compl. ¶¶ 5, 86, 102, 155-56, 158-167. For instance, Plaintiffs allege that: (1) "U.S. EPA's and Ohio's reliance on the agricultural stormwater exemption is not supported by law," *id.* ¶ 158; (2) the Maumee TMDL unlawfully fails to assign specific wasteload allocations to various discharging livestock operations, *id.* ¶¶ 157-70; (3) the TMDL fails to properly apportion the load allocation among nonpoint sources of agricultural pollution, *id.* ¶¶ 171-78; and (4) the implementation plan for the Maumee TMDL does not provide specific actions, schedules, and monitoring requirements—such as requiring new permits and best management practices for agricultural sources—that are necessary to provide reasonable assurances that pollutant reductions will in fact be achieved. *Id.* ¶¶ 181-88.

Agricultural Associations' members live and farm, raising livestock and growing crops, within the Maumee Watershed, and their farms would be directly subject to any new wasteload allocations and load allocations that Plaintiffs argue are required. Likewise, they would be directly impacted by any specific actions, deadlines, or monitoring requirements that Plaintiffs argue are necessary to provide reasonable assurances that the pollutant reductions are achieved. Moreover,

Plaintiffs' suit calls into question the interpretation of the CWA's exclusion of "agricultural stormwater discharges" from the Act's permitting requirements. *Compare* 33 U.S.C. § 1362(14), *with* Compl. ¶¶ 159-164, 167. The interpretation of that statutory exclusion is of utmost importance to Agricultural Associations, several of which have litigated that issue, both as petitioners and as intervenor-respondents. *E.g.*, *Food & Water Watch v. EPA*, No. 23-2146 (9th Cir. argued Sep. 12, 2024) (AFBF and NPPC as Respondent-Intervenors); *Waterkeeper Alliance v. EPA*, 399 F.3d 486 (2d Cir. 2005) (AFBF and NPPC as Petitioners/Intervenors); *Alt v. EPA*, 979 F. Supp. 2d 701 (N.D. W. Va. 2013) (AFBF as Plaintiff-Intervenors).

In a similar suit challenging EPA's promulgation of a TMDL, another federal court held that regulated entities had a legally protectable interest related to the litigation that entitled them to intervene as of right pursuant to Rule 24(a)(2). *See Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 104-06 (M.D. Pa. 2011). There, agricultural and other interested parties challenged U.S. EPA's TMDL for the Chesapeake Bay, and associations representing municipal wastewater dischargers, some of which had been assigned wasteload allocations under that TMDL, moved to intervene as defendants in the litigation pursuant to FRCP 24(a)(2). *Id.* at 102, 104-05. In granting the motion, the court wrote:

> [T]he Municipal Associations' members discharge nutrients and sediment pursuant to their NPDES permit limits which are subject to the strategy [wasteload allocations] established by the [Chesapeake] Bay TMDL. Thus, the court finds that Movants' interest in the amount of nutrients and sediment their members are authorized to discharge, which are governed by permits that may be amended as a result of this litigation, constitutes a legally protectable interest.

*Id.* at 105.

Similarly, here, Plaintiffs are seeking a court order assigning new wasteload allocations and load allocations to Agricultural Associations' members within the Maumee Watershed. *See* Compl. ¶¶ 196(c)-(d). Like the municipalities in *American Farm Bureau*, these members have a

protectable interest in the amount of phosphorus that permissibly may run off their lands along with precipitation events, which could be modified as a result of this litigation.

C. The Interests of Agricultural Associations' Members May Be Impaired Absent Intervention.

"To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." *Davis*, 560 F. App'x at 495 (quoting *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999)).

If Plaintiffs succeed in obtaining the relief sought, it would likely, not just possibly, impair Agricultural Associations' members' protected interests. As detailed above, Plaintiffs seek to vacate U.S. EPA's approval of the Maumee TMDL and require *U.S. EPA* to adopt a more stringent TMDL, which would: change U.S. EPA's (and Ohio EPA's) interpretation of the statutory exclusion for agricultural stormwater discharges; establish new wasteload allocations and load allocations that would apply to Agricultural Associations' members; and mandate specific actions, schedules, and monitoring requirements to provide reasonable assurance that those members will attain the required pollutant reductions within a reasonable period of time. *See* Compl. ¶¶ 158-70, 182-85, 187, 196(c)-(d). Such federal mandates would be burdensome and inconsistent with the statute. *Cf. Sierra Club v. EPA*, 995 F.2d 1478, 1485-86 (9th Cir. 1993) (city granted intervention in suit seeking to impose additional restrictions on city's CWA permit).

