## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OHIO, WESTERN DIVISION

THE BOARD OF LUCAS COUNTY
COMMISSIONERS, *et al.*

      *Plaintiffs,*

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al.*

      *Defendants.*

Case No. 3:24-cv-00779
Judge James G. Carr

---

## MAUMEE COALITION II ASSOCIATION'S AMENDED MOTION TO INTERVENE AS AN ADDITIONAL DEFENDANT

---

Pursuant to Fed. R. Civ. P. 24 and Local Rule 7.1, the Maumee Coalition II Association ("the Coalition") moves the Court to allow the Coalition to intervene as an additional Defendant in this proceeding as a matter of right or, in the alternative, for permissive intervention.  Plaintiffs have indicated that they oppose the Coalition's request to intervene.  U.S. EPA has indicated that it opposes the Coalition's request to intervene as a matter of right, but takes no position as to permissive intervention.

The Coalition's Motion to Intervene ("the Motion" or "the MTI") is timely because the Court has yet to rule on two pending motions to intervene filed by a group of agricultural trade organizations and Ohio EPA, the latter motion having just been filed on October 18, 2024, and no briefing schedule has yet been established.  In addition, because this proceeding is an appellate review of a final agency decision based on an administrative record, rather than a *de novo* trial, granting intervention will not (1) delay the briefing and adjudication of all issues, (2) prejudice the rights of any party, or (3) add substantial costs to any party's briefing of the issues.  Finally, U.S.

EPA's role as *parens patriae* under the Clean Water Act does not adequately represent the interests of the Coalition, and the members thereof will be prejudiced in several meaningful ways if they are not permitted to intervene, but are instead relegated to the right to comment on, and potentially challenge, a revised TMDL issued in follow-up to a potential ruling by the Court in favor of Plaintiffs.

For these reasons, which are elaborated upon in the following Memorandum in Support, the Coalition requests that the Court grant their MTI.  The Coalition files this Amended MTI to correct citations relating to additional defenses that the Coalition would raise if the Court grants intervention.  A draft of the Coalition's amended Answer is also enclosed as Exhibit A.

Respectfully submitted,

*/s/  Christina Wieg*
Stephen P. Samuels (007979)(Trial Counsel)
Stephen N. Haughey (0010459)
Christina Wieg (0098693)
**FROST BROWN TODD LLP**
10 West Broad Street
Columbus, OH 43215-3484
(614) 371-8042
ssamuels@fbtlaw.com
shaughey@fbtlaw.com
cwieg@fbtlaw.com
*Counsel for the Maumee Coalition II Association*

## MEMORANDUM IN SUPPORT OF MAUMEE COALITION II ASSOCIATION'S MOTION TO INTERVENE AS AN ADDITIONAL DEFENDANT

## I.  INTRODUCTION.

### A.  Makeup of the Coalition.

The Maumee Coalition II Association ("the Coalition") is a not-for-profit association of local governments and industries[1] holding NPDES permits issued by Ohio EPA.  These permits allow them to discharge treated wastewaters, noncontact cooling waters, and stormwater into rivers and streams in Ohio.  Some members of the Coalition discharge directly into the Maumee River or one of its tributaries, and thus are directly impacted by the outcome of Plaintiffs' challenge to U.S. EPA's September 28, 2023, decision approving Ohio EPA's issuance of the Maumee Watershed Nutrient TMDL ("the Maumee TMDL").  Other members discharge into other rivers and streams in Ohio that (1) are on Ohio EPA's list of impaired waters due to nutrient enrichment conditions, and (2) are the subject of an ongoing evaluation by Ohio EPA as a prelude to issuance of a TMDL designed to address those conditions, and therefore they are also likely to be impacted by the outcome of Plaintiffs' challenge.

### B.  Issues Raised by Plaintiffs that Affect the Interests of the Coalition.

Under the Clean Water Act ("CWA"),[2] each state must adopt and enforce water quality standards ("WQSs") for its navigable waters.  33 U.S.C. §1313(a).  Once adopted, states must periodically identify waters that are impaired due to nonattainment of the WQSs, and submit a list of such waters to U.S. EPA.  33 U.S.C. §1313(d).  States must then develop total maximum daily loads ("TMDLs") for the specific pollutant(s) that are causing or contributing to the impairment,

---

[1] The Coalition's current members are the Cities of Lima and Dayton, Ohio, the Board of Commissioners for Allen County, Ohio, and PCS Nitrogen Ohio, L.P.  Other local governments and industries are likely to join the Coalition shortly and, if the Court grants the MTI, the Coalition will most likely file an unopposed stipulation identifying the additional members and, if necessary, their interest in this proceeding.

[2] 33 U.S.C. §§ 1251 *et seq*.

3

designed to reduce the pollutant loadings to enable applicable WQSs to be met. *Id.* Per U.S. EPA's regulations, a TMDL determines a pollutant reduction target, and then, to achieve the target, allocates load reductions, along with a margin of safety, to contributing sources that discharge the applicable pollutants into the impaired waterbody. 40 C.F.R. § 130.2.

Sources of pollutants to waterbodies are designated as either "point sources" ("PSs") or "nonpoint sources" ("NPSs"), the former being "discernible, confined and discrete conveyances" to a waterbody, such as a pipe, channel or ditch, and the latter being any source of water pollution other than a point source, including agricultural stormwater discharges and return flows from irrigated agricultural lands. 33 U.S.C. § 1362(14).

On September 28, 2023, U.S. EPA approved Ohio EPA's issuance of a final Maumee TMDL, which establishes the maximum amount of total phosphorus ("TP") that the Maumee River Watershed can receive from all sources (both PSs and NPSs) within the watershed and still maintain applicable WQSs established by Ohio EPA. *See* U.S. EPA, Decision Document for Maumee Watershed Nutrient TMDL, In All or Parts of 18 Counties in Northwestern Ohio (Sept. 28, 2023) (available at https://www.epa.gov/tmdl/epas-approval-ohios-maumee-watershed-nutrient-total-maximum-daily-load). Several members of the Coalition were also members of an earlier coalition that actively participated in the process Ohio EPA utilized to develop the TMDL, including submitting comments on the Agency's issuance of the draft.

In this proceeding, Plaintiffs allege that Ohio EPA failed to develop the TMDL for the Maumee River Watershed sufficient to meet the CWA's requirements for TMDLs, and that U.S. EPA's approval of it was therefore unlawful, arbitrary and capricious. Complaint at ¶¶ 196-197. They ask the Court to vacate the Maumee TMDL and order U.S. EPA to develop a new TMDL that is substantially different in several ways. *Id.* at ¶ 198. Plaintiffs assert that the Maumee TMDL

is flawed in the following ways:

1. Ohio EPA failed to incorporate in the Maumee TMDL specific phosphorus limits for Concentrated Animal Feeding Operations ("CAFOs") as PSs, and failed to apportion phosphorus load allocations among all agricultural NPSs of phosphorus;

2. Ohio EPA failed to incorporate in the Maumee TMDL a phosphorus load allocation and discharge permit limits specific for dissolved reactive phosphorus ("DRP");[3]

3. Ohio EPA failed to incorporate in the Maumee TMDL an adequate margin of safety ("MOS");[4] and

4. Ohio EPA failed to incorporate in the Maumee TMDL an implementation plan that provides "reasonable assurances" that the targeted pollution loads will be reached.

*Id*. at ¶¶ 196-97.  The members of the Coalition are substantially impacted by the resolution of these four issues in the following ways, addressed in the same order as above:

1. Because TMDLs are akin to "pollution diets," how the "pieces of the allocation pie" are distributed among the various PSs and NPSs, and the size of each piece apportioned to each source, impact *all* sources that "make up the allocation pie," and therefore whether CAFOs receive specific limits for the discharge of phosphorus, and whether load allocations for NPSs are specifically apportioned among all NPSs of phosphorus, directly impacts the "slice of the allocation pie" to be apportioned to the members of the Coalition in their individual discharge permits.

---

[3] Dissolved phosphorus refers to the phosphorus that is dissolved in water (meaning not attached to particles), and thus more readily available for plant uptake, whereas total phosphorus ("TP") includes all phosphorus, regardless of form (both dissolved in water and attached to particles).  *See* Maumee Watershed Nutrient TMDL FAQs, September 29, 2023 (available at https://www.epa.gov/system/files/documents/2023-09/maumee-watershed-nutrient-tmdl-faqs.pdf.)

[4] A MOS is included in the TMDL load calculation to account for uncertainty in predicting how well pollutant reductions will result in achieving WQSs.  *See* U.S. EPA Overview of Total Maximum Daily Loads (TMDLs) (available at https://www.epa.gov/tmdl/overview-total-maximum-daily-loads-tmdls).

2.  For point source dischargers like the members of the Coalition, existing technology used to treat wastewater to achieve effluent limits for TP is *substantially* less expensive to build, operate, and maintain than the technology needed to achieve effluent limits for DRP, and therefore whether the Maumee TMDL must separately impose permit limits for DRP has a dramatic effect on the financial conditions of the members and their residents and customers.

3.  A MOS that is arbitrarily and unnecessarily large (a) substantially reduces each "slice of the allocation pie," which increases the corresponding targeted pollutant reduction required to be achieved by each member of the Coalition, thereby driving up its costs, and (b) severely restricts the ability of the members to expand their treatment systems to meet increasing populations (local governments) or increasing production demands (industry), as well as other potential growth opportunities for the watershed.

4.  Because TMDLs are meant to be iterative processes, and because nutrient enrichment conditions are impacted by a host of factors other than PS and NPS contributions, including physical, chemical, biological, geological, hydrological, and weather-related elements, an implementation plan whose "reasonable assurances" are overly strict, particularly in terms of timetables, will potentially lead to a premature and unnecessary reapportionment of the allocation pie, resulting in more stringent allocations and corresponding permit limits for the PSs, including those of the members of the Coalition.

## II.  ARGUMENT IN SUPPORT OF INTERVENTION.

### A.  The Coalition has the Right to Intervene in this Proceeding.

Under Civil Rule 24, on timely motion, a court must permit anyone to intervene who claims an interest relating to the property or transaction that is the subject of the action, and who is so situated that disposing of the action may, as a practical matter, impair or impede the movant's

6

ability to protect its interest, unless existing parties adequately represent that interest.  Fed. R. Civ. P. 24(a).  With respect to the interest of the movant, it must be a substantial legal interest, meaning that not just any articulated interest will suffice.  *See e.g., Drewes Farms Partnership v. City of Toledo*, 2019 WL 5420587 *1, *2 (N.D. Ohio 2019)(*citing Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 783 (6th Cir. 2007)).  Whether the movant's interest is "substantial" is case specific, but the Sixth Circuit has held that an organization has a substantial legal interest when its interests are greater than that of the general public.  *See e.g. Grutter v. Bollinger*, 188 F.3d 394, 398-399 (6th Cir. 1999); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1246-1247 (6th Cir. 1997).

In addition, whether the movant's interest will be impaired or impeded requires only the possibility thereof; the burden to make such showing is "minimal;" and courts generally allow intervention if the movant "*might* be practically disadvantaged by the disposition of the action." *Zeer Holdings, LLC v. Johnson, Jr.*, 338 F.R.D. 373, 379 (N.D. Ohio 2021) (Carr, J.) (internal citations omitted).  Whether the movant's interests will be adequately represented by existing parties requires only the "minimal" demonstration that such interests may not be adequately represented, not that they would in fact be so, and "it may be sufficient to show that existing parties who purport to seek the same outcome will not make all of the prospective intervenor's arguments."  *Id.*

Finally, in the Sixth Circuit, the standard for intervention as a matter of right is lenient; the intervenor need not have a specific legal or equitable interest to qualify for intervention; and intervention under Rule 24 is to be broadly construed in favor of potential intervenors.  *Id.* at 376.

### 1.  The Coalition's Motion is Timely.

When determining the timeliness of a motion to intervene, courts examine several factors

including: (1) the state of the proceedings; (2) the purpose for which the intervention is sought; (3) the length of time preceding the movant's application; (4) the potential prejudice to the original parties; and (5) the existence of unusual circumstances in favor or against intervention. *See e.g. Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990). The Coalition meets these criteria. First, this proceeding is in its early stages: no substantive arguments or rulings have been made, and no briefing and/or motion schedule has been established. Second, two additional motions to intervene are pending, one from a group of agricultural trade associations, and a second from the State of Ohio on behalf of Ohio EPA, the latter motion to intervene having just been filed on October 18, 2024. Third, this proceeding is an administrative appeal of a final action taken by U.S. EPA from an administrative record compiled below, not a *de novo* trial, and thus its resolution (assuming there is no settlement) will be based on the parties' briefs. As such, allowing the three movants to intervene as of right does nothing more (again, assuming there is no settlement) than add three additional briefs that will not cause substantial costs or delays for U.S. EPA and, for Plaintiffs, can be addressed in an appropriate scheduling order that avoids unnecessary duplication of effort or cost on the part of Plaintiffs. Finally, as summarized above, the interests of the Coalition, which is a group of local governments and industries directly impacted in several ways by the outcome of this proceeding, is both legitimate and substantial. For these reasons, the Coalition's MTI is timely.