D. Existing Parties May Not Adequately Represent the Interests of Agricultural Associations' Members.

The Supreme Court has found the burden of demonstrating inadequacy "minimal" and satisfied by demonstrating only that the representation provided by existing parties "'may be' inadequate." *Trbovich*, 404 U.S. at 538 n. 10 (citation omitted); *accord Linton ex rel. Arnold v. Comm'r of Health & Env't*, 973 F.2d 1311, 1319 (6th Cir. 1992). Proposed intervenors need show

only that there is a potential for inadequate representation. *Trbovich*, 404 U.S. at 538 n. 10; *see also Linton*, 973 F.2d at 1319.

Plaintiffs, who seek to increase the regulatory burdens on Agricultural Associations' members, clearly do not adequately represent Agricultural Associations' interests. And although Agricultural Associations seek to intervene as defendants, their interests are considerably different from those of U.S. EPA. In carrying out its responsibilities under the CWA, U.S. EPA represents the broader interests of the general public. By contrast, Agricultural Associations represent the narrower economic and other agricultural interests of their members, which are regulated by U.S. EPA and the States.

U.S. EPA cannot adequately represent its public interest in implementing the CWA while also representing the Agricultural Associations' private interest against unreasonable or unjustified permitting and land management requirements. *See Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 973-74 (3d Cir. 1998) ("The straightforward business interests asserted by intervenors here may become lost in the thicket of sometimes inconsistent governmental policies."); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003) ("[W]e have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors.").

Even if U.S. EPA's and the Agricultural Associations' interests were more closely aligned, Agricultural Associations' participation in this suit would still bring "necessary elements to the proceeding[,]" *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995), given their extensive involvement in prior administrative and judicial processes related to CWA regulation of agriculture. And Agricultural Associations' briefing in this case would "likely [] serve as a vigorous and helpful supplement to EPA's defense" of its approval of the Maumee TMDL. *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977). Members of

Agricultural Associations have significant technical expertise regarding the nature of agricultural operations, which can benefit the Court in resolving this case.

Finally, due process and simple fairness suggest that all sectors potentially affected by the Complaint should be heard: Plaintiffs, who charge that the Maumee TMDL is not stringent enough and must be reissued by U.S. EPA; U.S. EPA, the agency authorized to administer the CWA in the public interest; and Agricultural Associations, whose members are directly engaged in the activities that Plaintiffs seek to subject to additional permits and restrictions and who would bear the brunt of a ruling in Petitioners' favor. *See Kleissler*, 157 F.3d at 971 (in cases pitting private, state, and federal interests against each other, "[r]igid rules [barring intervention] contravene a major premise of intervention—the protection of third parties affected by the pending litigation. *Evenhandedness is of paramount importance.*") (emphasis added).

## II. ALTERNATIVELY, AGRICULTURAL ASSOCIATIONS' MEMBERS SHOULD BE GRANTED PERMISSIVE INTERVENTION.

If this Court does not grant Agricultural Associations intervention as of right, the associations alternatively request that the Court permit them to intervene. Rule 24(b) provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). A district court, "in exercising its discretion, must consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Purnell*, 925 F.2d at 951.

Agricultural Associations should be permitted to intervene here. ***First***, as mentioned above, this case has had no substantive proceedings to date. This motion is therefore timely and will not cause undue delay or prejudice to the parties. Moreover, Agricultural Associations agree to adhere to the Court's scheduling order when set. ***Second***, as intervenor-*defendants*, Agricultural Associations do not seek to inject new claims. Agricultural Associations intend to offer defensive

arguments in opposition to those allegations made by Plaintiffs that target agricultural activities for additional permitting and restrictions. Because Agricultural Associations would raise issues directly responsive to Petitioners' claims, they would necessarily assert a claim or defense in common with the main action, and thus satisfy the literal requirements of Rule 24(b). ***Last***, because of Agricultural Associations' extensive involvement in and familiarity with regulation of agricultural activities under the CWA, including the interpretation of the exclusion of "agricultural stormwater discharges" from the CWA's definition of "point source," their intervention would contribute to the just and equitable adjudication of the legal questions presented.

## CONCLUSION

Agricultural Associations respectfully request the Court grant them intervention as of right under Rule 24(a) or, alternatively, permissive intervention under Rule 24(b).

Dated: September 20, 2024

Respectfully submitted,

*/s/ Daniel W. Wolff*

Daniel W. Wolff (0074168)
David Y. Chung (*pro hac* application forthcoming)
Elizabeth B. Dawson (*pro hac* application forthcoming)
Eryn C. Howington (*pro hac* application forthcoming)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Facsimile: (202) 628-5116
Dwolff@crowell.com
Dchung@crowell.com
Edawson@crowell.com
Ehowington@crowell.com

*Attorneys for Proposed Intervenor-Defendants Ohio Pork Council, Ohio Dairy Producers Association, Ohio Cattlemen's Association, Ohio Poultry*

*Association, Ohio Farm Bureau Federation, Ohio Soybean Association, Ohio Corn & Wheat Growers Association, American Farm Bureau Federation, National Pork Producers Council, National Corn Growers Association, and United Egg Producers*