**2. The Coalition has a Substantial Legal Interest in this Proceeding.**

The Coalition has substantial legal interest in this case for several reasons. First, all of its members are local governments and private companies that discharge as PSs into the Maumee River Watershed or into other Ohio rivers and streams, under discharge permits that contain legally enforceable limits on how much total TP they can discharge. Thus, if their TP discharge limits

will be made more stringent, or their permits modified to add separate limits for DRP, the members would have to invest substantial capital and O&M costs to install and operate additional treatment equipment, paid for by rate increases imposed upon their residents (local governments) or price increases charged to customers for their products or services (private companies). *See e.g. Utahns for Better Transportation v. U.S. Dept. of Transportation*, 295 F.3d 1111, 1115 (10th Cir. 2002) (concluding that "[t]he threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest [to intervene]").

Second, if the MOS for the Maumee TMDL's phosphorus load allocations materially increases from the current 3% (say, to the requested 40% sought by Plaintiffs), such outcome directly and proportionately reduces the "slice of the allocation pie" apportioned to the Coalition PS members in the form of more stringent phosphorus limits required in their respective discharge permits, limits that may be economically and technologically unfeasible to achieve.

Third, if the Court should decide that CAFOs (and other putative NPSs of phosphorus) cannot be regulated as PSs of phosphorus under the CWA, Plaintiffs' focus (to achieve its overall goal of greater reduction in phosphorus discharges to the Maumee River Watershed) will almost certainly shift to demanding that U.S. EPA impose more stringent limits on the remaining phosphorus sources, which are the PSs that include the Coalition members.[5]  In situations where NPS load allocations are not deemed sufficient to enable an impaired waterbody to achieve the

---

[5] There is legitimate reason to believe that Plaintiffs might find a friendly ear at U.S. EPA for this argument.  In 2021, U.S. EPA formally objected to the City of Euclid's proposed discharge renewal permit issued by Ohio EPA, insisting that Ohio EPA impose a TP limit of 0.007 mg/L, instead of the 1.5/1.0 mg/l weekly/monthly limit that was proposed, for a PS of phosphorus contributing less than 0.1% of the overall phosphorus loading to Lake Erie.  *See* Specific Objection to the Proposed NPDES permit for the City of Euclid (OH0031062), U.S. EPA Region 5, November 2, 2021 (available at https://www.epa.gov/system/files/documents/2022-05/OH0031062_City%20of%20Euclid_Specific%20Objection%20Ltr_%2011_02_2021.pdf#:~:text=The%20phosphorus%20limit%20of%201000%20ug%2FL%20in%20the,Ohio%20public%20water%20supply%20use%20and%20narrative%20criterion (U.S. EPA's objection).  After Ohio EPA, the City, and trade groups objected strongly to U.S. EPA's action, it withdrew the objection.  This risk is but one reason, discussed *infra*, why U.S. EPA Region 5 may not adequately represent the interests of the Coalition and its members in this proceeding.

applicable WQS, guidance from U.S. EPA requires that, among other steps, additional load reductions be imposed on PSs in order to "speed progress toward achieving water quality standards."  *See e.g.* Memorandum: New Policies for Establishing and Implementing Total Maximum Daily Loads (TMDLs) (available at https://www.epa.gov/sites/default/files/2015-10/documents/2003_10_21_tmdl_ratepace1997guid_0.pdf).  For all of these reasons, the Coalition has a substantial legal interest in this proceeding.

### 3. The Interests of the Coalition May be Impaired Absent Intervention, and U.S. EPA May not Adequately Represent the Coalition's Interests to Avoid Such Impairment.

In Plaintiffs' October 18, 2024, Memorandum in Opposition to the Motion to Intervene filed by the agriculture trade groups, Plaintiffs argue that the interests of impacted entities will not be impaired if they are denied intervention, because they retain the right to comment on, and then challenge, any new proposed or final revised Maumee TMDL obligations that might result from the outcome of this proceeding.  *See Plaintiffs' Memorandum in Opposition to Motion of Agricultural Trade Associations to Intervene as Defendants*, p. 4.  This argument is flawed for several reasons.

First, during a future potential challenge to a revised or modified Maumee TMDL, the Coalition may be collaterally estopped from relitigating any issue that was adjudicated during *this* proceeding.  The doctrine of collateral estoppel binds a nonparty when it is found to be in privity with a party to the prior action.  *See e.g. Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1069 (6th Cir. 1995).  A non-party can be considered in privity, or sufficiently close to a party in the prior suit to justify being estopped from relitigating issues adjudicated in the prior suit, when the non-party's interest is found to be adequately represented by a party in the original suit.  *Id.* at 1070.  Thus, if the Coalition is denied intervention because the Court concludes that

10

U.S. EPA adequately represents the Coalition's interests, it may be estopped from asserting any of the issues discussed above in a future challenge if the issue was adjudicated in this proceeding, *regardless* of how well or how thoroughly the issue was vetted in the parties' briefs, and *regardless* whether U.S. EPA may, for programmatic or policy reasons, decide not to make certain arguments the Coalition would make.  *See* n. 5, *supra*.  (evidence that U.S. EPA's interests in the outcome of this proceeding may not, in fact, be aligned with those of PSs like the members of the Coalition, and perhaps not even aligned with the interests of Ohio EPA, whose TMDL U.S. EPA approved).

In addition, in this proceeding Plaintiffs have the burden to demonstrate that U.S. EPA's approval of Ohio EPA's Maumee TMDL is unlawful, arbitrary, or capricious under the Administrative Procedures Act ("APA").  Under the APA, U.S. EPA, and perhaps also Ohio EPA, as the administrative agencies entrusted by Congress to implement (Ohio EPA by delegation) the TMDL requirements under the CWA, are entitled to a presumption of reasonableness.  *See e.g. BCCA Appeal Group v. U.S. EPA*, 355 F.3d 817, 832 (5th Cir. 2003).  On the other hand, in a future challenge filed by the Coalition in response to the issuance of a revised Maumee TMDL, the burden of proof would be on the Coalition, with the same limited administrative standard of review and presumption of reasonableness as legal burdens that *it* would have to overcome.

In addition, in such future challenge, the Coalition would be prejudiced by having to meet the stringent standard required to obtain a stay of implementation of a revised Maumee TMDL, or otherwise bear the substantial risk that its members will be subjected to significant economic, technical and legal burdens to comply with more stringent permit limits and meet new compliance deadlines while waiting for the administrative appeal to run its course.  *See e.g. Nken v. Holder*, 129 S. Ct. 1749, 1760 (2009) (Noting that a stay is not only not a matter of right, but even when irreparable injury might otherwise result, a party requesting a stay bears the stringent burden to

demonstrate that it is likely to succeed on the merits, that the stay will not substantially injure the other parties, and that a stay is in the public interest). Thus, contrary to Plaintiffs' argument, the Coalition's interests will likely be impaired or impeded if it is relegated to filing a challenge to a potential future modified Maumee TMDL.

U.S. EPA may also not adequately represent the Coalition's interests sufficient to avoid such future impairment. In this regard, just because the Coalition and U.S. EPA *presumably* share the same ultimate objective to uphold the approval of the Maumee TMDL, that presumption, standing alone, is not sufficient to find that the Coalition's interests will be adequately represented, particularly if there are reasonable grounds to doubt such adequacy. *See Ohio v. U.S. EPA,* 313 F.R.D. 65, 68-69 (S.D. Ohio 2016). In addition, whether U.S. EPA will adequately represent the Coalition's interests requires only the "minimal" demonstration that such interests may not be adequately represented, not that they would in fact be so, and it may be sufficient to show that U.S. EPA, who purports to seek the same outcome, may not make all of the Coalition's arguments. *Zeer Holdings, LL, supra,* 338 F.R.D. at 379.

Here, the Coalition's interests are potentially considerably different from those of U.S. EPA in several respects. First, U.S. EPA has CWA-driven programmatic and policy interests, and perhaps even political interests, which are much broader than just supporting its approval of the Maumee TMDL. The fact that in 2021 U.S. EPA sought the imposition of very stringent new phosphorus limits for the City of Euclid, which is a permitted PS *de minimis* discharger of phosphorus to western Lake Erie, despite the strong opposition of Ohio EPA and trade groups representing permitted PS dischargers around the State of Ohio, clearly demonstrates that a presumption that U.S. EPA will adequately represent the interests of the Coalition is unsupported. *See* n. 5, *supra*.

12

Second, although U.S. EPA will hopefully vigorously defend its approval of the Maumee TMDL, that presumption cannot be assumed. *Id.* U.S. EPA must address Plaintiffs' challenge not just in the context of the limited procedural step taken to approve the TMDL, but also considering the issues raised by Plaintiffs in terms of their adjudication and the outcome thereof on future TMDL approvals across the country. Thus, U.S. EPA's interests are much broader than those of the Coalition, and are impacted by significant policy and political forces, whereas the Coalition's interests are limited to whether, *in the context of this specific TMDL*, Ohio EPA's decisions made in the issuance of the Maumee TMDL were lawful and supported by substantial evidence, and thus U.S. EPA's subsequent approval thereof was proper.

Members of the Coalition also have narrower economic and civic interests to consider, *i.e.*, those of their citizens, employees, and customers who would have to pay for potentially more stringent phosphorus limits imposed in a modification to their existing permits, or in future renewal permits, interests not shared by the general public. *See National Parks Conservation Association v. U.S. EPA*, 759 F.3d 969, 976-977 (8th Cir. 2014) (granting intervention to Northern States Power Company because (1) it owned a power plant targeted by the litigation, (2) it sought to protect the financial interests of its customers, an interest not shared by the general public, and (3) it could not be assured that U.S. EPA position would remain static or unaffected by unanticipated shifts in policy).

Furthermore, to the extent that cost and technical feasibility are relevant factors in the adjudication of the issues raised by Plaintiffs (which the Coalition adamantly maintains to be so), the Coalition, *not U.S. EPA*, have the requisite motivation and ability to present the factual and legal arguments that the estimated costs and technical feasibility of having to meet substantially more stringent future TP discharge limits, as well as potentially new future DRP discharge limits,

are material to the Court's disposition of this litigation.  No existing party to this proceeding can adequately provide this important information.

Finally, a comparison between the Coalition's proposed Answer and that of U.S. EPA and Ohio EPA (proposed) shows that the Coalition's intervention would include the assertion of significant additional defenses to Plaintiffs' claims that were not raised by either Agency:

1. Plaintiffs' claims are barred by collateral estoppel or waiver to the extent that they were not raised in the administrative process during the development of the Maumee TMDL.  *See* Coalition proposed Answer at p. 54.  This defense relates to the settled principle of administrative law that bars an appellant from raising new issues on appeal that it had an opportunity to raise during the underlying administrative process, but failed to raise, thereby denying the applicable agency an opportunity to address the issue in the formation of the administrative record for appeal.  *See e.g. BCCA Appeal Group, supra,* 355 F.3d at 828-829.

2. Plaintiffs' Complaint fails to state a claim upon which relief can be granted because U.S. EPA's review of TMDLs is a procedural, not substantive, review limited to a determination whether the Agency's checklist of items is contained in the state-issued TMDL.  *See* Coalition proposed Answer at p. 54.  This defense is premised on the fact that once a state completes a TMDL and submits it to U.S. EPA for approval, the Agency must approve or disapprove it within 30 days, and the CWA does not provide any review criteria.  33 U.S.C. 1313(d)(2).  Consistent therewith, U.S. EPA's review is merely ministerial or procedural, *not* a substantive review of the state's decisionmaking process.  *See e.g.* U.S. EPA, Guidelines for Reviewing TMDLs Under Existing Regulations Issued in 1992 (available at https://www.epa.gov/tmdl/guidelines-reviewing-tmdls-under-existing-regulations-issued-1992) (setting forth the checklist of items that U.S. EPA must find in a state-issued TMDL in order to approve it).

3.  Plaintiffs' Complaint fails to state a claim upon which relief can be granted because Plaintiffs may not challenge under the APA or the CWA the decisions of Ohio EPA, which are a matter of state law, in the context of a challenge to U.S. EPA's limited procedural review and approval of a state-issued TMDL.  TMDLs issued by a state or state agency are not reviewable under the APA or the CWA.  *See* Coalition proposed Answer at p. 54.  This additional defense is premised on the same grounds as the Coalition's second proposed additional defense.

4.  Plaintiffs' Complaint fails to state a claim upon which relief can be granted because the Court lacks subject matter jurisdiction to hear a challenge to Ohio EPA's state law decisions that underlie the Maumee TMDL  *See* Coalition proposed Answer at p. 54.  This defense is premised on the fact that Plaintiffs' challenge to U.S. EPA's approval of the Maumee TMDL is based entirely on their assertions that decisions Ohio EPA, *not U.S. EPA*, made during the TMDL development process were somehow flawed, and thus U.S. EPA should not have approved the TMDL.  The Coalition contends that the Court lacks subject matter jurisdiction to hear Plaintiffs' challenges to Ohio EPA's *state-law* decisions, which are not actionable under the APA or the CWA.

5.  Plaintiffs' Complaint fails to state a claim upon which relief can be granted because exclusive original jurisdiction to hear a challenge to final actions taken by Ohio EPA is vested in the Environmental Review Appeals Commission ("ERAC") under Ohio Revised Code § 3745.04. *See* Coalition proposed Answer at pp. 54-55.  *See e.g. State ex rel. Voleck, v. Village of Powhatan Point*, 127 Ohio St. 3d 299, 301-302 (2010).  The Coalition contends that Plaintiffs may not bypass Ohio's statutory appeal process set forth in Ohio Revised Code § 6111.564 for challenging Ohio EPA's TMDL actions, and then "bootstrap" their appeal of a purely ministerial approval process by U.S. EPA into a full-fledged challenge to Ohio EPA's decision-

15

making process for the Maumee TMDL.

6. Plaintiffs' Complaint fails to state a claim upon which relief can be granted because Plaintiffs failed to avail themselves of the right under Ohio Revised Code § 6111.564 to assert a challenge to the Maumee TMDL. *See* Coalition proposed Answer at p. 55. This additional defense is premised upon the fact that (a) on October 19, 2023, Ohio EPA issued a new NPDES general permit for dischargers to the Maumee River watershed containing effluent limits based on allocations from the Maumee TMDL (*see* https://epa.ohio.gov/divisions-and-offices/surface-water/permitting/maumee-watershed-total-phosphorus--general-permit); (b) Ohio Revised Code § 6111.564 and § 3745.04 provided Plaintiffs 30 days after notice of Ohio EPA's issuance to the new NPDES permit to file an appeal to the ERAC of the TMDL upon which the new permit limits were based; and (c) Plaintiffs failed to exercise their statutory appeal right, waiting instead until after U.S. EPA subsequently issued its ministerial approval of the Maumee TMDL to file their challenge in this Court to the state law decisions made by Ohio EPA in the development of the TMDL.

These additional defenses presented in the Coalition's proposed amended Answer raise important, and potentially outcome-determinative, issues not raised by any party in this proceeding. Each has substantial merit, and is not presented for the purpose of delaying this proceeding or adding undue costs for the existing parties.

For all of the foregoing reasons, the Coalition meets the factors under Civil Rule 24(a) for intervention as a matter of right in this proceeding.

**B. In the Alternative, the Coalition should be Granted Permissive Intervention.**

If the Court should conclude that the Coalition has not demonstrated the factors required to support intervention as a matter of right, the Coalition requests that the Court grant permissive

16

intervention under Civil Rule 24(b).  Under that Rule, the Court has broad discretion to allow intervention in response to a timely motion by a movant that has a claim or defense that it shares common questions of law or fact with the action.  Fed. R. Civ. P. 24(b)(1)(B).  In deciding whether to allow such intervention, the Court considers whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.  *Id.* at (b)(3).  For the reasons discussed above, the Coalition's MTI is timely, and allowing intervention will not unduly delay or prejudice the rights of Plaintiffs and U.S. EPA to a timely adjudication of the issues presented in this challenge to the Maumee TMDL.  While, for the reasons discussed above, the interests of the Coalition may not always be 100% aligned with those of U.S. EPA as this proceeding moves forward, it is clear that the Coalition shares common questions of law and fact, not just with U.S. EPA, but also with Plaintiffs.  For these reasons, the Coalition requests that the Court exercise its discretion to permit the Coalition to intervene as an additional Defendant in this proceeding.

## III. CONCLUSION.

For the foregoing reasons, the Coalition respectfully requests that the Court grant the Coalition's MTI either as a matter of right or in the form of permissive intervention.  In addition, after reviewing the Motions to Intervene filed by the agriculture trade groups and the State of Ohio on behalf of Ohio EPA, the Coalition respectfully requests that the Court grant those motions as well for many of the same reasons that support intervention by the Coalition.  The Coalition believes strongly that the Court will benefit by the presence of all three parties, in particular their separate, specific interests and areas of expertise, not just those interests they presumably share in common with U.S. EPA.  Furthermore, while the filing an amicus brief is admittedly one way for different interests and areas of expertise to be considered by the Court, only by the three being a party to this proceeding can they have "a seat at the table" for purposes of assisting in a potential

settlement of Plaintiffs' claims, a settlement that would be far more likely to avoid a future potential challenge because *all* interested parties most impacted by a future revised TMDL that might be issued following such settlement will have been signatories thereto.  For these reasons, the Coalition supports the Court granting all three Motions to Intervene that have been filed.

Respectfully submitted,

*/s/ Christina Wieg*
Stephen P. Samuels (007979) (Trial Counsel)
Stephen N. Haughey (0010459)
Christina Wieg (0098693)
**FROST BROWN TODD LLP**
10 West Broad Street
Columbus, OH 43215-3484
(614) 371-8042
ssamuels@fbtlaw.com
shaughey@fbtlaw.com
cwieg@fbtlaw.com
*Counsel for the Maumee Coalition II Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Amended Motion to Intervene was filed electronically on October 31, 2024, using the Court's CM/ECF system, and parties may access the filing under that system.

*/s/ Christina Wieg*
*Counsel for the Maumee Coalition II Association*

0148224.0747190  4882-6308-9396v1

18

# EXHIBIT A

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

THE BOARD OF LUCAS COUNTY
COMMISSIONERS, *et al.*

     *Plaintiffs*

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, *et al.*

     *Defendants*

Case No. 3:24-cv-00779
Judge James G. Carr

---

## THE MAUMEE COALITION II ASSOCIATION'S [AMENDED PROPOSED] ANSWER

Pursuant to Federal Rules of Civil Procedure 12 and 24(c), Intervenor-Defendant the Maumee Coalition II Association ("Coalition") hereby answers the Complaint of Plaintiff Board of Lucas County Commissioners, City of Toledo, and Environmental Law and Policy Center (collectively, "Plaintiffs").

Plaintiffs use headings in their Complaint. The Coalition's use of those same headings in this Answer is solely for ease of reference and should not be interpreted as an admission of or agreement with any language in Plaintiffs' Complaint.

Subject to the foregoing, in response to the numbered paragraphs of the Complaint, the Coalition respond as follows:

### Introduction

1.     Plaintiffs the Board of Lucas County Commissioners, City of Toledo, and Environmental Law & Policy Center ("ELPC") bring this case to remedy Defendant United States Environmental Protection Agency's ("EPA") failure to comply with its obligations under Clean Water Act, 33 U.S.C. § 1251 *et seq.* to prevent harmful algal blooms ("HABs") in western Lake

Erie.

> **ANSWER**: Paragraph 1 contains only Plaintiffs' characterization of their Complaint, without any allegations requiring a response on the part of the Coalition.

2.    Every year, HABs cover large portions of western Lake Erie in thick, foul-smelling scum.  HABs are accumulations of cyanobacteria that can release dangerous neurotoxins and liver toxins.

> **ANSWER**: The Coalition admits that algal blooms periodically appear on portions of western Lake Erie, and that HABs can contain cyanobacteria that can release various toxins, but denies for lack of knowledge the remaining allegations in Paragraph 2.

3.    HABs cause serious ecological, economic, and public health problems.  They impair outdoor recreation, degrade fisheries, devalue property, and threaten access to safe clean drinking water.  That threat materialized during the Toledo water crisis of 2014, when algal toxins got into a drinking water intake, cutting off water access to nearly 500,000 people.

> **ANSWER**: The Coalition admits that harmful algal blooms ("HABs") can cause ecological, economic, and public health problems, can impair outdoor recreation, degrade fisheries, devalue property, and threaten access to safe clean drinking water, and that algal toxins impacted a drinking water intake in Toledo in 2014 causing loss of drinking water access. The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 and therefore denies same.

4.    Lake Erie's HABs are caused by excess phosphorus. One form of phosphorus, known as dissolved reactive phosphorus (DRP), is the main driver of Lake Erie's HABs.

> **ANSWER**: The Coalition admits that excess phosphorus can contribute to the formation of HABs in the western Lake Erie basin and that dissolved reactive phosphorus ("DRP")

is a form of phosphorus that can contribute to the formation of HABs in the western Lake Erie basin, but denies for lack of knowledge the remaining allegations in Paragraph 4.

5.      The source of the phosphorus pollution causing Lake Erie's HABs is undisputed: manure and other livestock waste and synthetic fertilizer from upstream agriculture that either runs off field edges or is discharged through subsurface drainage systems. According to the Ohio Environmental Protection Agency (Ohio EPA), 92% of the phosphorus load into the Maumee River comes from agriculture.

**ANSWER**: The Coalition admits that a major source of phosphorus into western Lake Erie is from agricultural operations in the Maumee Watershed, but denies for lack of knowledge the remaining allegations in Paragraph 5.

6.      In 2015, the State of Ohio committed to reduce phosphorus loads, including DRP, into Lake Erie by 40% from 2008 levels pursuant to Annex 4 of the Great Lakes Water Quality Agreement. U.S. EPA, the State of Michigan, and the Province of Ontario all made the same commitment. The target date for these reductions is 2025.

**ANSWER**: The allegations in Paragraph 6 are characterizations of undocumented statements and commitments allegedly made by Ohio EPA, U.S. EPA, the State of Michigan and the Province of Ontario, with respect to which the Coalition lacks sufficient knowledge or information to confirm their veracity, and therefore denies same.

7.      It is now 2024 and water sampling data shows no evidence of any consistent reductions in Ohio's phosphorus loads from 2008 levels.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore denies same.

8.      HABs render western Lake Erie "impaired" under the federal Clean Water Act. The

Act obligates Defendant U.S. EPA to take a series of steps to remediate the impairment.

> **ANSWER**: The Coalition admits that Ohio EPA listed western Lake Erie as impaired under Section 303(d) of the CWA due to nutrients and the potential formation of HABs, but denies that such listing obligates U.S. EPA to take steps to remediate the impairment if Ohio EPA has already done so, which it did by, *inter alia,* issuing the Maumee TMDL.

9. The agency has repeatedly failed to take those steps. As a result, Plaintiffs filed three cases in this Court against U.S. EPA between 2017 and 2019. Each case succeeded in requiring the agency to take the applicable step in the statutory process. But when the cases were over, U.S. EPA—and Ohio EPA—failed to complete the required next step.

> **ANSWER**: The Coalition denies the allegations set forth in the first and last sentences in Paragraph 9. Plaintiffs' separate characterization of its three previous cases contains no allegations requiring a response on the part of the Coalition, and the outcome of those cases is a matter of public record.

10. This case challenges U.S. EPA's violation of the central statutory requirement for remediating impaired waters like Lake Erie: establishing a Total Maximum Daily Load (TMDL) that complies with section 303(d) of the Clean Water Act (33 U.S.C. § 1313(d)) and applicable regulations.

> **ANSWER**: Paragraph 10 contains Plaintiffs' characterization of this lawsuit to which no response is required, and the Coalition denies the remaining allegations set forth in Paragraph 10.

11. A TMDL is often known as a pollution "cap" or "diet."

> **ANSWER**: Admit.

12. The objective of a TMDL is to ensure that impairments are remediated and "water

quality standards [are] achieved." *See Overview of Total Maximum Daily Loads,* U.S. EPA (last visited Apr. 29, 2024).

**ANSWER**: Admits that U.S. EPA has characterized a TMDL in this manner.

13.     Technically, a TMDL is the total maximum pollutant load that a water body can tolerate without being impaired under the Clean Water Act. A TMDL also apportions this total load among pollution sources in the watershed, which must reduce their current loads to comply with the new limits.

**ANSWER**: Admits that a TMDL establishes a maximum pollutant load that a water body can receive without violating water quality standards, admits that a TMDL apportions the load among pollution sources in the watershed, but denies the remaining allegations in Paragraph 13.

14.     The Clean Water Act charges states with preparing TMDLs, which U.S. EPA must approve or disapprove. If it disapproves a TMDL, U.S. EPA must prepare the TMDL. *See* 33 U.S.C. § 1313.

**ANSWER**: Admits.

15.     In response to Plaintiffs' prior lawsuits, Ohio EPA prepared a TMDL for western Lake Erie, known as the Maumee Watershed Nutrient TMDL ("Maumee TMDL"). U.S. EPA approved the Maumee TMDL on September 28, 2023.

**ANSWER**: The Coalition admits that Ohio EPA prepared the Maumee TMDL and that, on September 28, 2023, U.S. EPA approved the Maumee TMDL, but the Coalition denies the remaining allegations in Paragraph 15.

16.     As explained in detail below, the Maumee TMDL fails to comply with numerous legal requirements under the Clean Water Act and applicable regulations and will not be sufficient

to remediate the HABs in western Lake Erie. Among other things, the Maumee TMDL:

    (a)    fails to limit DRP, which is the pollutant driving the HAB crisis, as required by 33 U.S.C. § 1313(d)(1)(C) and 40 C.F.R. § 130.7(c)(1)(ii);

    (b)    fails to include "a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality" as required by 33 U.S.C. § 1313(d)(1)(C);

    (c)    fails to apportion pollution reductions (known as "wasteload allocations") to large, industrialized livestock facilities designated as "concentrated animal feeding operations" (CAFOs) under the Clean Water Act, as required by 40 C.F.R. § 130.2(h);

    (d)    fails to apportion the "load allocation" among "nonpoint" sources of pollution as required by 40 C.F.R. § 130.2(g), Ohio Rev. Code 6111.562(B), and Ohio Admin. Code 3745-2-12(c); and

    (e)    fails to include an implementation plan that provides "reasonable assurances" that target pollution loads will be reached as required by Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f) and 3745-2-12(E)(3) and U.S. EPA Guidance. Office of Water, U.S. EPA, Guidance for the Implementation of Water Quality-Based Decisions: The TMDL Process 15 (Apr. 1991) ("U.S. EPA Guidance").

    **ANSWER**: The Coalition denies the allegations in Paragraph 16.

    17.    Because the Maumee TMDL violates these legal requirements and will not remediate Lake Erie's HABs, U.S. EPA's approval of the TMDL was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A).

**ANSWER**: The Coalition denies the allegations in Paragraph 17.

18.     Plaintiffs accordingly ask the Court to set aside U.S. EPA's approval of the Maumee TMDL and order Defendants to prepare a TMDL that both complies with the Clean Water Act and will actually be sufficient to clean up Lake Erie.

**ANSWER**: Paragraph 18 contains Plaintiffs' request for relief to which no response is required from the Coalition, but the Coalition denies that Plaintiffs are entitled to this relief.

## Jurisdiction and Venue

19.     This Court has jurisdiction because Plaintiffs are aggrieved by a final agency action subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701, *et. seq.*

**ANSWER**: The Coalition admits that the APA vests this Court with jurisdiction to review final actions of federal agencies, but denies that this Court has jurisdiction to review actions of state agencies taken under state law, including Ohio EPA's development and issuance of the Maumee TMDL, and denies that U.S. EPA's approval of the Maumee TMDL is a reviewable "final agency action" under the APA.

20.     U.S. EPA's approval of the TMDL was a "final agency action" subject to judicial review under 5 U.S.C. § 704 because it: (1) was the consummation of U.S. EPA's decision-making process on the TMDL under 40 C.F.R. § 130.7; and (2) determined rights and obligations of the parties or caused legal consequences.

**ANSWER**: Denied.

21.     Plaintiffs claim that U.S. EPA's approval of the TMDL was unlawful and should be set aside under 5 U.S.C. § 706(2)(A) because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Specifically, Plaintiffs claim that approval of the TMDL was contrary to law because the TMDL violated requirements in 33 U.S.C. § 1313(d)(1)(C), 40 C.F.R. § 130.2(h), 40 C.F.R. § 130.2(g), Ohio Rev. Code 61111.562(B), Ohio Admin. Code

3745-2-12(C), Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f) and 3745-2-12(E)(3), and U.S. EPA Guidance.

**ANSWER**: The Coalition denies the allegations in Paragraph 21.  U.S. EPA's approval of the Maumee TMDL does not vest this Court with jurisdiction under the APA or the CWA to review actions of state agencies taken under state law, including Ohio EPA's development and issuance of the Maumee TMDL.

22.     This court also has jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under laws of the United States.

**ANSWER**: The Coalition denies the allegations in Paragraph 22.  U.S. EPA's approval of the Maumee TMDL does not vest this Court with jurisdiction under the APA or the CWA to review actions of state agencies taken under state law, including Ohio EPA's development and issuance of the Maumee TMDL.

23.     A substantial part of the events or omissions giving rise to this case occurred on or near western Lake Erie, which is located in the Northern District of Ohio, making venue proper under 28 U.S.C. § 1391(e).  Alternatively, venue is proper in this Northern District of Ohio because Plaintiffs Lucas County Board of Commissioners (Lucas County Board) and City of Toledo are local units of government in this district and Plaintiff ELPC has members who reside in this district.

**ANSWER**: Without admitting subject matter jurisdiction, the Coalition admits that venue is proper.

<u>**Parties**</u>

24.     Plaintiff Lucas County Board is a body politic that, under Ohio Revised Code Section 305.12, can sue in its own name.

**ANSWER**: Admitted.

8

25.     Plaintiff City of Toledo is a chartered municipal corporation located in Lucas County, Ohio, which operates under home-rule authority pursuant to Section 3, Article XVIII of the Ohio Constitution. The Charter of the City of Toledo, Chapter II, Section 8(b), provides the authority for the City to sue and be sued.

**ANSWER**: Admitted.

26.     Plaintiff ELPC is a Midwest-based not-for-profit public interest environmental advocacy organization dedicated to improving environmental quality and public health, including protecting the Great Lakes and other Midwest natural resources. ELPC's headquarters is in Chicago, Illinois and ELPC has additional offices in Ohio, Iowa, Wisconsin, and Washington, D.C. ELPC members live, work, and play in and near Lake Erie and the other Great Lakes. They depend on clean water from Lake Erie as a source of drinking water, and they use and enjoy Lake Erie for its aesthetic and recreational value.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies same.

27.     Defendant U.S. EPA is an agency of the United States government. Among other responsibilities, U.S. EPA is responsible for overseeing and administering the development of TMDLs under 33 U.S.C. § 1313.

**ANSWER**: Admitted.

28.     Defendant Michael Regan is the Administrator of U.S. EPA and is being sued in his official capacity. The U.S. EPA Administrator is responsible for overseeing the agency, including its implementation of the Clean Water Act and its decisions to approve or disapprove state TMDLs submitted under 33 U.S.C. § 1313. Plaintiffs name Administrator Regan as a Defendant pursuant to 5 U.S.C. § 702 because they seek injunctive relief.

9

**ANSWER**: Admitted.

29.     Defendant Debra Shore is the Regional Administrator of U.S. EPA Region 5 (which includes Ohio, Michigan, Indiana, Illinois, Wisconsin, and Minnesota) and is being sued in her official capacity. The U.S. EPA Regional Administrator is responsible for overseeing Region 5 of the agency, including its implementation of the Clean Water Act and its decisions to approve or disapprove state TMDLs submitted under 33 U.S.C. § 1313. Plaintiffs name Regional Administrator Shore as a Defendant pursuant to 5 U.S.C. § 702 because they seek injunctive relief.

**ANSWER**: Admitted.

### Standing

30.     Plaintiffs have standing because: (i) they have been distinctly and palpably injured by HABs in western Lake Erie; (ii) their injuries are fairly traceable to Defendants' acts and omissions as alleged in this Complaint; and (iii) those injuries can be redressed by the relief sought in this Complaint.

**ANSWER**: The Coalition denies the allegations in Paragraph 30.

**Lucas County Board's Standing**

31.     Under Ohio law, the Lucas County Board is generally responsible for the health, welfare, and safety of the county's residents.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore denies same.

32.     As part of that role, the Board is authorized to, and obligated to, establish policies and rules regarding water quality management within the county, either directly or through agencies in which Lucas County is a participant.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and therefore denies same.

33.     The discharge of these responsibilities requires the Board to commit significant financial, personnel, and other resources to the maintenance and monitoring of water quality.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and therefore denies same.

34.     The presence and continuation of annual HABs in western Lake Erie causes pecuniary injury to the Lucas County Board by requiring expenditure of County resources that would have been unnecessary or at least substantially reduced if water quality standards were met in western Lake Erie and its waters were no longer impaired by HABs.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and therefore denies same.

35.     This ongoing pecuniary injury is fairly traceable to U.S. EPA's unlawful approval of Ohio EPA's legally defective TMDL. As alleged below, the Maumee TMDL fails to comply with statutory requirements and will not sufficiently reduce phosphorus pollution to remediate the impairment of western Lake Erie by HABs that are injuring the Lucas County Board and its constituents.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and therefore denies same.

36.     The Lucas County Board's injuries can be redressed by the relief sought in this case. Plaintiffs ask the Court to set aside U.S. EPA's approval of Ohio EPA's defective TMDL and order preparation of a TMDL that complies with the Clean Water Act. Because a lawful TMDL would lead to reduction of the HABs that are injuring the Lucas County Board, the requested relief would redress its injuries.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 36, and therefore denies same.

**City of Toledo's Standing**

37.    The City of Toledo is a home-rule municipality. The City has an interest in protecting the health, welfare, and safety of its residents.

**ANSWER**: Admitted.

38.    As part of that role, the City of Toledo supplies potable drinking water to roughly 500,000 people living in the City and surrounding areas. The City of Toledo is responsible for the effective production, filtration, treatment, and quality control of the water it supplies.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38, and therefore denies same.

39.    The discharge of these responsibilities requires the City of Toledo to commit significant financial, personnel, and other resources to the maintenance and monitoring of water quality.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and therefore denies same.

40.    The City of Toledo's water is sourced in western Lake Erie and pumped to a treatment plant owned and operated by the City, known as the Collins Park Treatment Plant. The Collins Park Treatment Plant filters an average of 75 million gallons of water per day.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore denies same.

41.    The presence and continuation of recurring HABs in western Lake Erie causes the City of Toledo pecuniary injury by requiring expenditure of City resources that would otherwise be unnecessary or at least significantly reduced if water quality standards were met in western Lake Erie and its waters were no longer impaired by HABs.

12

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and therefore denies same.

42.     Since 2014, the City of Toledo has incurred costs of $490.4 million to upgrade the Collins Park Treatment Plant, in part to improve its treatment of HAB toxins in water sourced from western Lake Erie. The City has also incurred substantial additional costs to upgrade other systems to address the HAB crisis.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and therefore denies same.

43.     The City of Toledo expects to be forced to continue to direct resources toward treating and mitigating HAB toxins in water sourced from Lake Erie.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43, and therefore denies same.

44.     This ongoing pecuniary injury is fairly traceable to U.S. EPA's unlawful approval of Ohio EPA's legally defective TMDL. As alleged below, the Maumee TMDL fails to fulfill basic statutory requirements and will not remediate the impairment of western Lake Erie by HABs that are injuring the City of Toledo and its residents.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, and therefore denies same.

45.     The City of Toledo's injuries can be redressed by the relief sought in this case. Plaintiffs ask the Court to set aside U.S. EPA's approval of Ohio EPA's defective TMDL and order preparation of a TMDL that complies with the Clean Water Act. Because a lawful TMDL would lead to reduction of the HABs that are injuring the City of Toledo, the requested relief would redress its injuries.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45, and therefore denies same.

**ELPC's Standing**

46.     ELPC files this action on behalf of itself and its members. ELPC members rely on the portion of western Lake Erie under Ohio's jurisdiction for drinking water, recreation, and aesthetic enjoyment. These uses are directly impaired by HABs and other phosphorus-related pollution. Such pollution harms water quality, threatens access to safe, clean drinking water, impedes swimming, boating and other outdoor recreation, and harms fish and other aquatic life.

> **ANSWER**: The Coalition admits that HABs and other phosphorus-related pollution can harm water quality, threaten access to safe, clean drinking water, impede swimming, boating and other outdoor recreation, and harm fish and other aquatic life, but the Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46, and therefore denies same.

47.     ELPC's injuries are directly traceable to U.S. EPA's unlawful approval of Ohio EPA's defective TMDL. As alleged below, the Maumee TMDL fails to comply with statutory requirements and, as a consequence, will not sufficiently reduce phosphorus pollution to remediate the impairment of western Lake Erie by HABs that are injuring ELPC and its members.

> **ANSWER**: The Coalition denies the allegation in Paragraph 47.

48.     ELPC's injuries can be redressed by the relief sought in this case. Plaintiffs ask the Court to set aside U.S. EPA's approval of Ohio EPA's defective TMDL and order preparation of a TMDL that complies with the Clean Water Act. Because a lawful TMDL would lead to reduction of the HABs that are injuring ELPC and its members, the requested relief would redress their injuries.

> **ANSWER**: The Coalition denies the allegations in Paragraph 48.

14

**The Clean Water Act**

49.    Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The statute aimed to make Americans' waters drinkable, fishable, and swimmable by 1983. 33 U.S.C. § 1251(a)(2). The Clean Water Act and its implementing regulations create a complex process under which U.S. EPA and the states share responsibility for achieving statutory objectives.

**ANSWER**: Admitted.

**NPDES Permits**

50.    The Clean Water Act prohibits anyone from "discharging pollutants" into "waters of the United States" without a National Pollution Discharge Elimination System (NPDES) permit. 33 U.S.C. § 1311(a).

**ANSWER**: Admitted as to point source discharges of pollutants, but denied as to nonpoint sources of pollution.

51.    The definition of "pollutant" includes "solid waste, . . . sewage, . . . biological materials, . . . and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

**ANSWER**: Admitted.

52.    "Discharge of a pollutant" means "any addition of any pollutant to" waters of the United States "from any point source." 33 U.S.C. § 1362(12).

**ANSWER**: Admitted.

53.    "Point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, *concentrated animal feeding operation*, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added).

**ANSWER**: Admitted.

54.     While the Clean Water Act gives U.S. EPA lead responsibility for the NPDES program, it allows most administrative functions to be delegated to states, subject to supervision by U.S. EPA. 33 U.S.C. § 1342. Ohio is one of 47 states that administers its NPDES program pursuant to delegation from U.S. EPA. Ohio EPA is the Ohio agency charged with that administration.

> **ANSWER**: Admitted, except that the Coalition denies for lack of knowledge the number of states that administer NPDES programs pursuant to delegation from U.S. EPA.

**Impaired Waters**

55.     The Clean Water Act requires states to establish "water quality standards" for all waters in its jurisdiction. 33 U.S.C. § 1313(c)(2). Water quality standards consist of the designated uses of the water body (e.g., public water supply, recreation, habitat) and criteria to evaluate if the uses are supported. 33 U.S.C. § 1313(c)(2)(A). These criteria can be expressed as numerical limits on concentration of a pollutant or as narrative statements.

> **ANSWER**: Admitted.

56.     Every two years, states must develop a list of water bodies within their jurisdiction that do not meet designated uses or attain water quality standards despite implementation of the NPDES program. These are known as "impaired" waters. States must also prepare a "priority ranking" for impaired waters to receive TMDLs, "taking into account the severity of the pollution and the uses to be made of such waters." 33 U.S.C. § 1313(d)(1)(A); *see also* 40 C.F.R. § 130.7(b)(4).

> **ANSWER**: Admitted.

57.     Every two years, states must submit their impaired waters lists, priority rankings for waters to receive TMDLs, and supporting documentation for approval to U.S. EPA. 40 C.F.R. § 130.7(b)(6). These materials are combined into an "Integrated Report." U.S. EPA may approve

the Integrated Report "only if it meets the requirements of § 130.7(b)," including the requirement for the state to "assemble and evaluate all existing and readily available water quality-related data" to develop its impaired waters list. 40 C.F.R. § 130.7(b)(5).

> **ANSWER**: Admitted.

**TMDLs**

58.    TMDLs are the Clean Water Act's tool for reducing pollution into impaired water bodies so that they are no longer impaired. Technically, TMDL is a number representing the maximum amount of a pollutant that a water body can tolerate and still comply with water quality standards and not be impaired.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to
> the truth of the allegations in Paragraph 58, and therefore denies same.

59.    As explained below, regulations require TMDLs to be accompanied by an implementation plan to reduce current pollutant loads to comply with TMDL limits. TMDLs are commonly described as a "diet" or "cap" on the pollutant being targeted.

> **ANSWER**: The Coalition admits the allegations in the last sentence in Paragraph 59, but
> lacks knowledge or information sufficient to form a belief as to the truth of the remaining
> allegations in Paragraph 59, and therefore denies same.

60.    The Clean Water Act requires each TMDL to "be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(e).

> **ANSWER**: Admitted.

61.    TMDLs must be established "for all pollutants preventing or expected to prevent attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii).

17

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61, and therefore denies same.

62.     TMDLs allocate the target pollution load between point sources and nonpoint sources. *See* 40 C.F.R. § 130.2.

**ANSWER**: Admitted.

63.     As noted earlier, a "point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, [or] concentrated animal feeding operation." 33 U.S.C. § 1362(14) "Nonpoint source" means any source of pollution that does not meet the definition of "point source" in 33 U.S.C. § 1362(14), such as overland agricultural runoff or urban stormwater runoff.

**ANSWER**: Admitted.

64.     A TMDL assigns pollution limits (known as wasteload allocations) to each point source in the TMDL zone. 40 C.F.R. § 130.2(h). Wasteload allocations become enforceable by incorporation into the point source's NPDES permit. 40 C.F.R. § 122.44(d)(1)(vii)(B).

**ANSWER**: Admitted.

65.     A TMDL's nonpoint source pollution targets are called "load allocations," defined as "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g).

**ANSWER**: Admitted.

66.     U.S. EPA Guidance requires each TMDL to include an implementation plan that provides "reasonable assurances that nonpoint source reduction will in fact be achieved." Otherwise, "the entire load reduction must be assigned to point sources." U.S. EPA Guidance at 15.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66, and therefore denies same.

67.    Ohio regulations require TMDLs to include an "implementation plan establishing specific actions, schedules and monitoring proposed to effectuate a TMDL." Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f).  Ohio likewise requires the final implementation to include "reasonable assurances that water quality standards will be attained in a reasonable period of time." Ohio Admin. Code 3745-2-12(E)(3).

**ANSWER**: Admitted.

68.    States must submit all TMDLs to U.S. EPA for review. 33 U.S.C. § 1313(d)(2). U.S. EPA "shall either approve or disapprove" a TMDL "not later than thirty days after the date of submission." 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

ANSWER: Admitted.

69.    If U.S. EPA approves a TMDL, the state must incorporate wasteload allocations into point sources' NPDES permits. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2); 40 C.F.R. § 122.44(d)(1)(vii)(B).

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69, and therefore denies same.

70.    If U.S. EPA disapproves a TMDL, the administrator "shall not later than thirty days after the date of such disapproval . . . establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters." 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).

**ANSWER**: Admitted.

## Factual Background

**Lake Erie Impairment**

71.     Western Lake Erie has suffered from recurring annual HABs for years. The current state of large Lake Erie HABs began in the mid-1990s.

**ANSWER**: The Coalition admits that portions of western Lake Erie have periodically experienced HABs for several years.  However, The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71, and therefore denies same.

72.     HABs coat surface waters in thick, odiferous scum and can produce powerful liver toxins and neurotoxins. These algal toxins, including microcystin, are more toxic by orders of magnitude than many other toxic compounds, including cyanide and DDT.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72, and therefore denies same.

73.     If consumed, algal toxins can cause kidney and liver damage, gastrointestinal distress and infections, as well as dementia, amnesia, other neurological damage, and death. Even skin contact with algal toxins is dangerous, potentially causing numbness, dizziness, and skin irritation or rashes.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73, and therefore denies same.

74.     HABs have sickened or killed pets that drink or swim in water containing algal toxins.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74, and therefore denies same.

75.     HABs also deplete dissolved oxygen levels and fuel the growth of toxic organisms, which can kill and damage fish and reduce the diversity of fish species.

**ANSWER**: The Coalition admits that HABs can reduce dissolved oxygen levels and induce the growth of toxic organisms, and admits that some toxic organisms can kill and damage fish and reduce the diversity of fish species.

76.     HABs occur when waters become overloaded with nutrients, particularly nitrogen and phosphorus. The "limiting nutrient" for cyanobacteria growth in freshwater is phosphorus. That means phosphorus loads determine the size and severity of HABs.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76, and therefore denies same.

77.     Phosphorus is fully "bioavailable" to cyanobacteria in its dissolved form, known as dissolved reactive phosphorus (DRP). Consequently, DRP loads drive HAB formation.

**ANSWER**: The Coalition admits that DRP is a bioavailable form of phosphorus that can contribute to the formation of HABs, but denies the remaining allegations in Paragraph 77.

78.     The current HAB crisis is not Lake Erie's first. Beginning around 1850, western Lake Erie was contaminated by extensive phosphorus pollution from industry and municipal sewage, and later, from phosphates in laundry detergent. These phosphorus loads peaked in 1968, causing annual HABs and depleted fish populations.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78, and therefore denies same.

79.     In 1972, Congress passed the Clean Water Act, and the United States and Canada also entered into the Great Lakes Water Quality Agreement (GLWQA). Through the GLWQA, scientists from the United States and Canada established a total phosphorus loading target (11,000 metric tons annually) to clean up Lake Erie. This target represented a 60% reduction in total phosphorus loads.

**ANSWER**: The Coalition admits that the Federal Water Pollution Control Act was enacted in 1972, that the United States and Canada entered into the GLWQA, but lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 79, and therefore denies same.

80.    The United States and Canada reached this target for the first time in 1981, largely through reducing pollution from wastewater treatment plants (which, in the United States, had to comply with NPDES permits) and phasing out phosphates in laundry detergent. HABs declined, Lake Erie's ecosystems began to recover, and the lake became known as the "walleye capital of the world."

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80, and therefore denies same.

81.    In the mid-late 1990s, however, large HABs began reappearing in western Lake Erie. A particularly large HAB formed in 2003 and large HABs have occurred every year since then, typically forming in late spring/early summer and, increasingly, continuing well into the fall. As discussed below, this HAB resurgence coincided with a major shift in livestock production to the CAFO model.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, and therefore denies same.

82.    The 2014 HAB was particularly costly and dangerous. The algal toxin microcystin got into one of Toledo's drinking water intakes, causing the City to issue a drinking water advisory. Nearly 500,000 people lost access to safe drinking water for more than two days. The governor declared a state of emergency and deployed the National Guard to truck in bottled water for residents to drink and cook with.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82, and therefore denies same.

83.     Western Lake Erie's HABs are enormous and persistent. In 2023, for example, Lake Erie suffered a "moderately severe" HAB, which covered 312 square miles and lasted from July 4th until mid-October.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83, and therefore denies same.

84.     HABs in the Western Basin of Lake Erie can also flow east to the Central Basin, die off, and then sink to the bottom where they are decomposed by bacteria. This process depletes dissolved oxygen levels, creating an annual "dead zone" in the Central Basin that typically equals the combined size of Delaware and Rhode Island.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and therefore denies same.

85.     Of all tributaries flowing into western Lake Erie, the Maumee River contributes the most phosphorus by far. Although it contributes only 3 to 4% of the water flowing into Lake Erie, the Maumee River delivers nearly 50% of the total phosphorus load. Nearly 75% of the Maumee watershed is in Ohio. The river forms near Fort Wayne, Indiana and flows through agricultural land in northwest Ohio before entering metropolitan Toledo and discharging to Lake Erie through Maumee Bay.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85, and therefore denies same.

86.     According to Ohio EPA, 92% of the phosphorus loads into the Maumee River come from agriculture. This pollution happens when manure and other livestock waste, or synthetic

23

fertilizer, enters surface waters through subsurface drainage systems or runs off the surface of crop fields following rain or snow melt.

> **ANSWER**: The Coalition admits that Ohio EPA has stated that approximately 92% of the phosphorus loads into the Maumee River come from agriculture, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86, and therefore denies same.

**Great Lakes Water Quality Agreement, Annex 4**

87.     In 2012, the United States and Canada tried to address the HAB resurgence by amending the Great Lakes Water Quality Agreement to include Annex 4, which addresses nutrient pollution.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87, and therefore denies same.

88.     Annex 4 created an "Objectives and Targets Task Team" (Task Team) to set new phosphorus loading targets for Lake Erie to control HABs. The Task Team co-chair was Dr. Jeffrey Reutter, then Director of Ohio Sea Grant (a research program within Ohio State University (OSU) focused on the health of Lake Erie) and OSU's Stone Lab.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88, and therefore denies same.

89.     The Task Team released a report titled Recommended Phosphorus Loading Targets for Lake Erie on May 11, 2015 ("Task Team Report"). The Task Team Report set loading targets equivalent to a 40% reduction from 2008 load levels in metric tons for two types of phosphorus: DRP and total phosphorus.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89, and therefore denies same.

90.     DRP refers to dissolved reactive phosphorus. Total phosphorus refers to DRP plus phosphorus attached to sediment or soil particles, known as particulate phosphorus (PP). Presently, DRP comprises approximately 21% of total phosphorus flowing into Lake Erie but, as explained below, it is the primary driver of HABs.

**ANSWER**: The Coalition admits the allegations in the first and second sentences of Paragraph 90, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90, and therefore denies same.

91.     Because phosphorus load levels can vary widely based on the volume of water entering Lake Erie (which is heavily driven by precipitation), the Task Team also identified target concentrations for DRP and total phosphorus that adjust for flow (flow-weighted mean concentration or FWMC) and correspond with the metric ton reduction targets. The Task Team recommended that FWMC be used to track progress toward achieving its targets.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91, and therefore denies same.

92.     The Task Team Report repeatedly emphasized the need for separate loading targets for total phosphorus and DRP. It explained that DRP is "the most important target for reduction" because it is 100% bioavailable to cyanobacteria, while PP is only 25-50% bioavailable. The more bioavailable phosphorus is, the more easily it will be consumed by and feed a HAB. Consequently, the Task Team Report explained, it made no sense to use a single total phosphorus target because "various combinations of DRP and PP [loads] can reach the 40% reduction in TP but have vastly different effects on the total bioavailable phosphorus."

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92, and therefore denies same.

25

93.    The Task Team Report recognized that total phosphorus loads declined before HABs re-emerged in the mid-1990s and had since shown "no clear trends in concentrations or loads;" by contrast, DRP concentrations and loads rose sharply beginning in the mid-1990s through 2015 (they have since plateaued at that elevated level).

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93, and therefore denies same.

94.    Total phosphorus reductions can be driven entirely by reductions in PP, but those will not, on their own, reduce HABs; DRP loads must also come down.

**ANSWER**: The Coalition denies the allegations in Paragraph 94.

95.    The divergent trends in total phosphorus and DRP loading reflect the fact that measures for reducing PP often do not work, or are even counterproductive, in reducing DRP. For instance, reducing or eliminating agricultural tillage can minimize erosion and PP loss, but the same practice can accelerate DRP loss.

**ANSWER**: The Coalition denies the allegations in Paragraph 95.

96.    Shortly after release of the Task Team Report in June 2015, the Governors of Michigan and Ohio and the Premier of Ontario signed a Collaborative Agreement committing to achieve the Task Team's 40% reduction targets for total phosphorus and DRP by 2025, with an interim goal of a 20% reduction by 2020. The United States and Canada adopted the Task Team targets in February 2016. And in June 2019, Ohio Governor Mike DeWine re-committed the State of Ohio to reducing its phosphorus loads into Lake Erie by 40% by 2025.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore denies same.

**Failure to Meet Annex 4 Targets**

97.    The State of Ohio has made virtually no progress toward meeting its Annex 4

commitments.

ANSWER: The Coalition denies the allegations in Paragraph 97.

98.     The U.S. Geological Survey has a gauging station in the Maumee River at Waterville, Ohio, just upstream of metropolitan Toledo. Pollutant levels at Waterville identify phosphorus loads coming from the Maumee River. Waterville monitoring station data demonstrate yearly fluctuations but no trending decrease in the flow-weighted mean concentration of DRP. Ohio still has not met its interim goal of a 20% phosphorus reduction (which it was supposed to do in 2020) and is far from meeting its commitment to reduce phosphorus loads by 40% by 2025.

ANSWER: The Coalition admits that USGS has a gauging station in the Maumee River near Waterville, Ohio, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98, and therefore denies same.

99.     Ohio's failure to reduce phosphorus loads has not resulted from a failure to spend money. Ohio's established the H2Ohio program in 2019. Since 2020, H2Ohio has been allotted over $400 million, much of which has been spent on voluntary conservation efforts in the western Lake Erie watershed to reduce agricultural phosphorus pollution. As of April 2024, H2Ohio's agricultural incentive program expanded beyond the Lake Erie watershed and is now available across the state.

ANSWER: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99, and therefore denies same.

100.    These voluntary conservation efforts largely rely on paying farmers to adopt so-called "best management practices" or BMPs. These BMPs, however, are often ineffective; indeed, as described above regarding reduced tillage, some BMPs can increase DRP loading. The effectiveness of BMPs depends on a slew of site-specific factors including field location, soil type, slope, tillage, and soil test phosphorus levels.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100, and therefore denies same.

101.    Ohio fails to target BMPs to where they are most needed and likely to succeed; instead, Ohio prioritizes "enrolling acres" in BMPs regardless of location or other conditions. Ohio also fails to measure BMP effectiveness by testing the water; instead, the state relies on unsupported formulas that presume phosphorus loss reduction without measuring if any reductions are achieved. The data show that reductions are not being achieved.

**ANSWER**: The Coalition denies the allegations in Paragraph 101.

102.    With pollution from upstream agriculture continuing unabated, downstream communities—especially the City of Toledo—have been forced to both live with annual HABs and spend enormous sums of public funds trying to address their consequences.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102, and therefore denies same.

103.    Since 2014, the City of Toledo has spent $490.4 million to upgrade its drinking water treatment plant in part to improve its treatment of HAB toxins. The City has also incurred substantial additional costs to upgrade other systems to address the HAB crisis. Statewide between 2011 and 2017, Ohio spent more than $3 billion to address HABs in Lake Erie, with $2.3 billion of that money going to fund wastewater or drinking water improvement projects.

**ANSWER**:    The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103, and therefore denies same.

104.    Climate change is making the HAB problem worse, as more intense storms drive more runoff from agricultural fields and warmer temperatures in Lake Erie promote more cyanobacteria growth. As rain becomes less predictable, agricultural operators are less able to time

how and when they apply manure or commercial fertilizer to reduce risk of runoff.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore denies same.

**Animal Feeding Operations**

105. The resurgence of HABs in Lake Erie coincided with a major change in livestock agriculture.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105, and therefore denies same.

106. For generations, livestock were raised on traditional, diversified farms with relatively small numbers of animals. These farms kept animals at pasture and balanced nutrient intake (grazing) with output (manure).

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, and therefore denies same.

107. In the 1990s, these diversified farms began to be replaced by a smaller number of much larger, industrial-scale confined feeding operations (with up to 100,000+ animals). These operations generate far more nutrients in manure and other waste than surrounding land can absorb.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107, and therefore denies same.

108. As the United States Department of Agriculture (USDA) recognizes, these are not farms in the traditional sense—they are "large industrialized livestock operations." *See* James M. Macdonald & William D. McBride, The Transformation of U.S. Livestock Agriculture: Scale, Efficiency, and Risks, U.S. Dept of Agric., iii (Jan 2009).

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108, and therefore denies same.

109.     Under the Clean Water Act, industrial livestock operations are known as Animal Feeding Operations or "AFOs." U.S. EPA regulations define AFOs as facilities where animals are confined for more than 45 days per year and where crops are not grown on site. 40 C.F.R. § 122.23(b)(1).

**ANSWER**: Admitted.

110.     The largest AFOs are defined as Concentrated Animal Feeding Operations or "CAFOs." "Large CAFOs" are AFOs with the equivalent of at least 700 mature dairy cows, 2,500 swine, or 125,000 chickens. 40 C.F.R. § 122.23(b)(2), (4). Smaller AFOs can be deemed "CAFOs" in certain circumstances. 40 C.F.R. § 122.23(b)(6), (9). The Clean Water Act's definition of "point source" expressly includes "concentrated animal feeding operations." 33 U.S.C. § 1362(14).

**ANSWER**: Admitted.

111.     Because AFOs concentrate so many animals in a relatively small space, they also concentrate enormous amounts of manure and other waste, including urine and wastewater from cleaning animal confinement areas. As of 2012, large CAFOs in the United States produced more than 20 times the volume of fecal wet mass produced by all of the country's humans. Livestock concentration—with fewer farms raising more animals—has increased since 2012, both in Ohio and nationwide.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111, and therefore denies same.

112.     Unlike diversified family-scale farms, which manage manure in its natural form, all dairy and most swine AFOs in the western Lake Erie watershed water down manure and other waste products and store it in liquid form in open cesspits (called "lagoons"). AFOs or third-party transferees dispose of this waste by applying it to crop fields, ostensibly as fertilizer.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, and therefore denies same.

113.     While manure nutrients can help fertilize crops, they become pollutants if they leave the field and get into surface waters. Other components of AFO waste, such as cleaning chemicals, antibiotics, and *E. coli*, likewise contaminate surface waters.

**ANSWER**: The Coalition admits that manure nutrients can help fertilize crops, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 113, and therefore denies same.

114.     When AFOs apply liquid waste in the western Lake Erie watershed, at least some portion of it (including dissolved contaminants), inevitably leaves crop fields and pollutes surface waters. This happens for two reasons.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114, and therefore denies same.

115.     First, liquid AFO waste routinely gets overapplied. Transporting liquid waste is costly, with hauling costs generally exceeding fertilizer value after one mile. As a result, agricultural fields near AFOs typically receive far more nutrients than crops need. This is particularly true for phosphorus, which accumulates in soil. Such excess phosphorus is more likely to run off field edges or escape through subsurface drains following rain or snow melt.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115, and therefore denies same.

116.     Second, at least some portion of land-applied liquid AFO waste gets directly discharged to surface waters through the subsurface or "tile" drainage systems that pervade the western Lake Erie watershed.

31

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116, and therefore denies same.

117.     Much of the western Lake Erie watershed was originally a swamp. To make the land dry enough for agriculture, people began installing subsurface drainage systems in the 19th century. These systems originally consisted of clay "tiles;" but flexible, perforated plastic pipes are now commonly used. The western Lake Erie watershed is among the most heavily tiled in the country, with nearly all cropland containing pervasive subsurface piping.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117, and therefore denies same.

118.     Tile drainage systems draw moisture from the surface, either through soil infiltration or through inlets installed at the low point of fields. When enough liquid accumulates in the tile pipes, gravity causes it to flow to edge-of-field outfalls, which discharge directly into streams or into human-made ditches that empty into streams.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118, and therefore denies same.

119.     Tile drainage is particularly effective in the western Lake Erie watershed because the soils are pervasively cracked and fractured. These cracks and fractures, as well as earthworm burrows, create "preferential flow paths" for liquid to quickly flow down into tile systems.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119, and therefore denies same.

120.     When applied to tiled fields, liquid AFO waste behaves exactly like water: some portion of it, including DRP and other dissolved contaminants, travels quickly through preferential flow paths down into tile systems, which discharge into surface waters.

32

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120, and therefore denies same.

121.    Standard BMPs—which are designed to address overland flow—do not prevent discharges of dissolved contaminants through tile systems in the western Lake Erie watershed. For example, buffer strips—vegetated areas at the edge of crop fields—can slow overland runoff but do not stop dissolved contaminants from infiltrating the soil and getting into tile systems.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121, and therefore denies same.

122.    These tile drainage systems help to explain why DRP loads into western Lake Erie began spiking in the 1990s. This is the same time that AFOs began proliferating in the watershed and applying liquid waste to tiled fields. Extensive additional evidence links AFOs to DRP pollution in the watershed, including water testing data and upstream-downstream studies.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122, and therefore denies same.

**Failure to Comply with Clean Water Act Requirements to Reduce Lake Erie HABs**

123.    This is the fourth lawsuit ELPC has had to file, and the second that the Lucas County Board has filed, to require U.S. EPA and the State of Ohio to comply with their Clean Water Act obligations to clean up HABs in western Lake Erie. *See ELPC v. U.S. EPA*, No. 3:17-cv-01032 (N.D. Ohio) (Carr, J.); *ELPC v. U.S. EPA*, No. 3:17-cv-01514 (N.D. Ohio) (Carr, J.); *ELPC v. U.S. EPA*, No. 3:19-cv-00295 (N.D. Ohio) (Carr, J.) (consolidated with *Bd. of Lucas County Comm'rs v. U.S. EPA*, No. 3:19-cv-00873 (N.D. Ohio)). At every turn, the State of Ohio failed to fulfill its statutory obligations and U.S. EPA excused Ohio's noncompliance, violating its own Clean Water Act obligations by approving Ohio's improper actions.

**ANSWER**: The Coalition admits that ELPC and the Lucas County Board have filed

previous lawsuits alleging a failure to comply with the Clean Water Act, but the Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 123, and therefore denies same.

**Failure to Assess Lake Erie for Impairment**

124.     The Clean Water Act requires states to submit Integrated Reports to U.S. EPA every two years. These documents assess water bodies for impairment and rank impaired waters for receipt of TMDLs based on "the severity of the pollution and the uses to be made of the waters." 40 C.F.R. § 130.7(b)(4)-(5).

**ANSWER**: Admitted.

125.     Judge Carr issued an Opinion and Order in ELPC's second case that carefully describes "Ohio's Noncompliance [w]ith the CWA" between 2012 and 2016. *See ELPC v. U.S. EPA*, No. 3:17CV01514, ECF No. 29 (N.D. Ohio Apr. 11, 2018) ("2018 Opinion"). In essence, Ohio refused to assess the open waters of Lake Erie for impairment in its 2012, 2014, or 2016 Integrated Reports, despite U.S. EPA directing it to do so. U.S. EPA nonetheless approved Ohio's 2012 and 2014 Integrated Reports and then failed to approve or disapprove Ohio's 2016 Report within the statutory period. That failure prompted ELPC to file its first lawsuit (3:17-cv-01032) on May 17, 2017 to require U.S. EPA to act. Two days later, U.S. EPA formally approved Ohio's 2016 Integrated Report.

**ANSWER**: The allegations in Paragraph 125 contain Plaintiffs' characterization of a 2018 Opinion and Order, to which no response is required of the Coalition.  The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 125, and therefore denies same.

126.     On July 18, 2017, ELPC filed its second case (No. 3:17-cv-01514). ELPC claimed that U.S. EPA's approval of Ohio's 2016 Integrated Report was arbitrary and capricious and

contrary to law in violation of the APA because Ohio had refused to assess Lake Erie for impairment as required by 40 C.F.R. § 130.7(b)(5).

> **ANSWER**: The Coalition admits that ELPC filed Case Number 3:17-cv-01514 in this Court on July 18, 2017, but the Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 126, and therefore denies same.

127. Both Ohio EPA and U.S. EPA responded to the case with what Judge Carr described as "legal maneuvering," including conduct by U.S. EPA that Judge Carr said created a "whiff of bad faith." 2018 Opinion at 22, 16 n.8. After Judge Carr called out the agencies' misconduct, Ohio finally assessed western Lake Erie as impaired in an "amended" 2016 Integrated Report, which U.S. EPA approved.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127, and therefore denies same.

**Failure to Establish TMDLs**

128. Having been effectively forced to list Lake Erie as impaired, the agencies began resisting the next steps required by the Clean Water Act to remediate the impairment: properly ranking Lake Erie for receipt of a TMDL and then establishing the TMDL.

> **ANSWER**: The Coalition denies the allegations in Paragraph 128.

129. Ohio's 2018 Integrated Report designated Lake Erie as impaired and gave it the highest priority score of any Ohio waterbody. At the same time, the 2018 Integrated Report gave Lake Erie a "low" priority ranking for developing a TMDL. Ohio EPA said that instead of a TMDL, it would pursue vaguely defined alternative approaches to restoring Lake Erie and refused to commit to establishing a TMDL even if the alternatives failed. U.S. EPA nonetheless approved Ohio EPA's 2018 Integrated Report.

35

ANSWER: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129, and therefore denies same.

130.    ELPC filed its third case on February 7, 2019, *ELPC v. U.S. EPA*, (N.D. Ohio) (No. 19-cv-00295). The Lucas County Board then filed a parallel case with identical claims (No. 19-cv- 00873) and Judge Carr consolidated the two cases

ANSWER: The Coalition admits that ELPC filed Case Number 19-cv-00295 in this Court on February 7, 2019, but the Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 130, and therefore denies same.

131.    U.S. EPA moved to dismiss Plaintiffs' claims. In an Opinion and Order dated November 13, 2019, Judge Carr denied the motion, holding that "Ohio EPA is essentially delaying, and intends to continue to delay indefinitely, a TMDL for western Lake Erie in favor of alleged half measures [and] does not have a plan to change course should those measures fail to remediate Lake Erie." *ELPC v. U.S. EPA*, 415 F. Supp. 3d 775, 793, ECF No. 34 (N.D. Ohio 2019).

ANSWER: The allegations in Paragraph 131 contain Plaintiffs' characterization of U.S. EPA's motion to dismiss and Judge Carr's Order in *ELPC v. EPA*, 415 F. Supp. 3d 775 (N.D. Ohio 2019), to which no response is required of the Coalition.The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 131, and therefore denies same.

132.    At Judge Carr's encouragement, the parties mediated their dispute before Judge Dan Polster of the Eastern Division of this Court. The parties ultimately agreed to a consent decree setting a schedule for completion of a western Lake Erie TMDL: Ohio was to release a draft TMDL for public comment by December 30, 2022, and submit a final TMDL to U.S. EPA by June 30, 2023.

U.S. EPA would then have 90 days to approve or disapprove Ohio's submission, and a total of six months from submission to establish its own TMDL in the event of disapproval.

    **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132, and therefore denies same.

133.    Judge Carr entered the consent decree on April 5, 2023.

    **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133, and therefore denies same.

### Maumee Watershed Nutrient TMDL

134.    As the Consent Decree was being finalized, Ohio EPA worked to complete the Maumee TMDL. Ohio EPA released several preliminary documents for public comment—including a "Loading Analysis Plan"—leading up to release of the full Draft TMDL for public comment on December 30, 2022. Ohio EPA submitted its final Maumee TMDL to U.S. EPA on June 30, 2023.

    **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 134, and therefore denies same. The Coalition admits the allegations in the second sentence of Paragraph 134.

135.    The Maumee TMDL contains five legal defects that both violate the Clean Water Act and ensure that the TMDL will not sufficiently reduce phosphorus to remediate Lake Erie's impairment. The Maumee TMDL: (1) fails to set limits for DRP as required by 33 U.S.C. § 1313(d)(1)(C) and 40 C.F.R. § 130.7(c)(1)(ii); (2) fails to set an adequate margin of safety as required by 33 U.S.C. § 1313(d)(1)(C); (3) fails to assign wasteload allocations to discharging CAFOs as point sources as required by 40 C.F.R. § 130.2(h); (4) fails to apportion the load allocation to nonpoint sources as required by 40 C.F.R. § 130.2(g), Ohio Rev. Code 61111.562(B), and Ohio Admin. Code 3745-2-12(C); and (5) fails to provide "reasonable assurances" that

necessary pollution reductions will be achieved as required by U.S. EPA Guidance and Ohio Admin. Code 3745-2-12(E)(3).

>**ANSWER**: The Coalition denies the allegations in Paragraph 135.

136.    Plaintiffs and others explained these defects to Ohio EPA at every opportunity, but the agency refused to change course and follow the law.

>**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136, and therefore denies same.

**Legal Defect #1: Failure to Set DRP Limits**

137.    The Maumee TMDL acknowledges that DRP is "the main driver of Western Basin of Lake Erie HABs" and that reducing DRP loads by at least 40% is necessary to remediate Lake Erie.

>**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137, and therefore denies same.

138.    The Maumee TMDL does not, however, set limits for DRP. Instead, it sets a limit only for total phosphorus, equivalent to a 40% reduction from 2008 levels.

>**ANSWER**: Admitted.

139.    That failure to set DRP limits violates the Clean Water Act. TMDLs must "be established at a level necessary to implement the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C). As the TMDL document recognizes, "implementing applicable water quality standards" in Lake Erie requires a 40% reduction in DRP loads. That means the TMDL must be "established at a level necessary" to achieve a 40% DRP reduction.

>**ANSWER**: The Coalition denies the allegations in Paragraph 139.

140.    The Maumee TMDL violates that requirement because it sets no limit at all for DRP, which is the pollutant driving HAB formation. Instead, it requires only a 40% reduction in

total phosphorus.

**ANSWER**: The Coalition denies the allegations in Paragraph 140.

141.    Reducing total phosphorus by 40%, however, will not reduce DRP loads by that amount. Because DRP comprises only around 21% of total phosphorus with PP (particulate phosphorus) making up the rest, Ohio could reduce total phosphorus loads by 40% solely by reducing PP. Such a total phosphorus reduction would leave DRP loads (and on that basis the extent of HABs) unchanged.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141, and therefore denies same.

142.    Because the Maumee TMDL sets no DRP limits, it is not "established at a level necessary" to clean up the HABs and comply with the Clean Water Act, 33 U.S.C. § 1313(d)(1)(C).

**ANSWER**: The Coalition denies the allegations in Paragraph 142.

143.    Because total phosphorus and DRP are different pollutants, the TMDL's failure to set DRP limits also violates U.S. EPA regulations, which state that "TMDLs shall be established for ***all*** pollutants preventing or expected to prevent attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii) (emphasis added).

**ANSWER**: The Coalition denies the allegations in Paragraph 143.

144.    Dr. Jeffrey Reutter, who co-led the Task Team that set the 40% reduction targets, filed extensive comments during the Maumee TMDL development process explaining why it was necessary for Ohio EPA to set DRP limits.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144, and therefore denies same.

145.    In his comments on the Loading Analysis Plan (submitted on October 21, 2021),

Dr. Reutter said that setting a limit only for total phosphorus would be a "huge mistake." He emphasized that there was "complete agreement [among the Task Team] that DRP was by far the most important component and increases in DRP loading were driving HABs" and that "achieving only the [total phosphorus] goal will not" remediate Lake Erie.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145, and therefore denies same.

146.    Dr. Reutter's later comments on the Draft TMDL, dated March 6, 2023, were even more pointed. He said that if Ohio EPA insisted on setting targets only for total phosphorus, "the TMDL is doomed to failure, and we should not even waste the money to do it." Dr. Reutter explained that "[o]ur efforts to only monitor and control TP loading had allowed DRP to surge and cause the crisis."

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146, and therefore denies same.

**Legal Defect #2: Failure to Set Adequate Margin of Safety**

147.    The Clean Water Act requires a TMDL to incorporate a "margin of safety" to "take into account any lack of knowledge concerning the relationship between effluent limitations" (the wasteload and load allocations) "and water quality." 33 U.S.C. § 1313(d)(1)(C). *See also* 40 C.F.R. § 130.7(c)(1) (same). The margin of safety accounts for any uncertainty as to whether achieving the wasteload and load allocations will, in fact, remediate the impairment.

> **ANSWER**: The Coalition admits the first sentence of Paragraph 147 and denies the second sentence of Paragraph 147.

148.    The Maumee TMDL claims to include a significant "implicit" margin of safety because it uses supposedly "conservative" assumptions and methods. The Maumee TMDL also adds an "explicit" margin of safety equal to 3% of the total loading capacity.

40

**ANSWER**: The Coalition admits that Maumee TMDL includes a significant "implicit" margin of safety because it uses "conservative" assumptions and methods, and adds an "explicit" margin of safety equal to 3% of the total loading capacity.

149.    This margin of safety is not sufficient to comply with the Clean Water Act.

**ANSWER**: The Coalition denies the allegations in Paragraph 149.

150.    As explained above, the Maumee TMDL's load and wasteload allocations are set only for total phosphorus but water quality is driven by DRP. Indeed, as Dr. Reutter's Draft TMDL comments pointed out, total phosphorus loads could be reduced by 40% without DRP declining at all and reducing DRP by 40% could require total phosphorus reductions of well over 80%.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 150, and therefore denies same.

151.    For this reason alone, the margin of safety in a total phosphorus-only TMDL should have been at least 40% (40% TP reduction in TMDL + 40% margin of safety = 80% total reduction). According to Dr. Reutter, "anything less than [40%] is certainly no 'margin of safety."

**ANSWER**: The Coalition denies the allegations in Paragraph 151.

152.    Even apart from the DRP issue, the 3% explicit margin of safety is inadequate because of uncertainties raised by climate change (discussed above).

**ANSWER**: The Coalition denies the allegations in Paragraph 152.

153.    A 3% margin of safety is also well below the general norm for TMDLs. For instance, Minnesota typically uses a 10% explicit margin of safety in TMDLs and Michigan recently used a 15% explicit margin of safety for the Ford/Belleville Lakes phosphorus TMDL. Ohio itself used a 5% margin of safety—describing it as "relatively low"—in the Black River TMDL, which included nutrients. *See* Black River Watershed TMDL, Ohio EPA (May 30, 2008).

41

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153, and therefore denies same.

**Legal Defect #3: Failure to Assign Wasteload Allocations to Discharging CAFOs**

154.    A TMDL must assign wasteload allocations to all discharging point sources. 40 C.F.R. § 130.2(h). CAFOs are included in the Clean Water Act's definition of "point source." 33 U.S.C. § 1362(14). Consequently, if CAFOs discharge pollutants, they must receive wasteload allocations in a TMDL.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154, and therefore denies same.

155.    The Maumee TMDL recognizes that there are at least 73 Large CAFOs in the Maumee River watershed in Ohio. The Maumee TMDL does not, however, assign wasteload allocations to any of them. Instead, it treats all Large CAFOs (and all smaller AFOs) as nonpoint sources subject to the single "landscape" load allocation discussed below. The Maumee TMDL defends this approach by insisting that no CAFOs in the watershed are discharging point sources under the Clean Water Act.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155, and therefore denies same.

156.    In fact, all dairy and most swine CAFOs in the watershed are discharging point sources because, among other reasons, they use liquid waste systems and nearly all fields in the Ohio portion of the Maumee watershed have pervasive subsurface tile drainage. When liquid manure and other CAFO waste is applied on tile-drained fields, at least some portion of it quickly flows down through the fractures and other preferential flow paths into tile systems. Those systems then discharge the liquid, including dissolved contaminants like DRP, to surface waters.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 156, and therefore denies same.

157.    The Maumee TMDL insists that these CAFO discharges do not require wasteload allocations because they are subject to what is known as the agricultural stormwater exemption. This is the same rationale Ohio uses in failing to require CAFOs to get NPDES permits; instead, it requires CAFOs to obtain "no discharge" permits from the Ohio Department of Agriculture.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157, and therefore denies same.

158.    U.S. EPA's and Ohio's reliance on the agricultural stormwater exemption is not supported by law.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156, and therefore denies same.

159.    Clean Water Act regulations state that a discharge "as a result of" land application of CAFO waste "is a discharge subject to NPDES permit requirements" unless it amounts to "agricultural stormwater." 40 C.F.R. § 122.23(e). *See also* Ohio Admin. Code 901:102-14.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159, and therefore denies same.

160.    "Agricultural stormwater discharge" is defined as:

> *runoff generated by precipitation that drains over terrain* used for agriculture as defined in section 1.61 of the Revised Code that conveys manure to waters of the state, provided that the manure has been applied in accordance with site specific nutrient management practices that *ensure appropriate agricultural utilization of nutrients in manur*e in compliance with the best management practices set forth in Chapter 901:10-2 of the Administrative Code.

Ohio Admin. Code 901:10-1-01 (emphasis added). *See also* 40 C.F.R. § 122.23(e).

> **ANSWER**: Admitted.

161.    Discharges resulting from application of liquid CAFO waste to tile-drained fields

do not meet the definition of "agricultural stormwater discharge" for three independent reasons.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 161, and therefore denies same.

162.    First, such discharges are not "runoff generated by precipitation that drains ***over***" agricultural terrain; instead, they result from liquid waste flowing straight into the tile lines, even during dry weather, which then inevitably discharge it to Ohio's waters. Discharge of liquid waste through tile systems is not "runoff" as commonly understood—accidental precipitation-caused discharge that can occur despite a farmer's best efforts to prevent it—but rather the outcome of a human-engineered system operating as designed.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162, and therefore denies same.

163.    Second, nutrients in CAFO waste that flow directly into tile drain systems cannot support crop growth and, therefore, are not subject to any, let alone "appropriate," "agricultural utilization." If a field is significantly tiled, following "site specific nutrient management practices that ***ensure*** appropriate agricultural utilization of the nutrients" would necessarily mean that liquid waste could not be applied to it.

**ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163, and therefore denies same.

164.    Third, many, if not most, CAFOs cannot satisfy the "agricultural utilization" requirement because they spread waste on fields that are already overloaded with phosphorus.

**ANSWER:** The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164, and therefore denies same.

165.    According to the Tri-State Fertilizer Recommendations applicable in Ohio, there is

"*no agronomic reason* to apply fertilizer" when soil test phosphorus levels exceed crop "maintenance limits," which for corn and soybeans is equivalent to 30 ppm on the Bray-P1 scale (emphasis added). Steve Culman et al., Tri-State Fertilizer Recommendations for Corn, Soy, Wheat & Alfalfa 25, 27-28 (2020).

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165, and therefore denies same.

166.    CAFOs routinely apply waste when soil test phosphorus levels exceed these "maintenance limits." Ohio regulations allow manure application until soil test phosphorus levels reach *150 ppm* Bray-P1 (five times the Tri-State recommended levels), even while barring application of synthetic fertilizer when levels exceed 40 ppm Bray-P1. *See* Appendix E Table 2 to Ohio Admin. Code 901:10-2-14.

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166, and therefore denies same.

167.    Because the agricultural stormwater runoff exemption does not apply to discharges of liquid CAFO waste through tile drainage systems, CAFOs applying liquid waste to tile-drained fields are discharging point sources that require wasteload allocations. The Maumee TMDL's failure to assign such wasteload allocations violates 40 C.F.R. § 130.2(h).

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166, and therefore denies same.

168.    The Maumee TMDL also should have assigned wasteload allocations to all medium AFOs (equivalent to 200-699 mature dairy cows or 750-2,499 swine weighing more than 55 lbs) that meet the definition of "Medium CAFO." *See* 40 C.F.R. § 122.23(a) & (d)(1); Ohio Admin. Code 3745-33-02(A).

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 168, and therefore denies same.

169.    A medium AFO meets the definition of a "Medium CAFO" if it "[d]ischarges pollutants into waters of the United States through a ditch, . . . flushing system . . . or another similar device constructed by humans." Ohio Admin. Code 903.01(Q). *See also* 40 C.F.R. § 122.23(6)(i)(A).

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 169, and therefore denies same.

170.    All dairy and most swine medium AFOs in the Maumee River watershed (of which there are more than 1,500 in Ohio) meet the "Medium CAFO" definition. Just as with Large CAFOs, these medium AFOs apply liquid waste to tile-drained fields. At least some of that waste flows directly into the tile lines and are not "agricultural stormwater" for the reasons explained above. The tile lines discharge into ditches (which flow into streams) or streams themselves, many of which would qualify as "waters of the United States." Both the tile drainage systems and ditches are "constructed by humans." Ohio Admin. Code 903.01(Q). Therefore, the Maumee TMDL's failure to assign wasteload allocations to discharging Medium CAFOs violates 40 C.F.R. § 130.2(h).

> **ANSWER**: The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 170, and therefore denies same.

**Legal Defect #4: Failure to Apportion Load Allocation**

171.    TMDL must assign "load allocations" to all nonpoint sources. 40 C.F.R. § 130.2(g). "Load allocations are best estimates of the loading, which may range from reasonably accurate estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading." *Id.*

**ANSWER:** Admitted.

172.     Load allocations must be based on existing and "reasonably anticipated" increases or reductions in pollutant loadings. Ohio Admin. Code 3745-2-12(C)(1). To the extent load allocations are based on anticipated reductions, the TMDL must collect and analyze "monitoring data . . . in order to validate the TMDL's assumptions [and] verify anticipated load reductions." Ohio Admin. Code 3745-2-12(C)(2).

**ANSWER:** Denied.

173.     In determining load allocations, the agency must "consider and evaluate, at a minimum, all of" seven listed factors. Ohio Rev. Code 6111.562(B)(1)-(7). These statutory factors include "flow dynamics, including, but not limited to, periodic or seasonal flow variations" as well as "the degree to which nonpoint source reductions would influence attainment of the applicable water quality standard." *Id.* at 6111.562(B)(2)(4). Another factor is "[r]easonable assurances that reductions can be implemented." *Id.* at 6111.562(B)(5).

**ANSWER:** Admitted.

174.     The Maumee TMDL violates these statutory and regulatory requirements by using a single "landscape" nonpoint source load allocation across the entire watershed. This "landscape" load allocation assumes that nonpoint source phosphorus loads—and potentials for reduction—are equivalent across the watershed.

**ANSWER:** The Coalition denies the allegations in Paragraph 174.

175.     In fact, nonpoint source pollution loads vary widely around the Maumee River watershed. The southern sub-watersheds, particularly the Auglaize and the St. Mary's, are the most agricultural and AFO-intensive. Agriculture is the largest nonpoint source category. Consequently, there are significantly more nonpoint sources, and significantly more nonpoint source pollution, in

the St. Mary's and other southern sub-watersheds than in the northern sub-watersheds.

> **ANSWER:** The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 175, and therefore denies same.

176.    The Maumee TMDL explicitly acknowledges that extensive water monitoring data shows that phosphorus loads and concentrations in the southern sub-watersheds are generally much higher than in the northern sub-watersheds.

> **ANSWER:** The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 176, and therefore denies same.

177.    By nevertheless allocating the entire nonpoint source load equally across the watershed, the Maumee TMDL fails to establish load allocations based on "best estimates" and "available data" as required by 40 C.F.R. § 130.2(g) or fulfill the other legal requirements explained above. Load allocations must reflect basic realities about the location of nonpoint sources across the watershed, which, in this case, requires apportioning a larger share of the total nonpoint source load to nonpoint sources in the southern as opposed to northern watersheds.

> **ANSWER**: The Coalition denies the allegation in Paragraph 177.

178.    Properly apportioning the load allocation is also essential to providing "reasonable assurances" of nonpoint source reductions, as discussed below.

> **ANSWER:** The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 178, and therefore denies same.

**Legal Defect #5: Inadequate Implementation Plan and Failure to Provide Reasonable Assurances**

179.    TMDLs must include a "[p]reliminary TMDL implementation plan establishing specific actions, schedules and monitoring proposed to effectuate a TMDL." Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f). In cases where "a TMDL implementation plan will not immediately

attain water quality standards, the TMDL implementation plan shall reflect reasonable assurances that water quality standards will be attained in a reasonable period of time." Ohio Admin. Code 3745-2-12(E)(3). *See also* Ohio Rev. Code 6111.562(B)(5).

**ANSWER:** Admitted.

180.    The Consent Decree also required the TMDL to include "an implementation plan as required by Ohio Administrative Code 3745-2-12(E)."

**ANSWER:** The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 180, and therefore denies same.

181.    U.S. EPA Guidance requires TMDLs to provide "reasonable assurances that nonpoint source reduction will in fact be achieved." U.S. EPA Guidance at 15.

**ANSWER:** The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181, and therefore denies same.

182.    The Maumee TMDL's implementation plan does not comply with these "reasonable assurances" requirements.

**ANSWER:** The Coalition denies the allegations in Paragraph 182.

183.    First, the Maumee TMDL does not provide "reasonable assurances that water quality standards will be attained in a reasonable period of time" (Ohio Admin. Code 3745-2-12(E)(3)) because it does not require reductions in DRP, which is the pollutant causing Lake Erie's impairment.

**ANSWER:** The Coalition denies the allegations in Paragraph 183.

184.    Second, even with respect to total phosphorus, the Maumee TMDL does not provide "specific actions, schedules and monitoring" (Ohio Admin. Code 3745-2-12(A)(2)(a)(iv)(f)) needed to provide "reasonable assurances" that "water quality standards will

49

be attained in a reasonable amount of time." Ohio Admin. Code 3745-2-12(E)(3).

**ANSWER:** The Coalition denies the allegations in Paragraph 184.

185.     The Maumee TMDL does not set any schedule for reducing total phosphorus loads. It contains no interim target loads for total phosphorus, even though loads and concentrations of that pollutant, as well as DRP, are already routinely measured across the watershed. The Maumee TMDL does not even set a date for achieving its final goal of a 40% total phosphorus reduction.

**ANSWER:** The Coalition denies the allegations in Paragraph 185.

186.     The Maumee TMDL Implementation Plan is no more than a laundry list of past and ongoing BMP programs, most of which have been failing for years. The Implementation Plan does not identify anything that Ohio will do differently to make these programs effective or explain why Ohio EPA believes they will suddenly start working, let alone how they will achieve a 40% reduction in phosphorus loads. The Maumee TMDL does not propose any schedule for imposing backstop measures if, as there is every reason to expect, the current programs continue to fail.

**ANSWER:** The Coalition denies the allegations in Paragraph 186.

187.     The Implementation Plan also fails to propose taking numerous steps to reduce phosphorus pollution that Ohio EPA and the Ohio Department of Agriculture can, and in some cases must, take under current law, including:

(a)     requiring CAFOs that discharge by applying liquid waste on tiled fields to obtain NPDES permits;

(b)     targeting BMPs to areas where they can be more effective and measuring their impact, focusing on pollution reduction instead of "money spent" and "acres enrolled;"

(c)     improving enforcement of existing CAFO permits;

(d)      improving data collection and analysis; and

(e)      implementing Ohio's "Watershed in Distress" program under Ohio Rev. Code 901:13-1-20.

**ANSWER:** The Coalition denies the allegations in Paragraph 187.

188.    The Maumee TMDL does not include an implementation plan that provides "reasonable assurances" of pollution reductions as required by law.

**ANSWER:** The Coalition denies the allegations in Paragraph 188.  .

**Final Maumee TMDL and U.S. EPA Approval**

189.    Ohio EPA submitted its final Maumee TMDL to U.S. EPA on June 30, 2023. The final TMDL did not correct any of the defects in the Draft that Plaintiffs and others identified. The draft and final TMDLs were nearly identical, except for a perfunctory "response to comments" section that purported, but failed, to address Plaintiffs' and other commenters' concerns.

**ANSWER:** The Coalition admits that Ohio submitted the final Maumee TMDL to U.S. EPA on June 30, 2023, but denies the remaining allegations in Paragraph 189.

190.    Plaintiffs met with U.S. EPA officials and staff to urge them to disapprove the defective Maumee TMDL. These meetings included: (a) an in-person meeting at U.S. EPA Region 5 headquarters where counsel for the Lucas County Board and ELPC gave a detailed presentation about the legal defects in Ohio's draft TMDL; and (b) a Zoom meeting between the Region 5 Administrator (Defendant Debra Shore) and her staff, all three Lucas County Board members, Toledo Mayor Wade Kapszukiewicz, and ELPC. The Lucas County Commissioners and Mayor Kapszukiewicz asked Regional Administrator Shore to disapprove the TMDL and prepare a lawful and effective TMDL. They emphasized the massive economic and public health burden that Lucas County and the City of Toledo suffer as a result of HABs and the unfairness of allowing upstream agriculture to externalize its waste disposal and environmental costs onto their constituents.

51

**ANSWER:** The Coalition lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 190, and therefore denies same.

191.    On September 28, 2023, U.S. EPA nonetheless approved the Maumee TMDL, finding that it "satisf[ied] all elements for approvable TMDLs." U.S. EPA, Decision Document for the Maumee Watershed Nutrient TMDL, In All or Parts of 18 Counties In Northwestern Ohio 69 (Sept. 28, 2023).

**ANSWER**: Admitted.

192.    U.S. EPA issued several documents related to the approval, including a primary "Decision Document" and attachments addressing "EPA Review of" two key issues: DRP and CAFOs. These documents completely deferred to Ohio EPA and found that Plaintiffs' objections did not preclude approval of the TMDL. In the process, these documents ignored or mischaracterized scientific evidence and misapplied the law. U.S. EPA allowed Ohio to violate its Clean Water Act obligations, and in doing so, violated its own.

**ANSWER**: The Coalition admits that U.S. EPA issued these documents, but the Coalition lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 192, and therefore denies same.

## COUNT I

### Violation of 5 U.S.C. § 706

193.    Plaintiffs reallege paragraphs 1-192 above and incorporate them by reference in this Count I.

**ANSWER**: The Coalition incorporates by reference its responses to Paragraphs 1 through 192 as if fully set forth herein.

194.    The APA requires courts to "hold unlawful and set aside" any "final agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706.

**ANSWER:** Admitted.

195.    U.S. EPA's Approval of Ohio EPA's TMDL was a "final agency action" because it: (1) was the consummation of U.S. EPA's decision-making process on the TMDL under 40 C.F.R. § 130.7; and (2) determined rights and obligations of the parties or caused legal consequences.

**ANSWER**: Denied.

196.    U.S. EPA's approval of Ohio EPA's TMDL was "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law" because the TMDL failed to comply with the Clean Water Act and applicable regulations and will not lead to the remediation of Lake Erie's impairment. These legal defects include:

- failure to set limits on DRP as required by 33 U.S.C. § 1313(d)(1)(C) and 40 C.F.R.§ 130.7(c)(1)(ii);

- failure to set an adequate margin of safety as required by 33 U.S.C. § 1313(d)(1)(C);

- failure to assign wasteload allocations to discharging CAFOs as point sources as required by 40 C.F.R. § 130.2(h);

- failure to apportion the load allocation among nonpoint sources as required by 40 C.F.R. § 130.2(g); Ohio Rev. Code 6111.562(B)(1-7); and Ohio Admin. Code 3745- 212(C); and

- failure to include an implementation plan that provides "reasonable assurances" that target pollution loads will be reached as required by Ohio Admin. Code 3745-2-2(A)(2)(a)(iv)(f) and 3745-2-12(E)(3) and U.S. EPA Guidance at 15.

While each of these failures alone would be sufficient to make U.S. EPA's approval of the

TMDL arbitrary and capricious and contrary to law in violation of the APA, the violations are even more compelling when these failings are considered together.

      **ANSWER**: The Coalition denies the allegations in Paragraph 196.

**ADDITIONAL DEFENSES**

1.     Plaintiffs have failed to state a claim upon which relief can be granted.

2.     Plaintiffs' claims are barred by collateral estoppel or waiver to the extent that they were not raised in the administrative process during the development of the Maumee TMDL.

3.     Plaintiffs' Complaint fails to state a claim upon which relief can be granted because U.S. EPA's review of state-issued TMDLs is a procedural, not substantive, review limited to a 30-day determination whether to approve or disapprove the TMDL based on whether the Agency's checklist of items is contained in the state-issued TMDL.

4.     Plaintiffs' Complaint fails to state a claim upon which relief can be granted because Plaintiffs may not challenge Ohio EPA's decisions that underlie the Maumee TMDL, which are a matter of state law, in the context of a challenge to U.S. EPA's limited procedural review and approval thereof.

5.     Plaintiffs' Complaint fails to state a claim upon which relief can be granted because the Court lacks subject matter jurisdiction to hear a challenge to Ohio EPA's state law decisions that underlie the Maumee TMDL.

6.     Plaintiffs' Complaint fails to state a claim upon which relief can be granted because exclusive original jurisdiction to hear a challenge to final actions taken by Ohio

54

EPA is vested in the Environmental Review Appeals Commission under Ohio Revised Code § 3745.04.

7.      Plaintiffs' Complaint fails to state a claim for which relief can be granted because Plaintiffs failed to avail themselves of their statutory right under Ohio law to assert a challenge to the Maumee TMDL.

8.      The Coalition reserves the right to add defenses as may be developed during litigation and reserves the right to request such additional relief as the Court may deem just and proper, including an award of such costs, disbursements, and attorney's fees as appropriate.

                                   Respectfully submitted,

                                   */s/ Stephen P. Samuels*
                                   Stephen P. Samuels (007979) (Trial Counsel)
                                   Stephen N. Haughey (0010459)
                                   Christina Wieg (0098693)
                                   **FROST BROWN TODD LLP**
                                   10 West Broad Street
                                   Columbus, OH 43215-3484
                                   (614) 559-7259
                                   ssamuels@fbtlaw.com
                                   shaughey@fbtlaw.com
                                   cwieg@fbtlaw.com
                                   *Counsel for the Maumee Coalition II Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Answer was filed this ____ day of _____ 2024, with the Court's electronic docketing system, and parties may access the filing through that system.

                                   */s/ Stephen P. Samuels*
                                   *Counsel for the Maumee Coalition II Association*

0148224.0747190   4874-1951-0260v1